UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THE ESTATE OF LORETTE JOLLES     :
SHEFNER by and through its executors     :
Mr. Barry Shefner, Ms. Ariela Braun, and     :
Mr. Leon Miller,     :
    :
          Plaintiff,     :
    :     **ECF CASE**
        - v.-     :
    :     08 Civ. 4443 (LTS)
MAURICE TUCHMAN, ESTI DUNOW,     :
GALERIE CAZEAU-BÉRAUDIÈRE,     :
the NATIONAL GALLERY OF ART,     :
LONTREL TRADING, and JOHN DOES     :
1-10,     :
    :
          Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL GALLERY OF ART'S MOTION TO DISMISS THE COMPLAINT

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant the National Gallery of Art
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2709
Facsimile: (212) 637-2702

SARAH S. NORMAND
Assistant United States Attorney

    - Of Counsel -

# TABLE OF CONTENTS

Preliminary Statement. ............................................................................................... 1

STATEMENT OF FACTS. ......................................................................................... 3

    A.    Shefner's Ownership and Sale of the Painting............................................ 3

    B.    The NGA's Purchase of the Painting. .................................................... 5

ARGUMENT. ............................................................................................................ 6

POINT I:    THE ESTATE'S REPLEVIN AND DECLARATORY JUDGMENT
             CLAIMS SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6). ............ 6

    A.    Applicable Pleading Standards. ................................................................ 6

        1.    Rule 12(b)(6). ................................................................................ 6

        2.    Rule 9(b). ...................................................................................... 8

    B.    The Estate Fails to State a Claim Against the NGA for Replevin or a
        Declaratory Judgment. ............................................................................ 9

        1.    The Complaint Does Not Adequately Allege Reasonable
            Reliance by Shefner, a Necessary Element of Its Fraud Claim................ 10

            a.    The Complaint Alleges That Tuchman and Dunow
                Disclosed That They Represented the Prospective
                Purchasers of the Painting............................................. 11

            b.    The Complaint Does Not Allege That Shefner
                Took Any Steps to Investigate the Painting's Value.................... 15

        2.    Even If the Complaint Adequately Alleged Fraud, It Fails
            to State a Claim That the NGA Was Not a Good Faith
            Purchaser. .............................................................................. 17

            a.    The NGA Had No Duty to Inquire Into the
                Circumstances of Prior Sales Absent Any Warning
                That the Seller Lacked Valid and Transferrable
                Title to the Painting..................................................... 18

b.    The Complaint Fails to Allege Any Warning That Would Have Triggered a Duty by the NGA to Investigate the Circumstances Surrounding Shefner's Sale of the Painting. ...................................................... 21

c.    Even If the NGA Had Conducted the Inquiry That the Estate Claims Was Necessary, It Would Not Have Revealed the Alleged Fraud. ........................................................ 26

POINT II:    THE ESTATE'S UNJUST ENRICHMENT CLAIM AGAINST THE NGA SHOULD BE DISMISSED PURSUANT TO RULES 12(b)(1) AND 12(b)(6). ........................................................ 29

A.    The Estate Fails to Allege a Proper Basis for Jurisdiction Over Its Unjust Enrichment Claim. ........................................................ 29

B.    The Estate Fails to State a Claim Against the NGA for Unjust Enrichment. ........................................................ 32

CONCLUSION. ........................................................ 34

# TABLE OF AUTHORITIES

*Cases*                                                                         *Page*

Abercrombie v. Andrew College, 438 F. Supp. 2d 243 (S.D.N.Y. 2006). .................................. 12

American Mayflower Life Ins. Co. v. Moskowitz, 794 N.Y.S.2d 32
    (N.Y. App. Div. 2005). ........................................................................................ 33

Astor Holdings, Inc. v. Roski, No. 01 Civ. 1905(GEL), 2002 WL 72936
    (S.D.N.Y. Jan. 17, 2002). ............................................................................... 32, 33

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007). .............................................................. 7

Branch v. FDIC, 825 F. Supp. 384 (S.D.N.Y. 1993). .................................................................. 32

Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655
    (2d Cir. 1997). ................................................................................................... 8

Cantor v. Anderson, 639 F. Supp. 364 (S.D.N.Y. 1986). ...................................................... 20, 25

Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704 (2d Cir. 2006). ................................................. 8

Chem-Nuclear Sys., Inc. v. Arivec Chems., Inc., 978 F. Supp. 1105
    (N.D. Ga. 1997). ............................................................................................... 32

Cohen v. Colistra, 233 A.D.2d 542 (N.Y. App. Div. 1996). ................................................. 15, 16

Conley v. Gibson, 355 U.S. 41 (1957). ......................................................................................... 7

De Jesus v. Sears, Roebuck & Co., 87 F.3d 65 (2d Cir. 1996). ................................................... 8

Dep't of Army v. Blue Fox, Inc., 525 U.S. 255 (1999). ......................................................... 29, 30

Dodge v. Trustees of Nat'l Gallery of Art, 326 F. Supp. 2d 1 (D.D.C. 2004). ........................... 30

Dow Jones & Co. v. Int'l Secs. Exch., Inc., 451 F.3d 295 (2d Cir. 2006). .................................. 8

Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189
    (2d Cir. 2003) ................................................................................................... 13

FDIC v. Walker, 815 F. Supp. 987 (N.D. Tex. 1997). ................................................................. 32

Feng Suo Zhou v. Li Peng, 286 F. Supp. 2d 255 (S.D.N.Y. 2003). ............................................ 30

iii

Franconia Assocs. v. United States, 536 U.S. 129 (2002). ............................................. 30

Garner v. First Nat'l City Bank, 465 F. Supp. 372 (S.D.N.Y. 1979) ............................. 27

Glidepath Holding B.V. v. Spherion Corp., No. 04 Civ. 9758(KMK),
    2007 WL 2176072 (S.D.N.Y. July 26, 2007). .......................................... 10, 16

Green v. Beer, No. 06 Civ. 4156(KMW), 2007 WL 576089
    (S.D.N.Y. Feb. 22, 2007). ................................................................... 31

Gutekunst v. Continental Ins. Co., 486 F.2d 194 (2d Cir. 1973). ................................. 20

Hope v. Klabal, 457 F.3d 784 (8th Cir. 2006). ...................................................... 13, 16

Huang v. Sy, No. 15155/90, 2008 WL  553646 (N.Y. Sup. Ct. 2008). ........................... 33

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007), cert. granted, Ashcroft v. Iqbal,
    2008 WL 336310, 76 U.S.L.W. 3417, 76 U.S.L.W. 3649,
    76 U.S.L.W. 3654 (U.S. Jun 16, 2008) (No. 07-1015). ................................ 7

John Paul Mitchell Sys. v. Quality King Distributors, Inc., No. 99 Civ. 9905(SHS),
    2001 WL 910405 (S.D.N.Y. Aug. 13, 2001). .......................................... 9

Johnson v. Smithsonian Inst., 189 F.3d 180 (2d Cir. 1999). .................................... 30

Johnson & Johnson Products, Inc. v. DAL Int'l Trading Co.,
    798 F.2d 100 (3d Cir. 1986)............................................................. 17, 20

Kinstlinger v. Mfrs. Trust Co., 117 N.Y.S. 147 (N.Y. App. Div. 1952). ...................... 27

Kregos v. Associated Press, 3 F.3d 656 (2d Cir. 1993). ......................................... 12

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413 (1996). ............................... 10

Lane v. Pena, 518 U.S. 187 (1996). .................................................................... 30

Lindholm v. Brant, 925 A.2d 1048 (Conn. 2007).............................................. passim

Louis Price Paper Co. v. Fed'n Employment & Guidance Serv.,
    Nos. 1024520/1994, 38, 1994 WL 116649 (N.Y. Sup. Feb. 28, 1994). ............ 19

Mills v. Polar Molecular Corp., 12 F.3d 1170 (2d Cir. 1993). ................................... 8

Morgold, Inc. v. Keeler, 891 F. Supp. 1361 (N.D. Cal. 1995)............................... passim

Payday Advance Plus, Inc. v. Findwhat.com, Inc., 478 F. Supp. 2d 496
    (S.D.N.Y. 2007). ................................................................. 31

Pesnell v. United States, 64 Fed. Appx. 73 (9th Cir. 2003). ......................................... 31

Pinney v. Beckwith, 202 A.D.2d 767 (N.Y. App. Div. 1992). ............................... 15, 16

In re Polis, 217 F.3d 899 (7th Cir 2000). ................................................... 23

Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117 (2d Cir. 2007). .................. 7

Porter v. Wertz, 68 A.D.2d 141 (N.Y. App. Div. 1979), aff'd,
    53 N.Y.2d 696 (1981). ................................................................. 28

Porter v. Wertz, 53 N.Y.2d 696 (1981). ............................................................. 28

Robinson v. Overseas Military Sales Corp., 21 F.3d 502 (2d Cir. 1994). ..................... 30

Roth v. Jennings, 489 F.3d 499 (2d Cir. 2007). ........................................... 4, 24

Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011 (2d Cir. 1989). ...................... 12

Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236 (2d Cir. 2002). ........................... 8

Stuart Silver Assocs., Inc. v. Baco Dev. Corp., 245 A.D.2d 96
    (N.Y. App. Div. 1997). ................................................................. 15

Tanzman v. La Pietra, 8 A.D.3d 706 (N.Y. App. Div. 2004). ............................... 15, 16

United States v. $30,006.25 in U.S. Currency, 236 F.3d 610 (10th Cir. 2000). ........................ 32

United States v. Lavin, 942 F.2d 177 (3d Cir. 1991) .............................................. 18

United States v. Sherwood, 312 U.S. 584 (1941). ........................................... 30

U.S. Envtl. Prot. Agency v. General Elec. Co., 197 F.3d 592 (2d Cir. 1999),
    opinion amended on reh'g, 212 F.3d 689 (2d Cir. 2000). ............................... 29

Volt Delta Res., LLC v. Soleo Commc'ns Inc., 816 N.Y.S.2d 702,
    2006 WL 800791 (N.Y. Sup. 2006). ................................................................. 9

Weldon v. United States, 70 F.3d 1 (2d Cir. 1995). ........................................... 31

Westbay Steel, Inc. v. United States, 970 F.2d 648 (9th Cir. 1992). ........................... 32

v

In re World Trade Center Disaster Site Litig., 521 F.3d 169 (2d Cir. 2008) .............................. 31

Wright v. United States, 902 F. Supp. 486 (S.D.N.Y. 1995)........................................................ 31

*Statutes*

20 U.S.C. § 41 et seq............................................................................................................... 30

20 U.S.C. § 72(a). ................................................................................................................... 30

Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80........................................................ 6

28 U.S.C. § 1346(b). ........................................................................................................... 9, 31

28 U.S.C. § 1346(b)(1). ............................................................................................................. 9

28 U.S.C. § 2201...................................................................................................................... 31

28 U.S.C. § 2679(a). .................................................................................................................. 9

N.J. U.C.C. § 2-403(1). ........................................................................................................... 20

N.Y. C.P.L.R. Art. 71. ............................................................................................................... 9

N.Y. U.C.C. § 1-201(19) ......................................................................................................... 18

N.Y. U.C.C. § 2-103(1)(b)........................................................................................................ 18

N.Y. U.C.C. § 2-104(1) ............................................................................................................ 19

N.Y. U.C.C. § 2-403 ................................................................................................................ 18

N.Y. U.C.C. § 2-403(1) ............................................................................................................ 17

N.Y. U.C.C. § 8-301 ................................................................................................................. 20

N.Y. U.C.C. § 8-304 ................................................................................................................. 20

*Rules*

Fed. R. Civ. P. 9(b). .................................................................................................................. 8

Fed. R. Civ. P.  12(b)(1)..................................................................................................... 3, 8, 17

Fed. R. Civ. P.  12(b)(6)............................................................................................... *passim*

vi

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| THE ESTATE OF LORETTE JOLLES SHEFNER by and through its executors Mr. Barry Shefner, Ms. Ariela Braun, and Mr. Leon Miller, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | **ECF CASE** |
| - v.- | : | |
| | : | 08 Civ. 4443 (LTS) |
| MAURICE TUCHMAN, ESTI DUNOW, GALERIE CAZEAU-BÉRAUDIÈRE, the NATIONAL GALLERY OF ART, LONTREL TRADING, and JOHN DOES 1-10, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL GALLERY
OF ART'S MOTION TO DISMISS THE COMPLAINT**

**Preliminary Statement**

Defendant the National Gallery of Art ("NGA"), by and through its attorney,

Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully

submits this memorandum of law in support of its motion to dismiss the complaint

("Complaint") brought by plaintiff, the Estate of Lorette Jolles Shefner ("Shefner"), by and

through its executors Barry Shefner, Ariela Braun, and Leon Miller (collectively, the "Estate"),

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

The Estate brings replevin, unjust enrichment and declaratory judgment claims

against the NGA, seeking to recover a work of art painted by artist Chaim Soutine, entitled *Piece*

*of Beef* (the "Painting").  Shefner, assisted by her children Barry Shefner and Ariela Braun

("Braun") (collectively, the "children"), sold the Painting to or through defendants Maurice

Tuchman ("Tuchman") and Esti Dunow ("Dunow") for $1 million in May 2004.  Having learned

that Tuchman and Dunow a short time later sold the Painting to the NGA for $2 million, the

Estate wishes to undo the sale and recover the Painting or, alternatively, compensatory damages,

based on Tuchman's and Dunow's alleged fraud.

   The claims against the NGA should be dismissed.  The Estate fails to state a claim

for fraud — on which all of its claims against the NGA are premised — because it has not

alleged facts that would demonstrate justifiable reliance by Shefner and her children on the

alleged statements or omissions by Tuchman and Dunow.  According to the Complaint, Tuchman

and Dunow disclosed to Shefner that they represented the prospective purchaser(s) in the

transaction; thus, it would have been unreasonable as a matter of law for Shefner to rely on their

statements regarding the fair market value of the Painting.  The Complaint also fails to allege that

Shefner or her children took any steps to independently verify the value of the Painting, a

necessary element of reasonable reliance.

   Even if the Estate had adequately alleged fraud by Tuchman and Dunow, its

replevin and declaratory judgment claims against the NGA nevertheless should be dismissed

because the Complaint fails to state a claim that the NGA did not purchase the Painting in good

faith, and thus the NGA obtained good title under the Uniform Commercial Code

notwithstanding any alleged fraud by Tuchman and Dunow.  The Complaint fails to allege any

facts that would have triggered a duty by the NGA to inquire into the circumstances of Shefner's

earlier sale of the Painting to or through Tuchman and Dunow, and even if the NGA had

conducted the inquiry that the Estate claims was required, it would not have uncovered the

alleged fraud.  Because the facts alleged in the Complaint indicate that the NGA was a good faith

purchaser of the Painting, the Estate's replevin and declaratory judgment claims against the NGA should be dismissed pursuant to Rule 12(b)(6).

With respect to the Estate's unjust enrichment claim against the NGA, the Court lacks subject matter jurisdiction because unjust enrichment is not cognizable under the Federal Tort Claims Act, the only asserted waiver of sovereign immunity alleged in the Complaint. The unjust enrichment claim should therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). In any event, the Estate fails to state a claim against the NGA for unjust enrichment. Based on the allegations in the Complaint, the Estate cannot establish that it would be inequitable for the NGA, as a good faith purchaser, to retain the Painting. The Estate's unjust enrichment claim is also duplicative of its replevin and declaratory judgment claims, and therefore is subject to dismissal under Rule 12(b)(6) on that ground as well.

## STATEMENT OF FACTS

For the limited purposes of this motion to dismiss, the NGA accepts as true the factual, non-conclusory allegations in the Complaint.

### A.    Shefner's Ownership and Sale of the Painting

The Painting was painted by artist Chaim Soutine in 1923. Complaint ¶ 1; Declaration of Sarah S. Normand dated August 1, 2008, Exh. A (excerpt from Soutine *Catalogue Raisonné* regarding *Piece of Beef*).[1] The decedent, Lorette Jolles Shefner, purchased the Painting

---

[1]    As the Complaint describes it, "a *catalogue raisonné* is a state-of-the art compilation of all known works of an artist, together with provenance information (concerning ownership, location, transfers of ownership, and exhibitions) for each such work. A *catalogue raisonné* is considered the most reliable source of information concerning the authenticity of a work." Complaint ¶ 17. The *Catalogue Raisonné* on Soutine is cited repeatedly in the Complaint, see ¶¶ 1, 16, 19-21, 32-37, 50, 103-04, 107, and accordingly is incorporated by

(continued...)

3

from a Paris gallery in 1981, for $68,000. Complaint ¶ 31. The Painting was shipped to the Shefner home in Montreal, Quebec, where it hung in her living room until April 2004, id., shortly before Shefner sold the Painting to or through defendants Tuchman and Dunow, id. ¶¶ 1, 55, 99.

According to the Complaint, Shefner initially met Tuchman and Dunow, "the foremost experts in the world on Soutine and his works," in 1986, when Tuchman and Dunow were compiling the *Catalogue Raisonné* of Soutine's works. Id. ¶¶ 1, 32-34. Tuchman and Dunow had repeated contact with Shefner between 1986 and 2003. Id. ¶ 37. The Estate alleges that Shefner, who was elderly and a "relative neophyte in the art world," id. ¶ 12, "was impressed and flattered by the attention that Tuchman and Dunow paid to her and the Painting," id. ¶ 38.

The Estate alleges that in May 2004, Tuchman and Dunow fraudulently induced Shefner to sell the Painting for $1 million, a price, according to the Complaint, that was "well below its fair market value." Id. ¶¶ 1, 90, 94. The allegations in the Complaint make clear, however, that Shefner's children (now executors of the Estate) were directly and actively involved in the sale of the Painting. See id. ¶¶ 47-48, 51, 53, 79, 82, 89, 95, 97. The Complaint alleges that Shefner and her children rejected Tuchman's and Dunow's first two offers, of $650,000 and $800,000, respectively, before agreeing to sell the Painting for $1 million, and otherwise negotiated the terms of the sale. Id. ¶¶ 51, 53, 82, 97. Barry Shefner also signed the sale contract on behalf of his mother. Id. ¶ 94.

The Estate acknowledges, moreover, that Tuchman and Dunow disclosed to

---

[1](...continued)

reference therein. See, e.g., Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) ("Documents that are attached to the complaint or are incorporated in it by reference are deemed part of the pleading and may be considered.").

Shefner and her children that they were acting on behalf of the prospective purchaser(s) of the Painting; specifically, according to the Complaint, they told Shefner and her children that they represented "a group of private investors" from Switzerland.  Id. ¶¶ 2(ii), 52-53, 83, 97; see also id. ¶¶ 93-94, 99 (alleging that Tuchman and Dunow represented that buyer was Lontrel Trading, "a transportation company in Switzerland that specializes in art," and that sale documentation reflected Lontrel Trading as purchaser).  Notwithstanding this disclosure, the Estate alleges that Tuchman and Dunow failed to advise Shefner that the negotiated price of $1 million was "well below" the fair market value of the Painting.  Id. ¶ 2(vi).  The Estate alleges that Tuchman and Dunow induced Shefner "to sell at such a low price" by, among other things, "relying on a decades-old relationship of trust and respect with . . . Shefner in regard to the Painting," id. ¶ 2(iii), "representing to . . . Shefner that the offer they tendered (purportedly on behalf of a group of private investors) was 'exceptionally advantageous,'" id. ¶ 2(ii) & Exh. A, and "providing her with a false and misleading list of 'comparables,'" which led Shefner "to reasonably believe that the Painting was worth much less than it actually was and that the market for Soutine works was in decline," id. ¶ 2(i).  The Estate further alleges that Tuchman and Dunow failed to advise Shefner that "they actually had a financial interest in the potential sale of the Painting" and "were planning to arrange to resell it for a quick and substantial profit."  Id. ¶ 54.

**B.    The NGA's Purchase of the Painting**

According to the Complaint, either immediately prior to or shortly after Shefner sold the Painting to or through Tuchman and Dunow, "Tuchman and Dunow began negotiating a resale of the Painting for a significant profit."  Complaint ¶¶ 3, 99.  Representatives of the NGA viewed the Painting at the Hôtel Plaza Athénée in New York City in May or June 2004.  Id.

5

¶¶ 92, 101.  The Painting was delivered to the NGA in or about September 2004, and the Board

of Trustees of the NGA approved its purchase on October 1, 2004.  Id. ¶ 101.  On November 17,

2004, the NGA purchased the Painting for $2 million.  Id. ¶¶ 102, 105.

The Estate alleges that the $2 million purchase price paid by the NGA was also

"well below the fair market value of the Painting," based on "the sale of certain comparables to

the Painting" prior to 2004, and that the NGA did not conduct adequate "due diligence" before

purchasing the Painting.  Id. ¶¶ 26, 103-04, 106.  The Estate does not allege that the NGA

engaged in fraud or conspiracy to defraud Shefner, compare id. ¶¶ 112-27, but brings claims for

replevin and unjust enrichment against the NGA, id. ¶¶ 131-36, 147-53, pursuant to the Federal

Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, id. ¶¶ 9, 24.  The Estate also seeks a

declaratory judgment that none of the defendants, including the NGA, is or was a *bona fide*

purchaser for value of the Painting, and that the Painting therefore should be returned to the

Estate.  Id. ¶¶ 24, 138-46.  The Estate seeks return of the Painting or, alternatively, compensatory

damages of "not less than $1 million."  Id. ¶ 137.

## ARGUMENT

## POINT I

### THE ESTATE'S REPLEVIN AND DECLARATORY JUDGMENT CLAIMS SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6)

**A.    Applicable Pleading Standards**

**1.    Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure

should be granted if the complaint fails "to state a claim to relief that is plausible on its face."

6

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007).  The factual allegations asserted "must be enough to raise a right to relief above the speculative level."  <u>Id.</u> at 1965.  In <u>Twombly</u>, the Supreme Court expressly repudiated the "no set of facts" standard that originated in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), which courts long had applied as the standard of pleading required to survive a motion to dismiss.  <u>See</u> <u>Conley</u>, 355 U.S. at 45-46 (stating "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); <u>Twombly</u>, 127 S. Ct. at 1969 ("<u>Conley</u>'s 'no set of facts' language has been questioned, criticized, and explained away long enough. . . . [A]fter puzzling the profession for 50 years, this famous observation has earned its retirement.  The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").

The Second Circuit has interpreted <u>Twombly</u> to require a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim <u>plausible</u>."  <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original), <u>cert. granted</u>, <u>Ashcroft v. Iqbal</u>, 2008 WL 336310, 76 U.S.L.W. 3417, 76 U.S.L.W. 3649, 76 U.S.L.W. 3654 (U.S. Jun 16, 2008) (No. 07-1015).  Thus, "a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."  <u>Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007).

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  See De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996).  The court need not, however, "give . . . credence to plaintiff's conclusory allegations."  Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2006) (citation and internal quotation marks omitted); see also Dow Jones & Co. v. Int'l Secs. Exch., Inc., 451 F.3d 295, 307 (2d Cir. 2006) (complaint that "consists of conclusory allegations unsupported by factual assertions . . . fails even the liberal standard of Rule 12(b)(6)" (citation and internal quotation marks omitted)); Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").

   2.    **Rule 9(b)**

A heightened standard of pleading applies to allegations of fraud.  Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).  Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a plaintiff is required to "allege facts that give rise to a strong inference of fraudulent intent."  Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 663 (2d Cir. 1997) (citation and internal quotation marks omitted).

**B.** **The Estate Fails to State a Claim Against the NGA[2] for Replevin or a Declaratory Judgment**

To state a claim for replevin under New York law,[3] the Estate must allege facts that, if true, would actively and plausibly suggest that the Estate "has an immediate and superior right to possession of" the Painting. John Paul Mitchell Sys. v. Quality King Distributors, Inc., No. 99 Civ. 9905(SHS), 2001 WL 910405, at *6 (S.D.N.Y. Aug. 13, 2001); see also N.Y. C.P.L.R. Art. 71; Volt Delta Res., LLC v. Soleo Commc'ns Inc., 816 N.Y.S.2d 702, 2006 WL 800791, at *3 (N.Y. Sup. 2006). As set forth below, the Estate's replevin claim should be dismissed for two independent reasons.

First, the Complaint fails to allege facts that would demonstrate that Shefner reasonably relied on any alleged statements or omissions by Tuchman or Dunow, and thus fails to state a claim for fraud. Because the Estate's replevin claim is premised on Tuchman's and Dunow's alleged fraudulent inducement of Shefner to sell the Painting, Complaint ¶¶ 148-49, it

---

[2]    The United States of America is the only proper defendant in an FTCA action; agencies of the United States are not subject to suit under the FTCA. See 28 U.S.C. § 1346(b) (providing jurisdiction for certain "claims against the United States"); 28 U.S.C. § 2679(a) (federal agencies not subject to suit under FTCA). With regard to the Estate's replevin and unjust enrichment claims, the only jurisdictional basis alleged in the Complaint is the FTCA. See Complaint ¶¶ 9, 24. With respect to those claims, therefore, the United States should be substituted as defendant in place of the National Gallery of Art.

[3]    In light of the Estate's allegations that "the act(s) or omission(s) complained of occurred within this District," Complaint ¶ 10 (alleging venue in this District proper as against NGA), and that the NGA "negotiated its purchase of the Painting . . . in New York City," id. ¶ 24, we assume for purposes of this motion that New York law applies to the Estate's claims against the NGA. See 28 U.S.C. § 1346(b)(1) (in FTCA cases, applicable law is "the law of the place where the act or omission occurred"). We note, however, that many of the actions of the NGA at issue in the Complaint, i.e., its purchase of the painting and its rejection of the Estate's demand that the Painting be returned, occurred in the District of Columbia, where the NGA resides. See Complaint ¶¶ 24, 101-02, 110-11. In any event, it does not appear that the result would be substantively different under D.C. law.

9

cannot establish an immediate or superior right to possession of the Painting if it fails to state a claim for fraud.

Second, even if the Complaint adequately alleged fraud, it fails to set forth facts that would demonstrate that the NGA was not a good faith purchaser of the Painting. For this additional reason, the Estate cannot establish an immediate or superior right to the Painting, for purposes of its replevin claim, nor can it establish that it is entitled to a declaratory judgment that the NGA was not a *bona fide* purchaser for value, see Complaint ¶ 146.

1. **The Complaint Does Not Adequately Allege Reasonable Reliance by Shefner, a Necessary Element of Its Fraud Claim**

"In an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996) (citing cases). Thus, "justifiable" or "reasonable" reliance by Shefner is "a necessary element" of the Estate's fraud claims against Tuchman, Dunow, Lontrel Trading, and Galerie Cazeau-Béraudière. Glidepath Holding B.V. v. Spherion Corp., No. 04 Civ. 9758(KMK), 2007 WL 2176072, at *18 (S.D.N.Y. July 26, 2007).

The allegations in the Complaint, even if true, demonstrate that the Estate as a matter of law cannot establish that Shefner relied reasonably on the alleged statements or omissions by Tuchman and Dunow as to the fair market value of the Painting, for two reasons. First, the Complaint concedes that Tuchman and Dunow advised Shefner that they represented the buyers. Second, according to the Complaint, Shefner took no steps to independently

10

investigate the Painting's market value.  Thus, the Complaint fails to state a claim for fraud or, in turn, replevin.

### a.    The Complaint Alleges That Tuchman and Dunow Disclosed That They Represented the Prospective Purchasers of the Painting

The Complaint acknowledges that defendants Tuchman and Dunow disclosed to Shefner and her children that they were acting on behalf of the prospective purchaser(s) in the transaction.  Complaint ¶¶ 2(ii), 52-53.  According to the Complaint, when Tuchman and Dunow communicated their initial offer of $650,000 for the Painting, which Shefner rejected, they stated that they were providing an "accommodation to the putative purchaser(s)."  Complaint ¶¶ 51-52 (emphasis supplied).  Specifically, Tuchman and Dunow allegedly told Shefner that they were acting on behalf of "a group of private investors from Switzerland."  Id. ¶ 97; see also id. ¶ 2(ii) (Tuchman and Dunow tendered offer "purportedly on behalf of a group of private investors"), ¶ 83 (referring to "a consortium of investors in Europe"), ¶¶ 28, 93, 99 (alleging that Lontrel Trading, a transportation company in Switzerland that specializes in art, was identified to Shefner as the purchaser).[4]

Thus, the allegations in the Complaint acknowledge that Tuchman and Dunow disclosed to Shefner that they represented the party or parties on the other side of the transaction. Whether or not Tuchman or Dunow disclosed that they would "derive pecuniary benefit from the

---

[4]    The Estate alleges that Tuchman and Dunow, in their March 26, 2004 letter communicating a second offer of $800,000 for the Painting, "offered to represent Ms. Jolles Shefner in the transaction, stating, '[w]e stand ready to assist you in any way we can.'"  See Complaint ¶ 57 & Exh. A.  The Estate further alleges that Tuchman and Dunow represented to Shefner that the $800,000 offer was "an exceptionally advantageous opportunity for you in our opinion."  Id. ¶ 61 & Exh. A.  Notwithstanding these statements, however, the Complaint concedes that the March 26, 2004 letter "indicat[ed] that [Tuchman and Dunow] were working on behalf of a prospective buyer who was willing to pay $800,000 (U.S.) for the Painting."  Id. ¶ 53 (emphasis supplied).

potential sale," id. ¶ 52, according to the Complaint, Tuchman and Dunow disclosed that they

were acting on behalf of "the putative purchaser(s)," id., and therefore not for Shefner.  Any

reasonable seller would have reason to question whether Tuchman's and Dunow's role as

representatives of the buyers was a factor in how they set the offering price for the Painting.

Accordingly, Shefner's alleged reliance on Tuchman's and Dunow's representations regarding

the fair market value of the Painting was unreasonable as a matter of law.  See Kregos v.

Associated Press, 3 F.3d 656, 665 (2d Cir. 1993) (affirming dismissal of common law fraud

claim because plaintiff "had no reasonable right as a matter of law to rely upon legal opinions

offered by the [defendant], an entity occupying an adversarial position" (citation and internal

quotation marks omitted)); Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011,

1016 (2d Cir. 1989) (same where plaintiff relied on defendant's attorney's interpretation of

statute).

        The Complaint's allegations that Tuchman and Dunow "rel[ied] on a decades-old

relationship of trust and respect" with Shefner, Complaint ¶ 2(iii); see id. ¶¶ 38, 44-46, 58-59, 87,

are inapposite.  The Estate does not allege any fiduciary relationship between Shefner and

Tuchman and Dunow, nor could it, given Shefner's acknowledged awareness that Tuchman and

Dunow represented the buyers.  See Abercrombie v. Andrew College, 438 F. Supp. 2d 243, 274-

75 (S.D.N.Y. 2006) (allegations of a "calculated friendship that resulted in trust and reliance," in

which defendant allegedly knew that plaintiff would rely on its recommendations, took advantage

of plaintiff's age and loneliness, and exercised undue influence over plaintiff, failed to allege a

fiduciary relationship for purposes of fraud claim).

Regardless of their alleged "relationship of trust and respect," Complaint ¶ 2(iii),

therefore, once Tuchman and Dunow disclosed to Shefner and her children that they represented

the buyers, Shefner could not reasonably have relied on their assessment of the fair market value

of the Painting.  See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189,

196 (2d Cir. 2003) (affirming dismissal of fraud claim for failure to allege reasonable reliance;

personal friendship between parties did not make reliance on extra-contractual representations

reasonable); Hope v. Klabal, 457 F.3d 784, 791-93 (8th Cir. 2006) (finding no fiduciary

relationship despite plaintiff's claim that she had never before purchased art as an investment but

relied on the advice of defendants, who allegedly "solicited and accepted her trust in their art

expertise," where plaintiff should have known that defendants represented an adverse interest).

Nor do the allegations in the Complaint regarding Shefner's age and relative

inexperience in the art world, see Complaint ¶¶ 12, 42, 49, 96, justify her alleged reliance on

Tuchman's and Dunow's representations as to the Painting's market value.  Although Shefner

may have been "87 years old," "computer illiterate," and "inactive in the business world for

several years," id. ¶ 42, there is no allegation that these factors rendered her incompetent in any

way to enter into a sale of her property.  To the contrary, the Estate alleges that Shefner "lived

independently in the Shefner family home until she passed away" in March 2007, "at the age of

90."  Id. ¶ 12.

In any event, according to the Complaint, Shefner's children, Barry Shefner and

Braun, were directly involved in the sale of the Painting and actively represented Shefner's

interests at every step of the transaction.  See id. ¶¶ 47, 51 (Tuchman and/or Dunow contacted

Braun and offered $650,000 for Painting), ¶ 53 & Exh. A (Dunow and Tuchman sent letter to

13

Braun offering $800,000 on behalf of prospective purchaser), ¶ 79 (Tuchman and Dunow had

further contact with Shefner and Braun in late March/early April 2004 to discuss sale of

Painting), ¶ 82 (on April 23, 2004, Tuchman and Dunow sent another letter to Braun, "this time

increasing their offer to $1 million (U.S.)"), ¶ 89 (Tuchman and Dunow had further contact with

Shefner and Braun after the April 23, 2004 letter), ¶ 94 (Barry Shefner signed sale contract on

behalf of Shefner), ¶ 97 (Barry Shefner had telephone conversation with Tuchman and Dunow

"on or about the time at which the Sale Contract was signed," in which Barry Shefner, on his

mother's behalf, rejected Tuchman's and Dunow's request for payment terms), ¶¶ 47-48, 96

(alleging that "at all relevant times," Braun and Barry Shefner apprised their mother of the

content of all communications with Tuchman and Dunow, and acted as an "intermediary" for and

at the direction of their mother).

   Notwithstanding their alleged lack of expertise in the art world, moreover, the

Complaint makes clear that Shefner and her children exercised independent judgment when it

came to disposition of the Painting.  According to the Complaint, in 2003, one year before the

sale at issue in this case, Shefner rejected a request from the curator of the Jewish Museum in

New York City, who was referred to Shefner by Tuchman and Dunow, to donate the Painting to

the museum, "specifically because she felt that the Painting was very valuable."  Id. ¶¶ 39-40.

Shefner then rejected Tuchman's and Dunow's first two offers to purchase the Painting for

$650,000 and $800,000, respectively.  Id. ¶¶ 51, 53, 82.  Barry Shefner, on behalf of his mother,

also rejected Tuchman's and Dunow's request, on behalf of the buyers, for payment terms,

instead requiring the buyers to pay the entire $1 million purchase price "all at once."  Id. ¶¶ 97-

98.  The allegations in the Complaint thus call into question whether Shefner did in fact rely on

Tuchman's and Dunow's representations regarding the market value of the Painting. Even assuming, for purposes of this motion, that they did rely on Tuchman and Dunow, however, such reliance was unreasonable as a matter of law, given Tuchman's and Dunow's disclosure of their adversarial role in the transaction and the lack of any fiduciary relationship.

**b.    The Complaint Does Not Allege That Shefner Took Any Steps to Investigate the Painting's Value**

The Complaint further fails to allege justifiable reliance by Shefner because it contains no allegations that she or her children took any steps to investigate and independently confirm the value of the Painting. A party that "has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, . . . cannot claim justifiable reliance on [the] defendant's misrepresentations." Tanzman v. La Pietra, 8 A.D.3d 706, 707 (N.Y. App. Div. 2004) (alteration in original); accord Stuart Silver Assocs., Inc. v. Baco Dev. Corp., 245 A.D.2d 96, 98-99 (N.Y. App. Div. 1997); Cohen v. Colista, 233 A.D.2d 542, 543 (N.Y. App. Div. 1996); Pinney v. Beckwith, 202 A.D.2d 767, 768 (N.Y. App. Div. 1992). Even as "neophytes" to the art world, Complaint ¶¶ 12, 49, 96, Shefner and her children could have taken a number of steps to investigate the fair market value of the Painting, such as consulting with an appraiser or an auction house, rather than relying on information provided by individuals representing the purchaser(s), as the Complaint alleges. See, e.g., Hope, 457 F.3d at 791-93 (despite allegations of inexperience in purchasing art, plaintiff could have hired independent appraisal expert or consulted with auction house to identify recent comparable sales, rather than relying on sellers' representations as to value, nature, significance and quality of artwork).

15

The Complaint does not state whether Shefner or her children took these — or any — steps to independently determine the fair market value of the Painting.  Instead, according to the Complaint, they relied on Tuchman and Dunow, who concededly represented the buyers, for information regarding the value of the Painting.  Although Tuchman and Dunow were experts on Soutine, they certainly were not the only sources of information regarding the fair market value of the Painting.  Because "a simple inquiry" of an art appraiser "would have armed [Shefner] with the truth" as to the Painting's market value, the Estate fails to allege justifiable reliance as a matter of law.  Pinney, 202 A.D.2d at 768 (reasonable reliance absent as a matter of law where plaintiff land purchaser failed to investigate alleged representation made by seller); see also Hope, 457 F.3d at 792 (plaintiff failed to exercise due diligence as a matter of law where she purchased artwork "without independently confirming the value of the works she was purchasing"); Tanzman, 8 A.D.3d at 708 (reversing jury verdict in favor of plaintiff vacation home purchasers where "[t]hey made no inquiry and took no steps to ascertain who owned the house, such as requesting a copy of the deed, reviewing title or checking public records," nor was there evidence that the disputed statement regarding ownership "was a matter peculiarly within defendant's knowledge or there were no means readily available by which plaintiffs could have determined its truth"); Cohen, 233 A.D.2d at 543 (summary judgment should have been granted to plaintiff sellers where, even accepting as true defendant purchasers' allegations of material misrepresentations regarding state of property being sold, "all of the deficiencies that defendants have alleged in this regard could have been discovered by routine investigation"); compare Glidepath Holding, 2007 WL 2176072, at **18-19 (denying motion to dismiss fraud claim for failure to plead reasonable reliance where plaintiffs alleged that they performed due diligence and

16

investigated representations made to them, but defendant thwarted their efforts, and plaintiffs

further alleged facts demonstrating the existence of a fiduciary relationship during the period of

the fraudulent scheme).

The Complaint does not adequately allege justifiable reliance by Shefner on the

alleged statements or omissions by Tuchman and Dunow, and thus fails to state a claim for fraud.

Accordingly, the Estate's replevin claim, which is premised on the alleged fraud, should be

dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## 2.    Even If the Complaint Adequately Alleged Fraud, It Fails to State a Claim That the NGA Was Not a Good Faith Purchaser

The Estate's replevin and declaratory judgment claims should also be dismissed

under Rule 12(b)(6) on the independent ground that the Complaint fails to set forth facts

demonstrating that the NGA was not a good faith purchaser of the Painting.

The Uniform Commercial Code ("UCC"), which applies to sales of works of art,

see Morgold, Inc. v. Keeler, 891 F. Supp. 1361, 1365-66 (N.D. Cal. 1995), provides, in pertinent

part:

> A purchaser of goods acquires all title which his transferor had or had power to transfer . . . .  A person with voidable title has power to transfer a good title to a good faith purchaser for value.  When goods have been delivered under a transaction of purchase the purchaser has such power even though . . . (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

N.Y. U.C.C. § 2-403(1).  "Under this provision of the UCC, a seller with voidable title, such as

that procured by common law fraud, can transfer good title to a subsequent good faith

purchaser."  Johnson & Johnson Products, Inc. v. Dal Int'l Trading Co., 798 F.2d 100, 102 (3d

17

Cir. 1986).  Indeed, the Third Circuit has noted that a good faith purchaser would obtain good title under the very circumstances alleged in this case:

> The operation of UCC § 2-403(1) is illustrated by the following hypothetical:  X has voidable title in a painting, because he fraudulently acquired it from Y.  A third party, W, then purchases the painting from X for value without any notice of Y's competing interest in the painting.  Under these circumstances, UCC § 2-403(1) would accord to W, a good-faith purchaser for value, good title in the fraudulently acquired painting.

United States v. Lavin, 942 F.2d 177, 186 (3d Cir. 1991).

The good faith purchaser provision in U.C.C. § 2-403 "developed over time in order to promote finality in commercial transactions and thus to encourage purchases and to foster commerce."  Lavin, 942 F.2d at 186.  "It does so by protecting the title of a purchaser who acquires property for valuable consideration and who, at the time of the purchase, is without notice that the seller lacks valid and transferable title in the property."  Id.

Although the Complaint contains conclusory assertions that the NGA was not a *bona fide* purchaser for value, Complaint ¶¶ 140, 146, 149, it contains no factual allegations that actively and plausibly suggest that the NGA had notice that Tuchman, Dunow, Galerie Cazeau-Béraudière, or Lontrel Trading lacked valid and transferable title in the Painting.  To the contrary, the non-conclusory, factual allegations in the Complaint indicate that the NGA was a good faith purchaser, and thus obtained good title to the Painting under the UCC.

> **a.     The NGA Had No Duty to Inquire Into the Circumstances of Prior Sales Absent Any Warning That the Seller Lacked Valid and Transferrable Title to the Painting**

The UCC defines "good faith" as "honesty in fact in the conduct or transaction concerned."  UCC § 1-201(19).  In the case of a "merchant," "good faith" means "honesty in fact

and the observance of reasonable commercial standards of fair dealing in the trade." UCC § 2-103(1)(b).[5] The Complaint does not allege that the NGA did not act with "honesty in fact" in its purchase of the Painting; that is, there are no factual allegations that the NGA had actual knowledge of the alleged fraud. The NGA's status as a good faith purchaser, therefore, turns on whether the Complaint contains factual allegations actively and plausibly suggesting that the NGA failed to observe reasonable commercial standards of fair dealing. The Estate has not met this burden.

In the absence of any reason to suspect that a seller of artwork is unable to convey good title, commercial standards in the art trade generally do not require inquiry into the particular circumstances of prior transactions involving the artwork. See, e.g., Morgold, 891 F. Supp. at 1368 ("it is not the practice in the art industry, in the absence of warnings, for a buyer to require a seller to make disclosures about the chain of title or the prices paid at every link in the chain"); Lindholm v. Brant, 925 A.2d 1048, 1057 (Conn. 2007) ("A dealer customarily is not required to present an invoice establishing when and from whom he bought the artwork or the

---

[5]    A "merchant" is defined in the UCC as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." UCC § 2-104(1). The Complaint does not allege that the NGA is a merchant, although it does make such allegations with regard to Tuchman and Dunow. See Complaint ¶¶ 14-15 (alleging that Tuchman and Dunow are "art dealer[s]," that Tuchman holds himself out as an expert on the art market in general and on the market for Soutine works in particular, and that Tuchman and Dunow derive significant income from their expertise in the Soutine field). Given that the NGA, as a public museum, does not "deal" in artwork or otherwise place artwork in the stream of commerce, but was simply the "end purchaser" of the Painting," id. ¶ 4, it is not at all clear that the NGA qualifies as a merchant under the UCC. See Louis Price Paper Co. v. Fed'n Employment & Guidance Serv., Nos. 1024520/1994, 38, 1994 WL 116649 (N.Y. Sup. Feb. 28, 1994) (defendant as "end user" of products in question, who "neither resells nor places them in the stream of commerce," not a "merchant" under UCC § 2-104(1)). Nevertheless, given the NGA's expertise in works of art generally, we assume, for purposes of this motion, that the NGA qualifies as a "merchant" under the UCC.

19

conditions of the purchase."). "[T]he reason that documentary proof of ownership customarily is

not required" in the art industry "is to protect the confidentiality of the owner and the buyer."

Lindholm, 925 A.2d at 1059.

        Courts have held that where "there are warnings that something is wrong with a

transaction," however, "a dealer in art must take reasonable steps to inquire into the title to a

painting." Morgold, 891 F. Supp. at 1368; id. at 1369 (under New York law, "an art dealer

cannot obtain good title unless he takes reasonable steps to investigate title when there are

warning signs"); Lindholm, 925 A.2d at 1058 ("agree[ing] with . . . courts that a merchant buyer

has a heightened duty of inquiry when a reasonable merchant would have doubts or questions

regarding the seller's authority to sell"); Cantor v. Anderson, 639 F. Supp. 364, 367-68

(S.D.N.Y. 1986) (purchaser had duty to inquire based on circumstances surrounding delivery of

painting, which gave purchaser reason to doubt seller's ownership); cf. also Gutekunst v.

Continental Ins. Co., 486 F.2d 194, 195-96 (2d Cir. 1973) ("New York law is that only actual

knowledge or disregard of suspicious circumstances may constitute evidence of bad faith" under

"bona fide purchaser" provision of UCC §§ 8-301 to 8-304); compare Johnson & Johnson, 798

F.2d at 106 (holding that New Jersey UCC § 2-403(1) does not impose any duty to inquire into

chain of title absent actual knowledge or suspicion of fraud, and that by "judging a purchaser by

the facts he or she might have obtained through an investigation of all prior transfers of the

goods," the district court had "imposed a burden on commerce which . . . the UCC did not intend

that it should bear").

       b.     **The Complaint Fails to Allege Any Warning That Would Have Triggered a Duty by the NGA to Investigate the Circumstances Surrounding Shefner's Sale of the Painting**

The Complaint alleges two facts that supposedly should have triggered a heightened level of due diligence by the NGA with regard to the "means by which the Painting had become available for purchase," Complaint ¶ 143-44,[6] neither of which withstands scrutiny.

First, the Complaint alleges that Shefner "was listed as the last owner of record" in the *Catalogue Raisonné*, which was published in or about 1993, apparently suggesting that the NGA should have known that Shefner owned the Painting, and that such knowledge somehow should have triggered an inquiry by the NGA into how Tuchman and Dunow obtained the Painting. Complaint ¶¶ 5, 19, 144; see also id. ¶ 103 ("although Ms. Jolles Shefner was clearly listed in the *Catalogue Raisonné* as the Painting's owner of record, the NGA failed to request any proof from Tuchman, Dunow, or the Galerie Cazeau-Béraudière as to how the Painting had come into their hands"). But the mere listing of Shefner as the Painting's last owner of record in the *Catalogue Raisonné*, standing alone, would not have raised any question regarding Tuchman's and Dunow's possession of or ability to sell the Painting to the NGA more than a decade later. And the Complaint itself acknowledges that Shefner did, in fact, sell the Painting to or through Tuchman and Dunow prior to the sale to the NGA. See Complaint ¶¶ 93-94, 99; infra Point I.B.2.c. The fact that the *Catalogue Raisonné* indicated that Shefner owned the Painting as of 1993 would not in any way have suggested to the NGA that "something [wa]s wrong with [the]

---

[6]     The Complaint also alleges that the NGA failed to inquire into the "authenticity of the Painting." Complaint ¶¶ 26, 103. There is no dispute, however, as to the authenticity of the Painting; no one contests that the artwork at issue is a genuine Soutine painting. See Complaint ¶ 1 ("This action involves the sale . . . of a painting by the artist Chaim Soutine entitled *Piece of Beef* . . . ."); Dictionary.com Unabridged (v 1.1) ("authenticity" means "the quality of being authentic; genuineness").

transaction," Morgold, 891 F. Supp. at 1368, and triggered a duty to inquire into the circumstances of Tuchman's and Dunow's ownership or ability to sell the Painting in 2004.

Second, the Complaint alleges that the NGA should have conducted further inquiry based on the fact that the Painting "had been sold during the Nazi era," and its "Nazi-era implications" were "clearly set forth in the *Catalogue Raisonné*."  Complaint ¶ 104; see also id. ¶ 144 (alleging that "the Painting had changed owners during the Nazi era, which change of ownership now generally triggers a higher level of due diligence as to provenance").  As an initial matter, it is not clear from the *Catalogue Raisonné* that the Painting either was "sold during the Nazi era" or has "Nazi-era implications"; the entry for the Painting in the *Catalogue Raisonné* simply indicates that the Painting was painted in 1923 and then had three owners ("Paul Guillaume, Paris," "Jos Hessel, Paris," and "Duncan MacDonald") at unspecified times before being acquired by "Eardley Knollys, London," "by 1945."  Normand Decl., Exh. A.  If anything, the *Catalogue Raisonné* suggests that the Painting remained outside Nazi territory throughout the period of World War II:  it was exhibited in London in 1938 and again in "May-June 1945."  See id.

But even if the *Catalogue Raisonné* categorically stated that the Painting had been "sold during the Nazi era," that fact would be immaterial to whether the NGA acquired good title in 2004 from entities that allegedly acquired the Painting fraudulently earlier that same year. There is no allegation in the Complaint that the Painting was stolen or otherwise mishandled during the Nazi period, nor that any change in ownership during that period has anything whatsoever to do with the transactions that took place in 2004.  Indeed, because Shefner herself purchased the Painting in 1981, id. ¶ 31, any defect in title accruing in the Nazi era would call

into question Shefner's own claim to ownership of the Painting. The purported "Nazi-era implications of the Painting" thus did not constitute a "warning sign," Morgold, 891 F. Supp. at 1369, that should have prompted the NGA to inquire into the circumstances of Tuchman's and Dunow's acquisition of the Painting from Shefner in 2004.

The remaining factual allegations in the Complaint relating to the NGA similarly fail to suggest any heightened duty to investigate the "circumstances by which [the Painting] came into the possession of Tuchman, Dunow, the Galerie Cazeau-Béraudière, and/or Lontrel Trading." Complaint ¶¶ 26, 131, 133, 143. The Complaint alleges that "the purchase price paid by the NGA was well below the fair market value of the Painting," which "is evident from the sale of certain comparables to the Painting" prior to 2004. Id. ¶ 106. According to the Complaint, however, in addition to the sale prices for Soutine paintings (including a beef painting) contained on the list provided by Tuchman and Dunow to Shefner, id. ¶ 62 & Exh. A, which ranged from $36,800 to $508,500, id. Exh. A, "at least half a dozen sales of Soutine paintings . . . had occurred between 1994 and 2004 at prices in excess of $1 million," id. ¶ 63. The Complaint acknowledges that the NGA paid at least $2 million for the Painting. Id. ¶ 105.

That two Soutine paintings sold for greater amounts at auction in November 2004, Complaint ¶¶ 108-09, after the NGA's Board of Trustees had approved the purchase of the Painting, id. ¶ 101, is irrelevant. The NGA obviously cannot be charged with knowledge of the prices at which paintings will sell at auction in the future. Cf. In re Polis, 217 F.3d 899, 902 (7th Cir. 2000) (Posner, J.) (noting that "[o]ften property appreciates in a wholly unexpected fashion," e.g., a painting might "suddenly increase[] in value because other paintings by the artist" have been "bought by the Metropolitan Museum of Art").

In addition, the Complaint alleges, upon information and belief, that Tuchman and Dunow "received significant additional compensation from the NGA for brokering its purchase of the Painting."  Complaint ¶ 105; see also id. ¶ 3 (alleging that Tuchman and Dunow "received substantial compensation in the form of a sizable commission on top of the sums generated by the resale").  Although this allegation is contested, and indeed refuted by documents incorporated by reference in the Complaint, see id. ¶ 26; Normand Decl., Exh. B,[7] accepting the allegation as true for purposes of this Rule 12(b)(6) motion, it would have raised the price paid by the NGA for the Painting to an amount exceeding $2 million.  The factual allegations in the Complaint therefore do not actively and plausibly suggest that the purchase price paid by the NGA for the Painting was so low as to constitute a "warning" that Tuchman and Dunow lacked authority to sell.  Morgold, 891 F. Supp. at 1368, 1369.

To the contrary, as the Complaint alleges, Tuchman and Dunow were the "foremost experts in the world on Soutine."  Complaint ¶¶ 1, 16.  According to the Complaint, as authors of the *Catalogue Raisonné* on Soutine, they "hold a special status in the art world, as they are often considered to be the foremost authorities concerning questions of authenticity and

---

[7]    In making allegations as to the contents, vel non, of the NGA's "provenance file," Complaint ¶ 26, the Estate has incorporated by reference into the Complaint the documents that the NGA provided to the Estate in correspondence prior to the filing of this litigation.  See Normand Decl., Exh. B (letter from Elizabeth A. Croog, Secretary and General Counsel, National Gallery of Art, to Barry Shefner, dated June 29, 2007, providing information requested by Barry Shefner regarding the NGA's purchase of the Painting, and enclosing copy of Seller's Warranty signed by Maurice Tuchman on October 19, 2004); Roth, 489 F.3d at 509 (principle that court may permissibly consider documents other than the complaint on a motion under Rule 12(b)(6), including documents incorporated by reference, "has its greatest applicability in cases alleging fraud").

provenance." <u>Id.</u> ¶ 18.[8]  The Complaint even goes so far as to allege that because of Tuchman's

and Dunow's "special status," "others regularly rely on their opinions" concerning Soutine, and

"such reliance by others is eminently reasonable, absent knowledge to the contrary." <u>Id.</u>  While,

for the reasons set forth <u>supra</u>, Shefner's knowledge that Tuchman and Dunow represented the

prospective purchaser(s) of the Painting made it unreasonable as a matter of law for her to rely

solely on their representations with regard to the fair market price of the Painting, the fact that the

NGA was purchasing the Painting from or through Tuchman and Dunow, the "foremost experts

in the world on Soutine," would have given the NGA even less reason to suspect that they lacked

authority to transfer good title to the Painting.  <u>See</u> <u>Morgold</u>, 891 F. Supp. at 1368 (finding no

warning signs that would have required purchaser to do further investigation, where purchaser

consulted expert on paintings by artist in question); <u>Lindholm</u>, 925 A.2d at 1059 (same where

sellers "had reputations as honest, reliable, and trustworthy art dealers"); <u>compare</u> <u>Cantor</u>, 639 F.

Supp. at 367-68 (finding that "circumstances surrounding the delivery of the Renoir placed a duty

upon [the art dealer buyer] to inquire into the painting's ownership," where buyer was aware of

seller's financial difficulties, was familiar with his practice of selling works on consignment, and

thus had reason to doubt his purported ownership of the painting).

---

[8]     The Complaint alleges that it is "generally unacceptable for authenticity experts (such as Tuchman and Dunow) to engage in valuation or appraisal of works in which they specialize," or to "otherwise broker or arrange the sale" of such works.  Complaint ¶¶ 23, 56. Here, however, there is no allegation that Tuchman or Dunow were engaged by any party to provide an opinion as to authenticity, or valuation or appraisal services, with respect to the Painting.  Further, the Complaint alleges that both Tuchman and Dunow are, in addition to being experts on Soutine, "art dealers," and that Tuchman "regularly attends gala art events in an effort to promote himself and his business."  Complaint ¶¶ 14-15.  The allegations in the Complaint thus indicate that the NGA was dealing with an established art dealer and expert on Soutine.

Moreover, in the Seller's Warranty incorporated by reference in the Complaint, see supra note 7, which was executed by Tuchman on October 19, 2004, before the sale to the NGA was consummated, Complaint ¶ 102, Tuchman expressly warranted that he was the authorized agent of the owner, the Galerie Cazeau-Béraudière, that the Painting was "free of all liens and encumbrances," and that he was competent to make the sale.  Normand Decl., Exh. B.[9] In the warranty, Tuchman transferred to the NGA "legal title" to the Painting and "all other property rights or interests therein of whatever kind and wheresoever situated."  Id.  That Tuchman signed "the National Gallery's standard warranty," id., further shows that the NGA had no reason to suspect that there was anything "wrong with [the] transaction."  Morgold, 891 F. Supp. at 1368.

For all of these reasons, the Complaint fails to allege any suspicious circumstances that should have led the NGA to inquire into the details of Shefner's sale of the Painting.

### c.  Even If the NGA Had Conducted the Inquiry That the Estate Claims Was Necessary, It Would Not Have Revealed the Alleged Fraud

Even if the NGA had requested "proof from Tuchman, Dunow, or the Galerie Cazeau-Béraudière as to how the Painting had come into their hands," Complaint ¶ 103, such inquiry would not have uncovered evidence of fraud, as Shefner did in fact sell the Painting to Lontrel Trading, through Tuchman and Dunow, and thus they ostensibly had the power to resell

---

[9]    The allegation that the NGA listed Tuchman, rather than Shefner, on its website following the sale, Complaint ¶ 107, does not avail the Estate.  The website did not purport to list the complete provenance history of the Painting, and the NGA purchased the Painting through Tuchman, the expert on Soutine.  In any event, to the extent the website listing was inaccurate at all, it should have listed the Galerie Cazeau-Béraudière (on whose behalf Tuchman was acting as agent), and not Shefner, as the prior owner.

it.  See id. ¶¶ 93-94, 99.  As the Complaint itself alleges, Barry Shefner, on behalf of his mother,

signed a written sale contract listing "Lontrel Trading c/o Alain Disch" as purchaser of the

Painting.  Id. ¶ 94.  Pursuant to that contract, upon the wire transfer of funds into Shefner's bank

account on or about May 18, 2004, "[t]itle of the Painting then ostensibly transferred to Lontrel

Trading."  Id. ¶ 99.[10]  Any request for documentation of the prior sale therefore would have

indicated to the NGA that Shefner had indeed sold the Painting to Tuchman, Dunow and/or their

affiliates, and thus confirmed, rather than cast doubt on, Tuchman's and Dunow's ability to

convey good title to the NGA.  See Garner v. First Nat'l City Bank, 465 F. Supp. 372, 383 n.17

(S.D.N.Y. 1979) ("a breach of the duty to inquire will create liability only if inquiry could have

revealed what would have deterred the inquirer from doing what he did") (citing Kinstlinger v.

Mfrs. Trust Co., 117 N.Y.S. 147, 151 (N.Y. App. Div. 1952)).

       Indeed, to discover the alleged fraud by Tuchman and Dunow, the NGA would

have had to do far more than "request proof" of "how the Painting had come into their hands."

Complaint ¶ 103.  The NGA would have had to commence a detailed investigation, interview

Shefner and her children, Tuchman and Dunow, and their European investors, id. ¶ 83, and

ultimately reach the conclusion that — rather than simply making a poor bargain or being

unfortunate enough to sell the Painting just before a spike in the Soutine market — Shefner

instead was defrauded by Tuchman and Dunow, notwithstanding her children's active

---

[10]     There is no allegation that Tuchman and Dunow did not have authority to sell the
Painting on behalf of Lontrel Trading and/or Cazeau-Béraudière.  To the contrary, the Complaint
alleges that Tuchman, Dunow, Lontrel Trading and Cazeau-Béraudière acted in concert and
collectively took title to the Painting.  Complaint ¶ 99; see also id. ¶¶ 27-28 (alleging that Galerie
Cazeau-Béraudière and Lontrel Trading aided Tuchman and Dunow in their efforts to sell the
Painting to the NGA), 121-27 (alleging conspiracy among Tuchman, Dunow, Lontrel Trading
and Galerie Cazeau-Béraudière).

involvement in the sale, id. ¶¶ 47-48, 51, 53, 79, 82, 89, 95, 97, their negotiation with Tuchman and Dunow with regard to price and other terms of sale, id. ¶¶ 51, 53, 82, 97, and Tuchman's and Dunow's conceded disclosure that they represented the buyers in the transaction, id. ¶¶ 2(ii), 52-53, 97.  This was not a situation where a simple inquiry would have revealed that the Painting had been stolen or that the seller was not who he claimed to be.  Compare Porter v. Wertz, 68 A.D.2d 141, 146 (N.Y. App. Div. 1979) (finding that art gallery was not good faith purchaser of painting, and noting that if art gallery had "done so much as call either of the telephone numbers [the seller] had left, [it] would have learned that [the seller] was employed by a delicatessen and was not an art dealer"), aff'd on other grounds, 53 N.Y.2d 696 (1981).

Imposing such onerous inquiry requirements as would have been required to uncover the alleged fraud here would place inordinate burdens on prospective purchasers of artwork — including, as in this case, public, not-for-profit museums — and have a chilling effect on the marketplace.  See Porter v. Wertz, 53 N.Y.2d at 701 (expressly declining to reach question of whether art merchants have any duty to inquire into title of artwork or seller's credentials, but noting that the Court of Appeals had received *amicus curiae* briefs on both sides of the issue, including one from the Art Dealers Association of America, "arguing that the ordinary custom in the art business is not to inquire as to title and that a duty of inquiry would cripple the art business which is centered in New York").  Moreover, as the Supreme Court of Connecticut recently observed in a case involving a disputed Andy Warhol painting, "[r]equiring a merchant buyer to obtain an invoice or other supporting documentation proving the seller's ownership would in every transaction destroy the privacy and confidentiality that buyers and sellers have come to desire and expect."  Lindholm, 925 A.2d at 1059.  "Accordingly, only when

28

circumstances surrounding the sale cast severe doubt on the ownership of the artwork are

merchant buyers required to obtain documentary assurance that the seller has good title." Id.

        Here, as discussed supra, the Complaint fails to allege circumstances casting any

doubt, much less severe doubt, on Tuchman's and Dunow's ability to transfer title of the

Painting, and obtaining "documentary proof of ownership" would only have confirmed their

authority to sell.  To discover the alleged fraud, the NGA not only would have had to gain access

to information about the prior transaction that is typically confidential, it would have had to look

behind the transaction and second-guess the actions and motivations of the participants.  Nothing

in the UCC, or the case law interpreting it, comes close to imposing such burdensome duties on

purchasers.  For this additional reason, therefore, the factual allegations in the Complaint fail to

state a claim that the NGA was not a good faith purchaser of the Painting, and the Estate's

replevin and declaratory judgment claims accordingly should be dismissed pursuant to Rule

12(b)(6).

## POINT II

### THE ESTATE'S UNJUST ENRICHMENT CLAIM AGAINST THE NGA
### SHOULD BE DISMISSED PURSUANT TO RULES 12(b)(1) AND 12(b)(6)

**A.**    **The Estate Fails to Allege a Proper Basis for Jurisdiction Over Its Unjust Enrichment Claim**

        The United States and its agencies are immune from judicial proceedings absent

an express waiver of sovereign immunity.  See, e.g., Dep't of Army v. Blue Fox, Inc., 525 U.S.

255, 260 (1999); U.S. Envtl. Prot. Agency v. General Elec. Co., 197 F.3d 592, 597 (2d Cir.

1999), opinion amended on reh'g, 212 F.3d 689 (2d Cir. 2000).  A waiver of the Government's

sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied."

Lane v. Pena, 518 U.S. 187, 192 (1996) (citations omitted); accord Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002); United States v. Sherwood, 312 U.S. 584, 590 (1941).

Such a waiver, moreover, "will be strictly construed, in terms of its scope, in favor of the sovereign." Lane, 518 U.S. at 192; Blue Fox, 525 U.S. at 261 (applying requirement of strict construction in favor of sovereign in Administrative Procedure Act action). "It is plaintiffs' burden to satisfy this 'high standard' and prove that a waiver of sovereign immunity exists." Feng Suo Zhou v. Li Peng, 286 F. Supp. 2d 255, 264 (S.D.N.Y. 2003) (citing Blue Fox, 525 U.S. at 261).

Absent a waiver of sovereign immunity, a suit against the United States or its agencies or officials is "properly dismissed for want of subject matter jurisdiction." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994). The NGA was established as an independently administered bureau in the Smithsonian Institution, 20 U.S.C. § 72(a); 20 U.S.C. § 41 et seq., and thus is a government entity entitled to sovereign immunity. Complaint ¶ 24 (alleging that the NGA is a federal agency); Dodge v. Trustees of Nat'l Gallery of Art, 326 F. Supp. 2d 1, 11 (D.D.C. 2004) ("The National Gallery is not subject to suits to which it has not explicitly consented."); see also Johnson v. Smithsonian Inst., 189 F.3d 180, 189 (2d Cir. 1999) (affirming dismissal of tort claims against Smithsonian for failure to comply with FTCA's administrative claim requirement). Thus, in order to establish this Court's subject matter jurisdiction over its claims against the NGA, the Estate must demonstrate that Congress has expressly and unequivocally waived the United States' sovereign immunity for those claims. Feng Suo Zhou, 286 F. Supp. 2d at 264.

As noted supra, note 2, the only basis for jurisdiction over the NGA alleged by the Estate is the FTCA, see Complaint ¶ 9, although the complaint alleges generally that the NGA is also "subject to suit in this action" under the Declaratory Judgment Act, 28 U.S.C. § 2201, Complaint ¶ 24.  The FTCA, however, only waives immunity for "state law-based torts."  In re World Trade Center Disaster Site Litig., 521 F.3d 169, 189 n.23 (2d Cir. 2008); see 28 U.S.C. §§ 1346(b), 2674.  "The FTCA does not contain a waiver of sovereign immunity for equitable claims."  Pesnell v. United States, 64 Fed. Appx. 73, 74 (9th Cir. 2003); see also Wright v. United States, 902 F. Supp. 486, 488 (S.D.N.Y. 1995) ("Since the relief he seeks is equitable, plaintiff cannot avail himself of the jurisdiction granted by Section 1346."); but cf. Weldon v. United States, 70 F.3d 1, 4 (2d Cir. 1995) (FTCA permitted equitable relief in independent action based on alleged fraud on court committed in course of prior FTCA lawsuit, on theory that "actions seeking relief from judgments based on alleged fraud upon the court should be treated as continuations of the former action").

The Estate's claim for unjust enrichment, see Complaint ¶¶ 128-37, does not fall within the waiver of sovereign immunity set forth in the FTCA.  As the Complaint itself makes clear, an unjust enrichment claim does not sound in tort; it affords equitable relief only when there is "no adequate remedy at law."  Complaint ¶¶ 133, 136; Payday Advance Plus, Inc. v. Findwhat.com, Inc., 478 F. Supp. 2d 496, 504 (S.D.N.Y. 2007) ("an unjust enrichment claim is an equitable quasi-contract claim, not a tort claim"); Green v. Beer, No. 06 Civ. 4156(KMW), 2007 WL 576089, at *6 n.14 (S.D.N.Y. Feb. 22, 2007) ("unjust enrichment sounds not in tort but in quasi-contract").  The FTCA therefore does not provide a basis for this Court to exercise jurisdiction over the Estate's unjust enrichment claim against the NGA.  See Pesnell, 64 Fed.

31

Appx. at 74 (dismissing unjust enrichment and constructive trust claims for lack of subject matter jurisdiction under FTCA); <u>Westbay Steel, Inc. v. United States</u>, 970 F.2d 648, 651 (9th Cir. 1992) (no jurisdiction under FTCA to award equitable lien for unjust enrichment); <u>Branch v. FDIC</u>, 825 F. Supp. 384, 420-21 (S.D.N.Y. 1993) ("unjust enrichment claims are not governed by the FTCA"); <u>see also</u> <u>United States v. $30,006.25 in U.S. Currency</u>, 236 F.3d 610, 614 (10th Cir. 2000) (noting that there is no "general waiver of sovereign immunity for unjust enrichment claims"); <u>Chem-Nuclear Sys., Inc. v. Arivec Chems., Inc.</u>, 978 F. Supp. 1105, 1110 (N.D. Ga. 1997) (dismissing state-law unjust enrichment claim for lack of waiver of sovereign immunity); <u>FDIC v. Walker</u>, 815 F. Supp. 987, 990 (N.D. Tex. 1997) (same).

Because the Estate's claim for unjust enrichment is not a tort subject to the FTCA, and the Estate has not identified any other waiver of sovereign immunity that would afford this Court jurisdiction over that claim, the claim should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

**B.    The Estate Fails to State a Claim Against the NGA for Unjust Enrichment**

Alternatively, the Estate's unjust enrichment claim should be dismissed under Rule 12(b)(6) for failure to state a claim.  To state a claim for unjust enrichment under New York law, the Estate must allege that (1) the NGA was enriched; (2) the enrichment was at the Estate's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution.  <u>Astor Holdings, Inc. v. Roski</u>, No. 01 Civ. 1905(GEL), 2002 WL 72936, at *17 (S.D.N.Y. Jan. 17, 2002) .  Even assuming that the Estate has adequately alleged that the NGA was "enriched" at its "expense," the Complaint fails to allege that "equity and good

conscience require" the NGA to make restitution, given that the Complaint does not allege that the NGA played any role in the fraud allegedly perpetrated by the other defendants, see Complaint ¶¶ 112-27, it would have been unreasonable as a matter of law for Shefner to rely on the alleged statements or omissions by Tuchman and Dunow, see supra Point I.B.1, and the NGA purchased the Painting in good faith, see supra Point I.B.2.

Furthermore, the Estate's claim for unjust enrichment is based on the very same conduct as its fraud and replevin claims. See Complaint ¶¶ 128-37 (alleging unjust enrichment based on Tuchman's and Dunow's alleged fraudulent inducement of Shefner to sell the Painting, their resale of the Painting to the NGA at a higher price, and the NGA's alleged "reckless disregard of the circumstances by which it came into the possession" of Tuchman, Dunow and other defendants). The Estate's unjust enrichment claim, therefore, "is merely an alternative theory for recovery and duplicative of [its] claim[] of fraud . . . as [it] arose from the same facts and did not allege distinct and different damages." Huang v. Sy, No. 15155/90, 2008 WL 553646, at *12 (N.Y. Sup. Ct. 2008); American Mayflower Life Ins. Co. v. Moskowitz, 794 N.Y.S.2d 32, 36 (N.Y. App. Div. 2005) (dismissing unjust enrichment claim that duplicated underlying fraud and forgery claims).

Because the Estate has "alleged no independent theory on which [the NGA's] success could be labeled unjust," it cannot establish that "equity should fill the gap and provide restitution where no tortious behavior can be shown." Astor Holdings, Inc., 2002 WL 72936, at *18 (dismissing unjust enrichment claim for failure to state a claim, where plaintiffs alleged that

same conduct was tortious).  The unjust enrichment claim accordingly is subject to dismissal under Rule 12(b)(6) on that ground as well.

## CONCLUSION

For the reasons set forth above, the Estate fails to allege a proper basis for jurisdiction over its unjust enrichment claim against the NGA, and fails to state a claim against the NGA for replevin, a declaratory judgment or unjust enrichment.  The claims against the NGA accordingly should be dismissed.

Date:   August 1, 2008
        New York, NY

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant National Gallery of Art

By:      s/ Sarah S. Normand
        _____
        SARAH S. NORMAND
        Assistant United States Attorney
        86 Chambers Street
        New York, New York 10007
        Telephone: (212) 637-2709
        Facsimile: (212) 637-2702
        sarah.normand@usdoj.gov

34