UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

THE ESTATE OF LORETTE JOLLES SHEFNER   :   Case No. 08 CIV 4443
by and through its executors Mr. Barry Shefner,   :
Ms. Ariela Braun, and Mr. Leon Miller,   :   **DECLARATION OF**
  :   **KARL GEERCKEN**
                                    Plaintiff,   :
  :
    -against-   :
  :
MAURICE TUCHMAN, ESTI DUNOW, the   :
GALERIE CAZEAU-BÉRAUDIÈRE, the   :
NATIONAL GALLERY OF ART, LONTREL   :
TRADING, and JOHN DOES 1-10.   :
  :
-------------------------------------------------------------- X

KARL GEERCKEN, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.    I am a partner with the law firm of Alston & Bird LLP, counsel for

Plaintiff in the above-captioned matter.  I am admitted to practice and am in good

standing in New York and the United States District Court for the Southern District of

New York.

2.    I am fully familiar with the facts and circumstances set forth herein and

make this Declaration on the basis of my own personal knowledge and a review of the

relevant litigation files in this matter.  I submit this Declaration in opposition to the

motion, brought by Defendant the National Gallery of Art (the "NGA") to dismiss the

Complaint in the above-captioned matter.

3.    Attached hereto as Exhibit A is a true and accurate copy of the Complaint,

filed in the above-captioned matter on May 12, 2008.

4.    Attached hereto as Exhibit B is a true and accurate copy of the Answer of

Defendants Tuchman and Dunow, filed in the above-captioned matter on June 13, 2008.

5.      Attached hereto as Exhibit C is a true and accurate copy of a page from the NGA library catalogue, indicating that Tuchman and Dunow's book, *The Impact of Chaim Soutine* is in the NGA library collection.

6.      Attached hereto as Exhibit D is a true and accurate copy of the provenance listing for the Painting from the NGA website.

7.      Attached hereto as Exhibit E is a true and accurate copy of the NGA Mission Statement as posted on its website.

8.      Attached hereto as Exhibit F is a true and accurate copy of a page from the NGA library catalogue, indicating that Tuchman and Dunow's *Catalogue Raisonné* is in the NGA library collection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   August 28, 2008
New York, New York

_____
Karl Geercken

# Exhibit A

JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

THE ESTATE OF LORETTE JOLLES SHEFNER **08**   Case V- **4443**
by and through its executors Mr. Barry Shefner, Ms.
Ariela Braun, and Mr. Leon Miller,                      :   **COMPLAINT**

                        Plaintiff,                   :   **JURY TRIAL**
                                     :   **DEMANDED**

    -against-                                 :

MAURICE TUCHMAN, ESTI DUNOW, the          :
GALERIE CAZEAU-BÉRAUDIÈRE, the            :
NATIONAL GALLERY OF ART, LONTREL          :
TRADING, and JOHN DOES 1-10.              :

--------------------------------------------------------- X

RECEIVED
MAY 1 2 2008
U.S.D.C. S.D. N.Y.
CASHIERS

      The Estate of Ms. Lorette Jolles Shefner ("Plaintiff" or the "Estate"), by and

through its executors Mr. Barry Shefner, Ms. Ariela Braun, and Mr. Leon Miller and the

Estate's undersigned counsel, Alston & Bird LLP, for its Complaint against the above-

named Defendants, hereby alleges as follows:

### Summary of Claims

    1.    This action involves the sale by Ms. Lorette Jolles Shefner (Plaintiff's

decedent) of a painting by the artist Chaim Soutine entitled *Piece of Beef* ("*Le bœuf*," as

per the *Catalogue Raisonné*, as set forth herein) (the "Painting") and its resale for a

significant profit almost immediately thereafter. Ms. Lorette Jolles Shefner owned the

Painting until 2004, when she was fraudulently induced by Defendants Maurice Tuchman

("Tuchman") and Esti Dunow ("Dunow"), the foremost experts in the world on Soutine

and his works, to sell the Painting at a price well below its fair market value. The

operative facts underlying the fraud and other claims asserted herein were learned by the

Estate only after Ms. Jolles Shefner's death.

2.      Tuchman and Dunow were able to induce Ms. Jolles Shefner to sell at such a low price by, among other things:

(i)      providing her with a false and misleading list of "comparables" that led Ms. Jolles Shefner to reasonably believe that the Painting was worth much less than it actually was and that the market for Soutine works was in decline;

(ii)     representing to Ms. Jolles Shefner that the offer they tendered (purportedly on behalf of a group of private investors) was "exceptionally advantageous";

(iii)    relying on a decades-old relationship of trust and respect with Ms. Jolles Shefner in regard to the Painting;

(iv)     failing to disclose their significant conflict of interest in the transaction;

(v)      representing to Ms. Jolles Shefner that they were acting on behalf of a group of private investors, when in fact, upon information and belief, they intended to "flip" the Painting almost immediately for a significant profit by arranging for its sale to an undisclosed, large public institution waiting in the wings; and

(vi)     failing to disclose that, as the world experts on Soutine, they had comprehensive and unique knowledge of virtually every Soutine sale since at least 1993, such that they were well aware that the price at which they induced Ms. Jolles Shefner to sell the Painting was well below its fair market value.

3.      Either immediately prior to or shortly after Ms. Jolles Shefner parted with the Painting, Tuchman and Dunow began negotiating a resale of the Painting for a significant profit. Specifically, they put the Painting on display at an elegant New York City hotel (the Hôtel Plaza Athénée) where they, upon information and belief, met with and entertained at least one prospective buyer. Their efforts paid off, inasmuch as they

- 2 -

then sold or arranged the sale of the Painting for at least twice what was paid to Ms. Jolles Shefner, and, upon information and belief, they (and/or one or more other Defendants) received substantial compensation in the form of a sizable commission on top of the sums generated by the resale.

4.      The end purchaser of the Painting—the National Gallery of Art (the "NGA")—began efforts with Tuchman and Dunow to acquire the Painting within days or weeks before or after Ms. Jolles Shefner sold it to or through Tuchman and Dunow. Upon information and belief, the Galerie Cazeau-Béraudière, a Paris gallery that appears to be affiliated with Tuchman, aided Tuchman and Dunow in their efforts to sell the Painting to the NGA and/or acted as a conduit for such sale.  Upon further information and belief, the Galerie Cazeau-Béraudière was at all relevant times aware of the fraudulent methods by which Tuchman and Dunow induced Ms. Jolles Shefner to sell the Painting to or through them.

5.      Upon information and belief:  (i) the NGA was a potential buyer with which Tuchman and Dunow met at the Hôtel Plaza Athénée in May/June 2004; and (ii) the NGA conducted little or no due diligence to investigate the circumstances under which the Painting came into the hands of Tuchman and Dunow, even though the only public record of ownership of the Painting listed Ms. Jolles Shefner as the last-known owner.

6.      Upon information and belief, the NGA either:  (i) knew of Tuchman and Dunow's plan to fraudulently acquire the Painting at a low price and resell it for a huge return; (ii) recklessly disregarded the fraudulent methods Tuchman and Dunow employed in doing so; and/or (iii) otherwise recklessly disregarded the circumstances by which the

- 3 -

Painting—which had been in private hands for over 20 years—became available for purchase.

7.      During her lifetime, Ms. Jolles Shefner was never aware that Tuchman and Dunow had defrauded her as set forth herein. It was only when she died in 2007 that Plaintiff discovered the nature and scope of Tuchman and Dunow's fraudulent acts. As a result, the Estate seeks: (i) damages for the fraud perpetrated on Ms. Jolles Shefner by Tuchman, Dunow, and others; (ii) rescission of the sale of the Painting to or through Tuchman, Dunow, and/or others acting in concert with them, including the Galerie Cazeau-Béraudière and Lontrel Trading; (iii) a declaration that none of the Defendants have ever been good faith purchasers of the Painting; and (iv) return of the Painting to the Estate.

### Nature of the Action

8.      This action is brought by the Estate of Ms. Lorette Jolles Shefner, by and through its executors, Mr. Barry Shefner, Ms. Ariela Braun and Mr. Leon Miller, against Defendants Tuchman, Dunow, the Galerie Cazeau-Béraudière, the National Gallery of Art, Lontrel Trading, and John Does 1-10, for declaratory judgment, replevin, and monetary damages resulting from the fraud perpetrated on the late Ms. Lorette Jolles Shefner.

### Jurisdiction and Venue

9.      This Court has jurisdiction over the claims asserted against the NGA via 28 U.S.C. § 1346 (Federal Tort Claims Act). This Court has jurisdiction over the claims asserted against the remaining Defendants pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

10.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(a) because several defendants reside in this judicial District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial District. Venue as against the NGA is appropriate under 28 U.S.C. § 1391(e) and/or 1402 because one or more defendants reside within this District and the act(s) or omission(s) complained of occurred within this District.

### The Parties

**Ms. Jolles Shefner and Her Estate**

11.     Messrs. Barry Shefner and Leon Miller are individuals residing in Montréal, Quebec and are citizens of Canada. Ms. Ariela Braun is an American citizen residing in New York. Each is a duly authorized executor of the Estate. The Estate is an entity created under Quebec law with its situs in Montréal, Quebec.

12.     Ms. Lorette Jolles Shefner was Barry Shefner and Ariela Braun's mother, resided in Montréal, Quebec, and was a citizen of Canada at the time of her death. Ms. Jolles Shefner died on March 23, 2007. Prior to selling the Painting to and/or through Tuchman and Dunow, as set forth herein, Ms. Jolles Shefner had never sold a piece of art and was a relative neophyte in the art world. Ms. Jolles Shefner was widowed when her husband of 41 years, Mr. Daniel Shefner, died on July 9, 1986. After that point, Ms. Jolles Shefner lived independently in the Shefner family home until she passed away at the age of 90.

13.     The above executors were appointed under the terms of Ms. Jolles Shefner's will and bring this action together on behalf of the Estate.

**Tuchman and Dunow**

14.    Defendant Maurice Tuchman is an art dealer, advisor, scholar, and author

who resides, upon information and belief, at 200 E. 69th Street, Apt. 17B, New York,

New York 10021. He is also well known in the art world, and, upon information and

belief, regularly attends gala art events in an effort to promote himself and his business.

He is also widely quoted in the press, where he holds himself out as an expert on the art

market in general and on the market for Soutine works in particular. Upon further

information and belief, Tuchman derives significant income from his expertise in the

Soutine field.

15.    Defendant Esti Dunow is also an art dealer, advisor, scholar, artist, and

author, and resides, upon information and belief, at 209 W. 86th Street, New York, New

York 10024. She—together with Tuchman—has authored several books on Soutine and,

upon information and belief, derives a significant income from her expertise in the

Soutine field.

**The Soutine *Catalogue Raisonné* and Other Aspects of Tuchman's and
Dunow's Expertise**

16.    Tuchman and Dunow are the foremost experts in the world on Soutine.

They attained this status when, with the help of now-deceased gallery owner Klaus Perls,

they published the Soutine *catalogue raisonné* in or about 1993.

17.    A *catalogue raisonné* is a state-of-the-art compilation of all known works

of an artist, together with provenance information (concerning ownership, location,

transfers of ownership, and exhibitions) for each such work. A *catalogue raisonné* is

considered the most reliable source of information concerning authenticity of a work. In

general, if a work purports to be from a certain artist, but is either not listed in the

- 6 -

*catalogue raisonné* or its provenance does not comport with the provenance listed in the *catalogue raisonné*, then, upon information and belief, absent other proof as to authenticity, the work is generally not considered authentic.

18.    Authors of a *catalogue raisonné* hold a special status in the art world, as they are often considered to be the foremost authorities concerning questions of authenticity and provenance. As such, *catalogue raisonné* authors—and Tuchman and Dunow specifically—are aware that others regularly rely on their opinions concerning the artist in whom they have acquired specialized knowledge (here, Soutine). Such authors (including Tuchman and Dunow) are aware that, given their special status vis-à-vis the artist in whom they specialize (here, Soutine), such reliance by others is eminently reasonable, absent knowledge to the contrary.

19.    Upon information and belief, there is only one *catalogue raisonné* for Soutine that is currently considered authoritative: the Tuchman/Dunow *catalogue raisonné*. As a result, upon information and belief, Tuchman and Dunow have been at least tangentially involved in virtually every legitimate sale of a Soutine work since their *catalogue raisonné* appeared in 1993. At a minimum, they or their *catalogue raisonné*, would have been consulted as to authenticity in regard to such sales.

20.    In order for a buyer to have any assurance concerning authenticity of the work the buyer is considering purchasing, the buyer (or its agents) must generally consult an authoritative authenticity source, such as a *catalogue raisonné* author.

21.    Upon information and belief, because of the singular status of the Tuchman/Dunow *catalogue raisonné*, Tuchman and Dunow have, since at least 1993, had knowledge of virtually every sale of a Soutine work—whether public or private—

including the amount for which each such work was eventually sold.  They also have had

knowledge of virtually every pending sale—sometimes months before such sales

occurred—because authenticity is one of the first issues addressed before an artwork can

be sold.  Normally, information concerning private sales (whether concluded or pending)

is not available in the marketplace.

22.    As a result, Tuchman and Dunow are universally regarded as the world's

most authoritative experts vis-à-vis Soutine.  In addition, both Tuchman and Dunow

regularly hold themselves out to be experts on Soutine and the valuation of Soutine

works.

23.    Upon information and belief, both Tuchman and Dunow regularly hold

themselves out to be experts in the valuation of paintings in general.  In the art-appraisal

world, however, it is generally unacceptable for authenticity experts (such as Tuchman

and Dunow) to engage in valuation or appraisal of works in which they specialize.  This

is so because, to some extent, such experts can create the market for such works,

inasmuch as they:  (i) are the arbiters of whether or not a work is authentic and, therefore,

of any value; and (ii) have comprehensive and, in relation to Tuchman and Dunow

specifically, exclusive and unique knowledge of public and private sales of works in

which they specialize.  It is also, therefore, generally unacceptable for authenticity

experts such as Tuchman and Dunow to otherwise broker or arrange the sale of works in

which they specialize, especially if such experts have a monetary or other interest in the

sale.

**Other Defendants**

24.     The NGA is a federal agency of the United States Government, and is subject to suit in this action under the Federal Tort Claims and Declaratory Judgment Acts. The NGA's offices are in Washington, D.C. Upon information and belief, the NGA negotiated its purchase of the Painting with Tuchman, Dunow and/or the Galerie Cazeau-Béraudière (which, upon information and belief, utilized Tuchman and/or Dunow as its agent(s) in that transaction) in New York City.

25.     The NGA began efforts to acquire the Painting as early as May/June of 2004, just days or weeks before or after Tuchman and Dunow induced Ms. Jolles Shefner to sell it to or through them.

26.     The NGA's provenance file for the Painting contains little or no evidence of due diligence concerning authenticity of the Painting or the circumstances under which the Painting left the possession of Ms. Jolles Shefner and ended up in the hands of Tuchman, Dunow, the Galerie Cazeau-Béraudière and/or others acting in concert with them.

27.     The Galerie Cazeau-Béraudière is, upon information and belief, a French entity based in Paris, France. Upon information and belief, it also aided Tuchman and/or Dunow in their efforts to sell the Painting to the NGA by, *inter alia*: (i) providing Tuchman and Dunow with a luxury hotel suite in which to exhibit the Painting; and (ii) arranging as well as paying for shipment of the Painting to New York through a third-party shipping company, International Freight Logistics ("IFL"). Upon information and belief, the Galerie Cazeau-Béraudière regularly does business in New York City. Also, upon information and belief, the principals of the Galerie Cazeau-Béraudière, Philippe

Cazeau (and/or his successor) and/or Jacques de la Béraudière, regularly travel to New York City to conduct Galerie Cazeau-Béraudière business.

28.    Lontrel Trading was identified to Ms. Jolles Shefner as the purchaser of the Painting. Upon information and belief, Lontrel Trading assisted Tuchman and Dunow in their efforts to induce Ms. Jolles Shefner to sell the Painting, and then resell the painting to the NGA. Upon further information and belief, Lontrel Trading assisted the Galerie Cazeau-Béraudière in arranging the transport to and exhibition in New York referenced in paragraph 27 above.

29.    Upon information and belief, Lontrel Trading regularly does business in New York, as is evidenced by the documents pertaining to the sale of the Painting by Ms. Jolles Shefner to or through Tuchman, Dunow, the Galerie Cazeau-Béraudière and/or Lontrel Trading.

30.    Defendants John Doe Nos. 1-10 are individuals and/or entities, the identities of which are not yet known to Plaintiff, against which Plaintiff may have causes of action based on the facts alleged herein. Plaintiff reserves the right to name these individuals and/or entities as Defendants in this action via future amendment of this Complaint.

### Factual Allegations Common to All Counts

**Background**

31.    On or about June 3, 1981, Ms. Jolles Shefner purchased the Painting from the Galerie Hyraud Bresson in Paris, France for the sum of $68,000. Shortly thereafter, the Painting was shipped to the Shefner home in Montréal, Quebec, where it hung in Ms. Jolles Shefner's living room until on or about April 2004.

32.     On or about May 1986, the Shefners became aware that Tuchman and/or Dunow were compiling a *catalogue raisonné* of Soutine's works, and that Dunow specifically was seeking information regarding current owners of Soutine paintings (such as the Painting) and the provenance of those paintings.

33.     Shortly thereafter, the Shefners contacted Dunow to inform her that the Shefners owned the Painting, and to invite Dunow to include them in the provenance for the Painting in the *catalogue raisonné*.

34.     To that end, the Shefners provided Dunow with a color transparency of the Painting as well provenance information that the Shefners had acquired when they purchased the Painting in 1981.

35.     According to the Tuchman/Dunow *catalogue raisonné* (the "*Catalogue Raisonné*"), there are only 10 "beef" paintings by Soutine. By 2003, all but two or three of those paintings had already been acquired by various museums around the world.

36.     Also according to the *Catalogue Raisonné*, Soutine's "beef" series is one of Soutine's best-known series of paintings and therefore in great demand.

**Tuchman and Dunow's Prior Attempts to Induce the Sale or Transfer of the Painting**

37.     Between 1986 and 2003, Tuchman and Dunow had repeated contact with the Shefners, and especially with Ms. Jolles Shefner, regarding the Painting. Specifically, one or both of them met with Ms. Jolles Shefner from time to time during that period to discuss the Painting and Soutine. Indeed, Tuchman and Dunow provided Ms. Jolles Shefner and her daughter with a signed copy of the first edition of their *Catalogue Raisonné*.

- 11 -

38.    Understandably, Ms. Jolles Shefner was impressed and flattered by the attention that Tuchman and Dunow paid to her and the Painting.  Tuchman and Dunow knew this and used it to develop a special relationship of trust with Ms. Jolles Shefner over the nearly 20 years of their acquaintance before they induced her to sell the Painting.

39.    Indeed, 2003 was not the first time that Tuchman and Dunow undertook efforts to induce Ms. Jolles Shefner to sell or otherwise transfer the Painting.  In or about 1997, Tuchman and/or Dunow suggested that Mr. Norman Kleeblatt (a curator with the Jewish Museum in New York City) contact Ms. Jolles Shefner so that he could view the Painting at the Shefner family home in Montréal.  Mr. Kleeblatt took their suggestion and requested a meeting with Ms. Jolles Shefner, indicating that he was introduced to her by Dunow.

40.    Mr. Kleeblatt later arranged that meeting, traveling to Montréal specifically to view the Painting and meet with Ms. Jolles Shefner.  After the meeting, Mr. Kleeblatt contacted Ms. Ariela Braun to discuss whether Ms. Jolles Shefner would consider donating the Painting to the Jewish Museum.  Ms. Jolles Shefner rejected Mr. Kleeblatt's request, specifically because she felt that the Painting was very valuable.  In fact, she had never thought of selling the Painting, let alone donating it.

41.    In light of her inexperience in connection with selling art works, Ms. Jolles Shefner was unaware that it was generally considered improper for an authentication expert to appraise the works of an artist in whom the expert specializes and/or to arrange or otherwise broker the sale of such works, especially when the authentication expert has a monetary or other interest in the sale.

42.    Furthermore, Ms. Jolles Shefner was 87 years old when Tuchman and Dunow fraudulently induced her to sell the Painting to or through them. Ms. Jolles Shefner was also computer illiterate, and she relied on Tuchman and Dunow for all material information regarding the sale of the Painting as set forth below. Tuchman and Dunow relied upon: (i) Ms. Jolles Shefner's advanced age; (ii) the fact that she had been inactive in the business world for several years; and (iii) her reliance on them for information concerning the Painting in their efforts to defraud her.

**Tuchman and Dunow's Scheme to Induce the Sale of the Painting**

43.    On or about December 2003, Dunow telephoned Ms. Jolles Shefner in an effort to induce her to sell the Painting. Upon information and belief, Dunow made this telephone call with the knowledge and consent of Tuchman.

44.    At the time of Dunow's call, Tuchman and Dunow knew that Ms. Jolles Shefner held them in high regard and that they were considered to be the foremost experts in the Soutine field. She based her assessment of them on their prior contacts with her, their representations to her concerning their Soutine expertise, and the relationship of trust that they had cultivated with Ms. Jolles Shefner over many years.

45.    Indeed, Tuchman, by virtue of his prior dealings with Ms. Jolles Shefner, knew that she understood that he was an important figure in the art world and that she was duly impressed by the attention he paid to her and the Painting.

46.    Upon information and belief, Tuchman intentionally cultivated this impression in Ms. Jolles Shefner in order to be able to exert influence over her, specifically in regard to his and Dunow's efforts to induce her to sell the Painting.

- 13 -

47.     At the time of the December 2003 telephone call from Dunow, Ms. Jolles Shefner was suffering from a loss of hearing that affected her ability to discuss business matters over the phone.  For that reason, Ms. Jolles Shefner asked Dunow to speak with Ms. Jolles Shefner's daughter, Ms. Ariela Braun.  At all relevant times, Ms. Braun apprised her mother of the content of all her communications with Tuchman and/or Dunow concerning the Painting.

48.     At all relevant times in relation to the sale of the Painting, Ms. Braun was acting as an intermediary for and on direction of her mother, Ms. Jolles Shefner, a fact that was known to both Tuchman and Dunow.

49.     Ms. Braun did not possess, nor has she ever possessed, any expertise in relation to the sale or valuation of artworks.  She too was a neophyte in the art world and merely provided assistance to her mother in terms of communicating with Tuchman and Dunow.  Both Tuchman and Dunow were aware of these facts.

50.     Ms. Braun was herself acquainted with Tuchman and Dunow as she had attended the 1993 signing gala for the *Catalogue Raisonné*, where Tuchman and Dunow signed a copy of their *Catalogue Raisonné* and dedicated it to Ms. Jolles Shefner. Because of this and other interactions with Tuchman and Dunow, Ms. Braun held Tuchman and Dunow in a similarly high level of esteem, a fact known to and relied upon by both Tuchman and Dunow in their dealings with her.

51.     Upon information and belief, Dunow and/or Tuchman subsequently called Ms. Braun in an effort to induce Ms. Jolles Shefner to sell the Painting.  During that call, they offered $650,000 (U.S.) for the Painting, an offer Ms. Jolles Shefner rejected.

- 14 -

52.     In communicating their offer to Ms. Jolles Shefner, Tuchman and Dunow falsely stated that they were providing an accommodation to the putative purchaser(s) only, and they would not derive pecuniary benefit from the potential sale.

53.     On or about March 26, 2004, Dunow and Tuchman sent a letter to Ms. Braun (the "3/26/04 Letter") indicating that they were working on behalf of a prospective buyer who was willing to pay $800,000 (U.S.) for the Painting.  A true and correct copy of the 3/26/04 Letter is attached hereto as Exhibit A.

54.     Given Tuchman and Dunow's prior representations on the subject, Ms. Jolles Shefner understood that they were still acting as disinterested parties and would not derive pecuniary benefit from the potential sale.  Tuchman and Dunow never disclosed or otherwise indicated that this was not the case.  Specifically, at no time did they reveal to Ms. Jolles Shefner, Ms. Braun, or later Mr. Barry Shefner, that they actually had a financial interest in the potential sale of the Painting or were planning to arrange to resell it for a quick and substantial profit.

55.     Upon information and belief, at no time did Tuchman or Dunow disclose to Ms. Jolles Shefner or Ms. Braun that they were, in actuality, acting as agents, art advisors, or brokers on behalf of the prospective buyer, or that they themselves were purchasing the Painting through one or more entities such as Lontrel Trading and/or the Galerie Cazeau-Béraudière.

56.     Upon information and belief, at no time did Tuchman or Dunow inform Ms. Shefner that, in the art world, it is generally considered improper for either Tuchman or Dunow, as authenticity experts vis-à-vis Soutine, to act as an agent, appraiser, broker, and/or to have a financial or other interest in a Soutine-related sale.  Indeed, as noted

- 15 -

above, Tuchman and Dunow misrepresented to Ms. Jolles Shefner and/or her children that they were performing a mere accommodation for the prospective purchaser, for which they were to receive no monetary compensation.

57.    Further, despite their interest in the transaction, Tuchman and Dunow, in the 3/26/04 Letter, offered to represent Ms. Jolles Shefner in the transaction, stating, "[w]e stand at the ready to assist you in any way we can."

58.    This statement was made with the intent to obtain Ms. Jolles Shefner's trust and mislead her into believing that Tuchman and Dunow would protect her interests in connection with any sale of the Painting.

59.    The statement had its desired effect, inasmuch as Ms. Jolles Shefner was induced to rely on the opinions expressed by Tuchman and Dunow (as well as the incomplete and misleading factual information they provided to her) regarding the fair market value of the Painting.  Ms. Jolles Shefner's reliance on Tuchman and Dunow was reasonable because they were the foremost experts in the Soutine field in the world, a fact of which Ms. Jolles Shefner was aware.

60.    Virtually all of Tuchman and Dunow's communications with Ms. Jolles Shefner concerning the Painting were made with the intent to induce her to rely upon them in regard to the fair market value of the Painting and any offer they communicated to her for it.

61.    To that end, Tuchman and Dunow represented to Ms. Jolles Shefner and Ms. Braun that the offer referenced in the 3/26/04 Letter was "an exceptionally advantageous opportunity for you in our opinion."

- 16 -

62.    In furtherance of their scheme to defraud Ms. Jolles Shefner, Tuchman and Dunow compiled and enclosed with the 3/26/04 Letter a list of purported "comparables" (the "List") that was designed to show that the offer they communicated was "an exceptionally advantageous opportunity."

63.    The List, however, was materially incomplete.  In fact, it omitted at least half a dozen sales of Soutine paintings that had occurred between 1994 and 2004 at prices in excess of $1 million.

64.    In addition, the List gave the false and misleading impression that both the market for and the value of Soutine's works was declining, despite the fact that, upon information and belief, Tuchman and Dunow had specific knowledge that the opposite was, in fact, true.  Indeed, demand for and value of the *beef* series of paintings was *increasing*, as, at that time, the great majority of *beef* paintings were held by prominent museums, thereby reducing the number of *beef* paintings likely to come up for sale. Tuchman and Dunow never disclosed these facts to either Ms. Jolles Shefner or her children.

65.    Specifically, the List omitted Soutine paintings of lesser stature and value than the *beef* series (such as portraits) that had sold for over $1 million.  Also, the List indicated that many Soutine paintings had been put up for sale but were not "bought in," and that therefore demand for Soutine was on the decline, when the opposite was true.

66.    Specifically, upon information and belief, a Soutine portrait sold in 2001 for $2.092 million, and a Soutine landscape sold in 2002 for £1.575 million (roughly $3 million).  As set forth below, Soutine portraits and landscapes are generally less valuable than his *beef* series, and information concerning the sale of these paintings should have

- 17 -

been disclosed in the List that Tuchman and Dunow sent to Ms. Jolles Shefner on or about March 26, 2004.

67.    Upon information and belief, there is a hierarchy of value of certain types of works by Soutine: (i) iconic works, such as the *beef* paintings, generally have the greatest value; (ii) portraits are generally of lesser value than the *beef* paintings; (iii) landscapes are generally of lesser value than portraits; and (iv) non-*beef* still lifes generally have the lowest value. In light of the foregoing, the fair market value of the Painting at the time Ms. Jolles Shefner sold it to or through Tuchman and Dunow was greater than the paintings listed in paragraph 66 above.

68.    Furthermore, the List made no mention of several additional Soutine paintings that were, at that time, being prepared for auction. Tuchman and Dunow never disclosed these auctions to Ms. Jolles Shefner or her children. The paintings at issue later sold for as much as $6 million each.

69.    As the foremost experts in the world on Soutine and his works, Tuchman and Dunow knew or should have known that the paintings referenced in paragraph 68 above were being prepared for auction, and that they would be sold for significantly more than $800,000, at the time Tuchman and Dunow sent the List to Ms. Braun.

70.    Indeed, upon information and belief, Tuchman and Dunow sought to induce Ms. Jolles Shefner to sell the Painting before the paintings referenced in paragraph 68 above sold at auction, in order to conceal from Ms. Jolles Shefner the fair market value of the Painting.

71.    As the preeminent experts in the Soutine field, Tuchman and Dunow also knew that the paintings referenced in paragraphs 63, 65-66 and 68 above should have

been included in the List, if the List were to give a true and accurate indication of the fair

market value of the Painting.

72.    Because the List omitted the paintings referenced in paragraphs 63, 65-66

and 68 above (as well as, upon information and belief, other material information)

(together, the "Material Omissions"), the List itself was a material misrepresentation,

false when made by Tuchman and Dunow, as to the fair market value of the Painting.

73.    Tuchman and Dunow knew the List and the Material Omissions therein to

be material misrepresentations, which were incomplete and false when made.

74.    Tuchman and Dunow also represented to Ms. Jolles Shefner, Ms. Braun

and/or Mr. Barry Shefner that Soutine's portraits were his most sought-after works, and

that the *beef* paintings were therefore generally of lesser value.

75.    These representations were false when made, and Tuchman and Dunow

knew them to be false.  Indeed, the *beef* paintings are among Soutine's most

recognizable, iconic, and sought-after works.

76.    The iconic nature of the *beef* paintings in general—and the Painting in

particular—is evidenced by the cover photo of Tuchman and Dunow's 2002 book, *The

Impact of Soutine*.  That cover photo (a true and correct copy of which is attached hereto

as Exhibit B), is of the Painting.  Upon information and belief, the photograph used by

Tuchman and Dunow for the cover of their book was the color transparency provided to

Dunow by the Shefners in the late 1980s.  At no time before the publication of *The

Impact of Soutine* did either Tuchman or Dunow approach Ms. Jolles Shefner for

permission to use this photograph for the cover of their book.  Nor did they disclose to

her the fact that they did so at any time after the book was published.  Furthermore,

- 19 -

neither Tuchman nor Dunow ever disclosed the fact that they had authored *The Impact of Soutine* and used a photograph of the Painting for its cover at any time prior to or after the sale.

77.    Indeed, as both Tuchman and Dunow were aware, because of its iconic and sought-after nature, the Painting was worth far more than the $800,000 offered by Tuchman and Dunow, which offer they falsely and fraudulently described as "exceptionally advantageous."

78.    Upon information and belief, the Painting was—at the time Ms. Jolles Shefner sold it at the urging of Tuchman and Dunow—worth at least between $4 million to $6 million.

79.    Upon information and belief, Tuchman and Dunow had further contact with Ms. Jolles Shefner and/or Ms. Braun in late March/early April 2004 to discuss the sale of the Painting. At no time during this period (or at any time thereafter) did Tuchman or Dunow disclose the Material Omissions or correct any of the other misrepresentations described above.

80.    At no time during this period or at any time thereafter did Tuchman or Dunow disclose to Ms. Jolles Shefner or Ms. Braun the true fair market value of the Painting.

81.    Indeed, although they had offered to act on Ms. Jolles Shefner's behalf and although they had induced Ms. Jolles Shefner to rely on them as the foremost experts in the world in the Soutine field, Tuchman and Dunow deliberately concealed the true fair market value of the Painting from Ms. Jolles Shefner and her children in an effort to

induce Ms. Jolles Shefner to accept an offer significantly lower than the Painting's fair market value.

82.    On April 23, 2004, Tuchman and Dunow sent another letter (the "4/23/04 Letter") to Ms. Braun, this time increasing their offer to $1 million (U.S.).

83.    Upon information and belief, Tuchman and Dunow intended to sell the Painting to the National Gallery of Art (the "NGA"), or individuals or entities acting on behalf of the NGA, instead of a consortium of investors in Europe.

84.    At no time did Tuchman or Dunow disclose to Ms. Jolles Shefner or her children that they were acting on behalf of or for the benefit of the NGA.

85.    At no time did Tuchman or Dunow disclose that they were arranging a sale of the Painting to themselves or to or through Lontrel Trading and/or the Galerie Cazeau-Béraudière before selling it to the NGA.

86.    Upon information and belief, the NGA, or the individuals or entities acting on the NGA's behalf to whom Tuchman and Dunow intended to sell the Painting, had authorized Tuchman and Dunow to purchase the Painting for the NGA for significantly more than $1 million.

87.    Upon information and belief, it was Tuchman and Dunow's plan to induce Ms. Jolles Shefner—through the special bond of trust, confidence, and respect they had forged with her—to sell the Painting to them (or to individuals or entities with which they are affiliated, such as Lontrel Trading and/or the Galerie Cazeau-Béraudière) at a very low price and then re-sell the Painting to the NGA, or to an individual or entity acting on the NGA's or another buyer's behalf, at a significantly higher price, so that Tuchman and Dunow could derive significant profit and/or other compensation from the sale.

88.    Neither Tuchman nor Dunow ever disclosed the above plan or their financial interest in the transaction to Ms. Jolles Shefner, Ms. Braun or Mr. Barry Shefner.

89.    Upon information and belief, Tuchman and Dunow had—after the 4/23/04 Letter—further contact with Ms. Jolles Shefner and Ms. Braun, seeking to further induce Ms. Jolles Shefner—using the tactics outlined above (including via the List)—to accept their alleged $1 million offer.

90.    By May 2004, Tuchman and Dunow's tactics were successful, as Ms. Jolles Shefner agreed to sell the Painting for $1 million.

**Tuchman and Dunow Quickly Re-Sell the Painting for at Least Double the Sale Price**

91.    On or about April 28, 2004, Tuchman and Dunow, together with others under their control, caused the Painting to be transported to New York City, allegedly for inspection by their potential buyer.  Upon information and belief, this buyer was the NGA or others acting in concert with or on behalf of the NGA.

92.    Specifically, Tuchman and Dunow (together with the Galerie Cazeau-Béraudière and/or Lontrel Trading) arranged for the Painting to be shipped to the Hôtel Plaza Athénée in New York City.  They never disclosed this destination to Ms. Jolles Shefner, but rather represented to her and her children that the Painting would be shipped to them or their agents for the purposes of inspection and authentication.  Upon information and belief, Tuchman and Dunow arranged to have the Painting shipped to the Hôtel Plaza Athénée so that they could present it to the NGA there and negotiate a quick resale for a significant profit and/or other compensation.

93.     According to documents only recently uncovered by the Estate, when the Painting was shipped to the Hôtel Plaza Athénée, it was shipped, insured, and received by IFL, the shipping company retained or engaged by the Galerie Cazeau-Béraudière. Tuchman and Dunow, however, had never disclosed to Ms. Jolles Shefner that the Galerie Cazeau-Béraudière would be involved in the sale of the Painting in any manner. Rather, they represented to Ms. Jolles Shefner that the buyer was Lontrel Trading, which appears to be a transportation company in Switzerland that specializes in art. Upon information and belief, Lontrel Trading was, at all relevant times, acting at the direction and on behalf of Tuchman, Dunow, and/or the Galerie Cazeau-Béraudière.

94.     Tuchman and Dunow then informed Ms. Jolles Shefner that the Painting had passed inspection, and, on or about May 7, 2004, Mr. Barry Shefner signed, on behalf of Ms. Jolles Shefner, a Conditional Contract of Sale (the "Sale Contract") for the Painting. The sale price in the Sale Contract was $1 million, and the purchaser was listed as "Lontrel Trading c/o Alain Disch."

95.     At all relevant times in relation to the sale of the Painting, Mr. Barry Shefner was acting as an intermediary for and at the direction of his mother, Ms. Jolles Shefner, a fact that was known to both Tuchman and Dunow. At all relevant times, Mr. Shefner apprised Ms. Jolles Shefner of the content of all communications he had with Tuchman and/or Dunow.

96.     Like his mother and sister, Mr. Barry Shefner was also a neophyte in the art world, a fact that was, upon information and belief, known to Tuchman and Dunow.

97.     In a telephone conversation on or about the time at which the Sale Contract was signed, Tuchman and Dunow represented to Mr. Barry Shefner that the

- 23 -

purported buyer was or represented a group of private investors from Switzerland, who may have difficulty coming up with the purchase price all at once. Tuchman and Dunow therefore asked for payment terms, which Mr. Barry Shefner, on his mother's behalf, rejected.

98.    Nowhere on the Sale Contract (which was drafted by Tuchman and Dunow) did Tuchman or Dunow disclose the involvement of the Galerie Cazeau-Béraudière or anyone else in the sale.

99.    Pursuant to the Sale Contract, a wire transfer in the amount of $1 million was made into Ms. Jolles Shefner's bank account on or about May 18, 2004. Title of the Painting then ostensibly transferred to Lontrel Trading (at least as far as the Ms. Jolles Shefner had been informed by Tuchman and Dunow). In actuality, Tuchman and Dunow (and others acting with them, including Lontrel Trading and the Galerie Cazeau-Béraudière), upon information and belief, themselves took title to the Painting and began the process of reselling the Painting to the NGA.

100.    Indeed, the NGA has admitted that it began its efforts to acquire the Painting in "May/June 2004," or at or about the time that Tuchman and Dunow induced Ms. Jolles Shefner to sell the Painting to them or others acting on their behalf.

101.    Upon information and belief, the NGA initially decided to purchase the Painting in or shortly after "May/June 2004," such that the Painting was delivered to the NGA in or about September, 2004. On or about October 1, 2004, the Board of Trustees of the NGA approved the purchase of the Painting from Tuchman, Dunow, Lontrel Trading and/or the Galerie Cazeau-Béraudière.

102.    On or about November 17, 2004, the NGA made a wire transfer to Tuchman, Dunow and/or the Galerie Cazeau-Béraudière, and/or individuals or entities under their control, to effect the purchase of the Painting from them.

103.    Upon information and belief, the NGA, before making that transfer, conducted little or no due diligence concerning ownership or authenticity of the Painting. Indeed, although Ms. Jolles Shefner was clearly listed in the *Catalogue Raisonné* as the Painting's owner of record, the NGA failed to request any proof from Tuchman, Dunow, or the Galerie Cazeau-Béraudière as to how the Painting had come into their hands.

104.    Such lack of due diligence is, upon information and belief, insufficient to meet generally accepted standards of due diligence in the art field, especially concerning a work of art—such as the Painting—that had been sold during the Nazi era. The Nazi-era implications of the Painting were also clearly set forth in the *Catalogue Raisonné*. Upon information and belief, at all relevant times, the NGA had a copy of the *Catalogue Raisonné* in its library, but either failed to consult it in relation to its purchase of the Painting or consulted it and improperly disregarded the information therein concerning the Painting.

105.    The NGA asserts that the purchase price it paid for the Painting was $2 million. Upon information and belief, Tuchman and/or Dunow received significant additional compensation from the NGA for brokering its purchase of the Painting.

106.    Upon information and belief, the purchase price paid by the NGA was well below the fair market value of the Painting. This is evident from the sale of certain comparables to the Painting (which comparables were not disclosed in the List) prior to 2004.

107.    After acquiring the Painting, the NGA website identified the provenance of the Painting merely by reference to "Maurice Tuchman." This was done despite the clear provenance set forth in the *Catalogue Raisonné*, which lists Ms. Jolles Shefner as the Painting's last known owner of record.

108.    In or about November 2004, another still life by Soutine (but not of the *beef* series) sold for over $5 million. Upon information and belief, this painting should have been disclosed as a comparable to the Painting, along with an estimate as to its fair market value, especially since Tuchman and Dunow would have known at the time that it was coming up for auction.

109.    Also in or about November 2004, a Soutine portrait sold for approximately $6 million. Upon information and belief, this painting should have been disclosed as a comparable to the Painting, along with an estimate as to its fair market value, especially since Tuchman and Dunow would have known at the time that it was coming up for auction.

110.    Prior to the commencement of this action, the Estate demanded the return of the Painting from the NGA, or, in the alternative, payment of a sum certain, on the grounds, *inter alia*, that the NGA was not a good faith purchaser for value of the Painting.

111.    The NGA has denied the Estate's demands.

## COUNT I
### FRAUD
### (against Tuchman and Dunow, the Galerie Cazeau-Béraudière, Lontrel Trading and John Does 1-10)

112.    Plaintiff hereby reasserts paragraphs 1-111 above as if set forth fully herein.

113.    Tuchman and Dunow, as set forth above, made numerous material misrepresentations of existing or pre-existing fact to Ms. Jolles Shefner concerning: (i) the fair market value of the Painting (in the form, *inter alia*, of the materially incomplete List attached to the 3/26/04 Letter); and (ii) their characterization, in the 3/26/04 Letter and elsewhere, of the offer for its purchase that they communicated to her.

114.    Tuchman and Dunow also failed to disclose: (i) the fair market value of the Painting; (ii) the fact that they stood to derive a huge profit and/or other significant compensation as a result of its sale; or (iii) the fact that the List attached to the 3/26/04 Letter was materially incomplete. The failure by Tuchman and Dunow to disclose this information was material to Ms. Jolles Shefner's decision to sell the Painting to or through them.

115.    Tuchman and Dunow knew that the above misrepresentations and omissions were false when made. Tuchman and Dunow also made the above misrepresentations and omissions with the intent that Ms. Jolles Shefner would rely on them to her detriment.

116.    Furthermore, Tuchman and Dunow relied on Ms. Jolles Shefner's advanced age and the fact that she had been inactive in the business world for several years in their efforts to defraud her.

117.    Ms. Jolles Shefner relied on Tuchman and Dunow's misrepresentations and omissions to her detriment by selling the Painting for a price that was well below its fair market value. Ms. Jolles Shefner's reliance on Tuchman and Dunow in this regard was reasonable given that: (i) Tuchman and Dunow were and still are the foremost experts in the world on Soutine and his works; (ii) Ms. Jolles Shefner was aware of this;

- 27 -

and (iii) Tuchman and Dunow had cultivated, over a period of several years, a relationship of trust and confidence with her.

118.    Ms. Jolles Shefner was therefore damaged in an amount to be determined at trial.

119.    Tuchman and Dunow's conduct in this regard was willful, wanton, malicious, and undertaken with conscious disregard of the rights and interests of Ms. Jolles Shefner, such that an award of punitive damages as against Tuchman and Dunow is warranted.

120.    As a result, Plaintiff is entitled to judgment in its favor for compensatory and punitive damages in an amount to be determined at trial, but not less than $1 million.

## CIVIL CONSPIRACY

121.    Upon information and belief, the Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1-10 intentionally combined or agreed with Tuchman and Dunow to fraudulently induce Ms. Jolles Shefner to sell the Painting at a price well below its fair market value as set forth above.

122.    In such combination and/or agreement, the Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1-10 have shared a common purpose and knowingly acted in concert or combination to fraudulently induce Ms. Jolles Shefner to sell the Painting.

123.    Upon information and belief, both the object of their combination and/or agreement and the means by which the Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1-10 acted in concert or combination with Tuchman and Dunow were unlawful.

124.    In so conspiring, the Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1-10, together with Tuchman and Dunow, acted with malice and intent.

125.    As a direct and proximate result of this conspiracy, and the underlying fraud, Ms. Jolles Shefner and the Estate have sustained damages and will incur further damages in an amount to be proven at trial.

126.    The Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1-10 are therefore jointly and severally liable for damages sustained by Ms. Jolles Shefner and the Estate as a result of both their conspiracy and the underlying fraud on Ms. Jolles Shefner as set forth above.

127.    In addition, the conduct of the Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1-10 in this regard was willful, wanton, malicious, and undertaken with conscious disregard of the rights and interests of Ms. Jolles Shefner, such that an award of punitive damages as against them is warranted.

## COUNT II
## UNJUST ENRICHMENT
### (against the Defendants)

128.    Plaintiff hereby reasserts paragraphs 1-127 above as if set forth fully herein.

129.    Tuchman and Dunow fraudulently induced Ms. Jolles Shefner to sell the Painting to or through them at a price far below its fair market value.  Furthermore, Tuchman and Dunow relied on Ms. Jolles Shefner's advanced age and the fact that she had been inactive in the business world for several years in their efforts to defraud her.

130.    Tuchman, Dunow, the Galerie Cazeau-Béraudière, Lontrel Trading, and/or one or more of the John Does 1-10 then resold the Painting to the NGA or others acting

on behalf of the NGA (or to another buyer) for a significantly higher sum, keeping the difference for themselves. Upon information and belief, Tuchman, Dunow, the Galerie Cazeau-Béraudière, and/or Lontrel Trading also received a substantial commission or fee in relation to such sale.

131.    Upon information and belief, the NGA purchased the Painting with reckless disregard of the circumstances by which it came into the possession of Tuchman, Dunow, the Galerie Cazeau-Béraudière, and/or Lontrel Trading.

132.    It would be inequitable for any of Tuchman, Dunow, the Galerie Cazeau-Béraudière, Lontrel Trading, and/or the John Does 1-10 to retain the benefit they received by deceiving Ms. Jolles Shefner and then reselling the Painting at a higher price and/or receiving a commission or fee for such resale.

133.    Further, it would be inequitable for the NGA to retain the benefit(s) it has received through the purchase of the Painting due to its reckless disregard of the deceptive circumstances under which the Painting came into the possession of any of the other Defendants.

134.    Defendants have therefore been unjustly enriched in an amount to be determined at trial.

135.    As a direct and proximate result of this unjust enrichment, Plaintiff has sustained damages and will incur further damages in an amount to be proven at trial. Plaintiff has suffered and will continue to suffer irreparable harm, and will continue to suffer such injury until Defendants are ordered to disgorge the funds or other benefit(s) by which they have been unjustly enriched.

136.    Plaintiff has no adequate remedy at law.

- 30 -

137.    As a result, Plaintiff is entitled to judgment in its favor for compensatory damages in an amount to be determined at trial, but not less than $1 million.

## COUNT III
## DECLARATORY JUDGMENT
### (against the Defendants)

138.    Plaintiff hereby reasserts paragraphs 1-137 above as if set forth fully herein.

139.    Plaintiff has presented Defendants Tuchman, Dunow, and the NGA with a summary of the above claims in an effort to recover the Painting from them. These Defendants have all denied any wrongdoing in relation to the above allegations, and the NGA has specifically denied Plaintiff's request for return of the Painting.

140.    As a result, an actual case or controversy exists between the Estate, the NGA and the other Defendants inasmuch as each Defendant has asserted that it (and/or an entity with which it was/is affiliated) had or was able to transfer good and marketable title to the Painting and the Estate asserts that none of the Defendants is a *bona fide* purchaser for value.

141.    In addition, the Estate faces future cost and uncertainty inasmuch as it cannot be fully administered and closed unless and until the dispute surrounding title to the Painting and the fraud perpetrated on Ms. Jolles Shefner is resolved.

142.    The Estate bases its assertion as to the lack of *bona fides* vis-à-vis Tuchman, Dunow, the Galerie Cazeau-Béraudière, Lontrel Trading, and John Does 1 though 10 on the fact that they engaged in the fraudulent scheme discussed above to induce Ms. Jolles Shefner to sell the Paining at less than its fair market value. Tuchman

and Dunow further relied on Ms. Jolles Shefner's advanced age and her inactivity in the business world in their efforts to defraud her.

143.    The Estate bases its assertion as to the lack of *bona fides* vis-à-vis NGA on the fact that the NGA apparently conducted little or no due diligence in relation to its purchase of the Painting, and purchased the Painting with reckless disregard to the fraudulent means by which the Painting had become available for purchase.

144.    Upon information and belief, the NGA's failures in this regard were in derogation of generally accepted due-diligence practices in the industry, especially given the facts that:  (i) Ms. Jolles Shefner was listed as the last owner of record before the NGA's purchase of the Painting; and (ii) the Painting had changed owners during the Nazi era, which change of ownership now generally triggers a higher level of due diligence as to provenance.

145.    Upon information and belief, had the NGA conducted appropriate due diligence, it would have discovered the fraud perpetrated on Ms. Jolles Shefner by Tuchman, Dunow, the Galerie Cazeau-Béraudière and others.

146.    As a result, Plaintiff is entitled to declaratory judgment in its favor, declaring that the none of Defendants is or ever was a *bona fide* purchaser for value of the Painting (or a buyer in the ordinary course of business under the UCC), and that the Painting must therefore be returned to the Estate.

**COUNT IV**
**REPLEVIN**
**(against the NGA)**

147.    Plaintiff hereby reasserts paragraphs 1-146 above as if set forth fully herein.

148.    As set forth above, the Ms. Jolles Shefner was defrauded by one or more Defendants into selling the Painting for a price far below its fair market value.

149.    As also set forth above, because of that fraud and the NGA's apparent lack of due diligence, the NGA was not a *bona fide* purchaser for value of the Painting.

150.    As a result, the NGA has neither good nor marketable title to the Painting, nor any right to current possession of it.

151.    Rather, the Estate has good and marketable title to the Painting as well as the right to immediate possession of it.  The Painting must therefore be returned to the Estate.

152.    The Estate has demanded return of the Painting, but the NGA has improperly rejected the Estate's demand and currently exerts possession and control over the Painting.

153.    As a result, Plaintiff is entitled to judgment in its favor against the NGA ordering the return of the Painting to the Estate.

**COUNT V**
**RESCISSION**
**(against Lontrel Trading)**

154.    Plaintiff hereby reasserts paragraphs 1-153 above as if set forth fully

herein.

155.    As set forth in Count I above, Lontrel Trading was a co-conspirator in the

fraud perpetrated on Ms. Jolles Shefner.

156.    As a result, Lontrel Trading cannot have had good or marketable title in

the Painting.

157.    Furthermore, inasmuch as it was induced by the fraud of Tuchman and

Dunow—in which Lontrel Trading was a co-conspirator—the Sale Contract is a nullity

and should be rescinded.

158.    As a result, Plaintiff is entitled to judgment in its favor rescinding the Sale

Contract as between Ms. Jolles Shefner and Lontrel Trading.

WHEREFORE Plaintiff demands judgment as follows:

(i)     on its first claim against Tuchman, Dunow, the Galerie Cazeau-

Béraudière, Lontrel Trading and others acting in concert with them for

compensatory and punitive damages in an amount to be determined at

trial;

(ii)    on its second claim against all Defendants for compensatory damages in

an amount to be determined at trial;

(iii)   on its third claim for declaratory judgment against all Defendants

declaring that none of them has ever been a *bona fide* purchaser for value

of the Painting and that the Painting should be returned to the Estate;

(iv)    on its fourth claim, for judgment against the NGA ordering return of the

Painting to the Estate;

(v)    on its fifth claim, for judgment against Lontrel Trading rescinding the Sale

Contract as a result of the fraud perpetrated on Ms. Jolles Shefner;

(vi)    awarding Plaintiff its reasonable attorneys' fees and costs expended in this

action, together with pre- and post-judgment interest thereon to the extent

permitted by law; and

(vii)    awarding Plaintiff such other and further relief as this Court deems just

and proper under the circumstances.

Dated: New York, New York
       May 12, 2008

ALSTON & BIRD LLP

By: _____

Karl Geercken (KG 5897)
F. Paul Greene (FG 1837)
90 Park Avenue
New York, New York 10016
(212) 210-9400

*Attorneys for the Estate of Ms. Lorette Jolles
Shefner*

30730115

- 35 -

# EXHIBIT A

Alston & Bird

FROM : LAURENCE BRAUN          PHONE NO. : 2124522395          Apr. 14 2004 06:02PM P1

209 West 86 Street
New York, NY 10024
Tel./Fax: 212 496-1966

Ariella Braun
941 Park Avenue
New York, NY 10028

March 26, 2004

Dear Ms. Braun:

We now have received a firm offer of $800,000 for your *Beef*, subject to normal examination.

This is an exceptionally advantageous opportunity for you in our opinion. We trust you will consider it seriously and attentively.

We stand at the ready to assist you in any way we can.

Please call or write. Esti's address and number are listed above; Maurice can be reached at 212 452-9101 (tel.)/212 452-9102 (fax).

Sincerely yours,

*Esti Dunow & Maurice Tuchman (ED)*

Esti Dunow and Maurice Tuchman

Apr. 14 2004 06:02P
PAGE 8

PHONE NO. : 2124522395
DUNOW UNGER

LAURENCE BRAUN
04/13/2004  09:21    12124961965

| | |
|---|---|
| Nature morte aux harengs (Still Life with Herrings)  1917<br>Christie's, NY -- Nov 5, 2003 | $130,700 |
| Les pintades (Fowl) 1926-27<br>Christie's, NY -- May 8, 2003 | $113,525 |
| Glaieuls (Gladiolas) 1919<br>Christie's, NY -- May 8, 2003 | $89,625 |
| Nature morte aux fruits (Still Life with Fruit) 1922<br>Christie's, London -- June 25, 2002<br>Estimate: $219 – 292,000 | Bought In (NOT SOLD) |
| La cruche aux roses (Roses) 1918<br>Christie's, London -- April 9, 2002 | $202,945 |
| Nature morte au chou rouge (Still Life with Red Cabbage) 1918<br>Phillips, NY – Nov 5, 2002<br>Estimate: $200 – 300,000 | Bought In (NOT SOLD) |
| Oie plumée (Plucked Goose) 1926-27<br>Sotheby's, London -- June 27, 2001<br>Estimate: $48 – 62,000 | Bought In (NOT SOLD) |
| Canard pendu (Hanging Duck)<br>Christie's, NY -- May 10, 2001<br>Estimate: $60 – 80,000 | Bought In (NOT SOLD) |
| Le lievre sur fond blue (Rabbit/Hare) 1924-25<br>Camard, Florence – April 3, 2001<br>Estimate: $69 – 97,000 | Bought In (NOT SOLD) |
| La vase de fleurs (Vase of Flowers) 1918<br>Sotheby's, London – February 6, 2001<br>Estimate: $88 – 118,000 | Bought In (NOT SOLD) |
| Nature morte au chou rouge (Still Life with Red Cabbage) 1918<br>Sotheby's, NY -- May 11, 2000 | $159,750 |
| Nature morte au deux perdrix rouges (Still Life with Fowl) 1918<br>Christie's, NY -- Nov 9, 1999<br>Estimate: $140 – 180,000 | Bought In (NOT SOLD) |
| Le lievre (Rabbit/Hare) 1918<br>Christie's, NY -- Nov 9, 1999<br>Estimate: $100 – 150,000 | Bought In (NOT SOLD) |

FROM : LAURENCE BRAUN          PHONE NO. : 2124522395          Apr. 14 2004 06:02PM P3
04/13/2004  09:21   12124961965                      DUNOW UNGER

2

| | |
|---|---|
| L'étal de boucherie  (Butcher Stall with Beef)  1919 Christie's, NY — Nov 9, 1999 Estimate:  $180 – 220,000 | Bought In (NOT SOLD) |
| Nature morte a la coupe de fruits  (Still Life with Fruit)  1916 Christie's, NY — Nov 9, 1999 | $140,000 |
| Les glaieuls (Gladiolas)  1919 Sotheby's, Tel Aviv — Oct 8, 1998 | $244,500 |
| Oie plumée (Plucked Goose)  1926-27 Christie's, London — July 2, 1998 | $72,190 |
| Les pintades (Fowl)  1926-27 Loudmer, Paris — June 19, 1997 | $157,628 |
| Le faisan (Pheasant)  1926 Christie's, NY — May 15, 1997 | $36,800 |
| Nature morte aux fruits (Still Life with Fruit)  1922 Sotheby's, London — Dec 4, 1996 | $110,722 |
| Les glaieuls (Gladiolas) 1919 Christie's, NY — Nov 14, 1996 | $74,000 |
| Bouquet de fleurs (Bouquet of Flowers)  1919 Christie's, Tel Aviv — Sept 30, 1996 | $96,000 |
| Nature morte aux poivrons et carottes (Still Life with Peppers and Carrots) 1918 Christie's, Tel Aviv — April 14, 1996 | $90,500 |
| Nature morte a la soupiere (Still Life with Soup Tureen) 1916 Christie's, Tel Aviv — Oct 12, 1995 | $145,500 |
| Nature morte au canard (Still Life with Duck) 1923 Christie's, London — June 27, 1995 | $107,227 |
| Piece de boeuf (Beef)  1922-23 Christie's, NY — May 10, 1995 | $508,500 |
| Les glaieuls (Gladiolas) 1919 Christie's, NY — May 10, 1995 | $354,500 |
| Les glaieuls au pot bleu (Gladiolas) Sotheby's, NY — May 8, 1995 | $112,500 |

FROM : LAURENCE BRAUN
04/13/2004  09:21   12124561965                    PHONE NO. : 2124522395                    Apr. 14 2004 06:03PM P4
                                                   DUNOW UNGER

3

Nature morte au faisan (Pheasant) 1918
Christie's, NY -- May 11, 1984                    $222,500

Le canard, 1933-34
Christie's, London -- June 23, 1993              $66,489

# EXHIBIT B

Alston & Bird

# The impact of Chaim Soutine

De Kooning, Pollock, Dubuffet, Bacon

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                          :

THE ESTATE OF LORETTE JOLLES SHEFNER   :      08 CIV 4443 (LTS) (DFE)
by and through its executors Mr. Barry Shefner, Ms.   :
Ariela Braun, and Mr. Leon Miller,                :

                                Plaintiff,     :

                         —against—         :      **ANSWER OF**
                                        :      **DEFENDANTS**
MAURICE TUCHMAN, ESTI DUNOW, the      :      **MAURICE TUCHMAN**
GALERIE CAZEAU-BÉRAUDIÈRE, the        :      **AND ESTI DUNOW**
NATIONAL GALLERY OF ART, LONTREL     :
TRADING, and JOHN DOES 1-10,            :

                              Defendants.   :

------------------------------------------------------------------ x

      Defendants Maurice Tuchman ("Tuchman") and Esti Dunow ("Dunow"), by their
attorney, Georges G. Lederman, Esq., do hereby answer the complaint, dated May 12, 2008 (the
"Complaint"), of Plaintiff The Estate of Lorette Jolles Shefner ("Plaintiff") in the above-
captioned action as follows:

### AS TO INTRODUCTORY PARAGRAPHS 1-111

    1.      Deny the allegations contained in paragraph "1" of the Complaint.

    2.      Deny the allegations contained in paragraph "2" of the Complaint.

    3.      Deny the allegations contained in paragraph "3" of the Complaint but admit that
Tuchman and Dunow each received a commission stemming from the sale of the painting by the
artist Chaim Soutine ("Soutine") entitled *Piece of Beef* (the "Painting") when co-defendant

Galerie Cazeau-Béraudière ("Cazeau-Béraudière") sold the Painting to co-defendant the National

Gallery of Art ("NGA").

4.    Deny the allegations contained in paragraph "4" of the Complaint.

5.    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph "5" of the Complaint.

6.    Deny the allegations contained in paragraph "6" of the Complaint.

7.    Deny the allegations contained in paragraph "7" of the Complaint.

8.    Deny the allegations contained in paragraph "8" of the Complaint.

9.    Defer all questions of law contained in paragraph "9" of the Complaint to the

Court.

10.    Defer all questions of law contained in paragraph "10" of the Complaint to the

Court.

11.    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph "11" of the Complaint.

12.    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph "12" of the Complaint.

13.    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph "13" of the Complaint.

14.    Deny the allegations contained in paragraph "14" of the Complaint, but Tuchman

admits that he (i) is an advisor, scholar and author who resides at 200 East 69th Street, Apt. 17B,

New York, New York 10021, (ii) holds himself out as an expert on the works of Soutine as to

questions of authenticity, and (iii) derives an income from his expertise on Soutine.

2

15.    Deny the allegations contained in paragraph "15" of the Complaint, but Dunow admits that she (i) is an advisor, scholar and author who resides at 209 West 86th Street, New York, New York 10024, (ii) has authored several books on Soutine together with Tuchman, and (iii) derives an income from her expertise on the works of Soutine as to questions of authenticity.

16.    Deny the allegations contained in paragraph "16" of the Complaint but admit that they are among the foremost authorities concerning questions of authenticity as to the works of Soutine.

17.    Deny the allegations contained in paragraph "17" of the Complaint but admit that a *catalogue raisonné* is (i) a state-of-the-art compilation of all known and examined works of an artist, and (ii) considered the most reliable source of information concerning authenticity of a work; and Tuchman and Dunow further admit that if a work purports to be from a certain artist but is not listed in the *catalogue raisonné*, then, absent other proof as to authenticity, the work may not be considered authentic.

18.    Deny the allegations contained in paragraph "18" of the Complaint but admit that authors of a *catalogue raisonné* are often considered to be the foremost authorities concerning questions of authenticity and that others rely upon their opinions concerning questions of authenticity.

19.    Deny the allegations contained in paragraph "19" of the Complaint but admit that the Tuchman/Dunow *catalogue raisonné* is the only one that is currently considered authoritative by their peers.

20.    Deny the allegations contained in paragraph "20" of the Complaint but admit that for a buyer to have reasonable assurance concerning authenticity of the work the buyer is

3

considering purchasing, the buyer (or its agents) must generally consult an authoritative authenticity source, such as a *catalogue raisonné* author.

21.    Deny the allegations contained in paragraph "21" of the Complaint.

22.    Deny the allegations contained in paragraph "22" of the Complaint but admit that they are among the foremost authorities concerning questions of authenticity as to the works of Soutine.

23.    Deny the allegations contained in paragraph "23" of the Complaint.

24.    Defer all questions of law contained in paragraph "24" of the Complaint to the Court and deny the allegations as to Tuchman and Dunow contained in paragraph "24" of the Complaint.

25.    Deny the allegations contained in paragraph "25" of the Complaint.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "26" of the Complaint.

27.    Deny knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph "27" of the Complaint that Cazeau-Béraudière is a French entity.  Tuchman and Dunow deny the remaining allegations contained in paragraph "27" of the Complaint but admit that Cazeau-Béraudière regularly does business in New York City and that its principals travel to New York to conduct business.

28.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "28" of the Complaint.

29.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "29" of the Complaint.

30.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "30" of the Complaint.

31.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "31" of the Complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "32" of the Complaint.

33.     Admit the allegations contained in paragraph "33" of the Complaint.

34.     Admit the allegations contained in paragraph "34" of the Complaint.

35.     Deny the allegations contained in paragraph "35" of the Complaint.

36.     Deny the allegations contained in paragraph "36" of the Complaint.

37.     Deny the allegations contained in paragraph "37" of the Complaint.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph "38" of the Complaint as to Ms. Lorette Jolles Shefner ("Jolles Shefner") and deny the allegations contained in paragraph "38" of the Complaint as to Tuchman and Dunow.

39.     Deny the allegations contained in paragraph "39" of the Complaint.

40.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "40" of the Complaint.

41.     Deny knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph "41" of the Complaint as to Jolles Shefner and deny the allegations contained in paragraph "41" of the Complaint as to Tuchman and Dunow.

42.     Deny the allegations contained in paragraph "42" of the Complaint.

43.     Deny the allegations contained in paragraph "43" of the Complaint.

44.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "44" of the Complaint.

45.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "45" of the Complaint.

46.    Deny the allegations contained in paragraph "46" of the Complaint.

47.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "47" of the Complaint.

48.    Admit the allegations contained in paragraph "48" of the Complaint.

49.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "49" of the Complaint.

50.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "50" of the Complaint as to Ms. Ariela Braun ("Braun") but admit that Tuchman and Dunow signed a copy of their *Catalogue Raisonné* for Jolles Shefner.

51.    Deny the allegations contained in paragraph "51" of the Complaint.

52.    Deny the allegations contained in paragraph "52" of the Complaint.

53.    Admit the allegations contained in paragraph "53" of the Complaint.

54.    Deny knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph "54" of the Complaint as to Jolles Shefner and deny the allegations contained in paragraph "54" of the Complaint as to Tuchman and Dunow.

55.    Deny the allegations contained in paragraph "55" of the Complaint.

56.    Deny the allegations contained in paragraph "56" of the Complaint.

57.    Deny the allegations contained in paragraph "57" of the Complaint.

58.    Deny the allegations contained in paragraph "58" of the Complaint.

59.    Deny the allegations contained in paragraph "59" of the Complaint but admit that they are among the foremost authorities concerning questions of authenticity as to the works of Soutine.

60.    Deny the allegations contained in paragraph "60" of the Complaint.

61.    Deny the allegations contained in paragraph "61" of the Complaint.

62.    Deny the allegations contained in paragraph "62" of the Complaint.

63.    Deny the allegations contained in paragraph "63" of the Complaint.

64.    Deny the allegations contained in paragraph "64" of the Complaint.

65.    Deny the allegations contained in paragraph "65" of the Complaint.

66.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "66" of the Complaint.

67.    Deny the allegations contained in paragraph "67" of the Complaint.

68.    Deny the allegations contained in paragraph "68" of the Complaint.

69.    Deny the allegations contained in paragraph "69" of the Complaint but admit that they are among the foremost authorities concerning questions of authenticity as to the works of Soutine.

70.    Deny the allegations contained in paragraph "70" of the Complaint.

71.    Deny the allegations contained in paragraph "71" of the Complaint but admit that they are among the foremost authorities concerning questions of authenticity as to the works of Soutine.

72.    Deny the allegations contained in paragraph "72" of the Complaint.

73.    Deny the allegations contained in paragraph "73" of the Complaint.

74.    Deny the allegations contained in paragraph "74" of the Complaint but admit that Dunow informed Braun that Soutine's portraits were his most popular works.

75.    Deny the allegations contained in paragraph "75" of the Complaint but admit that Soutine's *beef* paintings are recognizable, iconic and popular works.

76.    Deny the allegations contained in paragraph "76" of the Complaint but admit that (i) a photograph on the cover of Tuchman and Dunow's 2001 book, *The Impact of Soutine*, is that of the Painting; (ii) at no time before the publication of *The Impact of Soutine* did either Tuchman or Dunow approach Jolles Shefner for permission to use this photograph for the cover of their book; (iii) they did not disclose to Jolles Shefner that they did so after the book had been published; and (iv) they did not disclose that they had authored *The Impact of Soutine* and had used a photograph of the Painting prior to or after the sale of the Painting. Tuchman and Dunow deny knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph "76" of the Complaint that the photograph that had been used was the color transparency that had been provided to Dunow in the late 1980s.

77.    Deny the allegations contained in paragraph "77" of the Complaint.

78.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "78" of the Complaint.

79.    Deny the allegations contained in paragraph "79" of the Complaint but admit that Dunow had had further contact with Jolles Shefner and/or Braun in late March/early April 2004 to discuss the sale of the Painting.

80.    Deny the allegations contained in paragraph "80" of the Complaint.

81.    Deny the allegations contained in paragraph "81" of the Complaint.

8

82.     Deny the allegations contained in paragraph "82" of the Complaint but admit that they sent a letter, dated April 23, 2004, to Braun extending an offer by a third party for the Painting in the amount of $1 million (USD).

83.     Deny the allegations contained in paragraph "83" of the Complaint.

84.     Deny the allegations contained in paragraph "84" of the Complaint.

85.     Deny the allegations contained in paragraph "85" of the Complaint.

86.     Deny the allegations contained in paragraph "86" of the Complaint.

87.     Deny the allegations contained in paragraph "87" of the Complaint.

88.     Deny the allegations contained in paragraph "88" of the Complaint.

89.     Deny the allegations contained in paragraph "89" of the Complaint.

90.     Deny the allegations contained in paragraph "90" of the Complaint.

91.     Deny the allegations contained in paragraph "91" of the Complaint.

92.     Deny the allegations contained in paragraph "92" of the Complaint but admit that they arranged for the Painting to be shipped to the Hôtel Plaza Athénée in New York City.

93.     Deny the allegations contained in paragraph "93" of the Complaint but admit that (i) when the Painting was shipped to the Hôtel Plaza Athénée, it was shipped, insured and received by the shipping company retained or engaged by Cazeau-Béraudière; and (ii) they did not disclose to Jolles Shefner that Cazeau-Béraudière would be involved in the purchase of the Painting in any manner.

94.     Admit the allegations contained in paragraph "94" of the Complaint.

95.     Deny knowledge or information sufficient to form a belief as to the truth of the allegation contained in paragraph "95" of the Complaint as to Mr. Barry Shefner ("Barry

Shefner") but admit that they understood that Barry Shefner was acting as an intermediary for Jolles Shefner in the sale of the Painting.

96.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "96" of the Complaint.

97.  Deny the allegations contained in paragraph "97" of the Complaint.

98.  Deny the allegations contained in paragraph "98" of the Complaint but admit that Tuchman and Dunow did not disclose the involvement of Cazeau-Béraudière in the purchase of the Painting.

99.  Deny the allegations contained in paragraph "99" of the Complaint but admit that a wire transfer in the amount of $1 million was made into Jolles Shefner's bank account.

100.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "100" of the Complaint.

101.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "101" of the Complaint.

102.  Deny the allegations contained in paragraph "102" of the Complaint.

103.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "103" of the Complaint.

104.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "104" of the Complaint.

105.  Admit that they each received a commission stemming from the sale of the Painting by Cazeau-Béraudière to the NGA.

106.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "106" of the Complaint.

10

107.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "107" of the Complaint.

108.    Deny the allegations contained in paragraph "108" of the Complaint.

109.    Deny the allegations contained in paragraph "109" of the Complaint.

110.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "110" of the Complaint.

111.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "111" of the Complaint.

<u>COUNT I</u>

**FRAUD**
**(against Tuchman and Dunow, the Cazeau-Béraudière, Lontrel Trading**
**and John Does 1-10)**

112.    Answering paragraph "112" of the Complaint, Tuchman and Dunow repeat, reiterate and reallege each and every admission and denial set forth in paragraphs 1 through 111 of this Answer with the same force and effect as if herein set forth in full.

113.    Deny the allegations contained in paragraph "113" of the Complaint.

114.    Deny the allegations contained in paragraph "114" of the Complaint.

115.    Deny the allegations contained in paragraph "115" of the Complaint.

116.    Deny the allegations contained in paragraph "116" of the Complaint.

117.    Deny the allegations contained in paragraph "117" of the Complaint but admit that they are among the foremost authorities concerning questions of authenticity as to the works of Soutine.

118.    Deny the allegations contained in paragraph "118" of the Complaint.

119.    Deny the allegations contained in paragraph "119" of the Complaint.

11

120.    Deny the allegations contained in paragraph "120" of the Complaint.

## CIVIL CONSPIRACY

121.    Deny the allegations contained in paragraph "121" of the Complaint.

122.    Deny the allegations contained in paragraph "122" of the Complaint.

123.    Deny the allegations contained in paragraph "123" of the Complaint.

124.    Deny the allegations contained in paragraph "124" of the Complaint.

125.    Deny the allegations contained in paragraph "125" of the Complaint.

126.    Deny the allegations contained in paragraph "126" of the Complaint.

127.    Deny the allegations contained in paragraph "127" of the Complaint.

## COUNT II

### UNJUST ENRICHMENT
### (against the Defendants)

128.    Answering paragraph "128" of the Complaint, Tuchman and Dunow repeat, reiterate and reallege each and every admission and denial set forth in paragraphs 1 through 127 of this Answer with the same force and effect as if herein set forth in full.

129.    Deny the allegations contained in paragraph "129" of the Complaint.

130.    Deny the allegations contained in paragraph "130" of the Complaint but admit that they each received a commission stemming from the sale of the Painting by Cazeau-Béraudière to the NGA.

131.    Deny the allegations contained in paragraph "131" of the Complaint.

132.    Deny the allegations contained in paragraph "132" of the Complaint.

133.    Deny the allegations contained in paragraph "133" of the Complaint.

134.    Deny the allegation contained in paragraph "134" of the Complaint.

12

135.    Deny the allegations contained in paragraph "135" of the Complaint.

136.    Deny the allegation contained in paragraph "136" of the Complaint.

137.    Deny the allegations contained in paragraph "137" of the Complaint.

## COUNT III

### DECLARATORY JUDGMENT
### (against the Defendants)

138.    Answering paragraph "138" of the Complaint, Tuchman and Dunow repeat, reiterate and reallege each and every admission and denial set forth in paragraphs 1 through 137 of this Answer with the same force and effect as if herein set forth in full.

139.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "139" of the Complaint as to the NGA but admit the allegations contained in paragraph "139" of the Complaint as to Tuchman and Dunow.

140.    Defer all questions of law contained in paragraph "140" of the Complaint to the Court.

141.    Deny the allegations contained in paragraph "141" of the Complaint.

142.    Deny the allegations contained in paragraph "142" of the Complaint.

143.    Deny the allegations contained in paragraph "143" of the Complaint.

144.    Deny sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph "144" of the Complaint.

145.    Deny the allegations contained in paragraph "145" of the Complaint.

146.    Deny the allegations contained in paragraph "146" of the Complaint.

## COUNT IV

### REPLEVIN
**(against the NGA)**

147.    Answering paragraph "147" of the Complaint, Tuchman and Dunow repeat, reiterate and reallege each and every admission and denial set forth in paragraphs 1 through 146 of this Answer with the same force and effect as if herein set forth in full.

148.    Deny the allegations contained in paragraph "148" of the Complaint.

149.    Deny the allegations contained in paragraph "149" of the Complaint.

150.    Deny the allegations contained in paragraph "150" of the Complaint.

151.    Deny the allegations contained in paragraph "151" of the Complaint.

152.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "152" of the Complaint.

153.    Deny the allegation contained in paragraph "153" of the Complaint.

## COUNT IV

### RESCISSION
**(against Lontrel Trading)**

154.    Answering paragraph "154" of the Complaint, Tuchman and Dunow repeat, reiterate and reallege each and every admission and denial set forth in paragraphs 1 through 153 of this Answer with the same force and effect as if herein set forth in full.

155.    Deny the allegation contained in paragraph "155" of the Complaint.

156.    Deny the allegation contained in paragraph "156" of the Complaint.

157.    Deny the allegations contained in paragraph "157" of the Complaint.

158.    Deny the allegation contained in paragraph "158" of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

159.  The Complaint fails to state facts sufficient to constitute any cause of action against Tuchman or Dunow.

### SECOND AFFIRMATIVE DEFENSE

160.  Plaintiff is precluded from obtaining the relief it seeks because it has not suffered any damages.

### THIRD AFFIRMATIVE DEFENSE

161.  Plaintiff's claims are barred, in whole or in part, because the causes of action in the Complaint have been asserted in bad faith.

### FOURTH AFFIRMATIVE DEFENSE

162.  Plaintiff's claims are barred, in whole or in part, because any damages that Plaintiff may have sustained, which are expressly denied, were not directly, indirectly, proximately, in fact or otherwise caused by any conduct, act, statement or omission by either Tuchman or Dunow.

### FIFTH AFFIRMATIVE DEFENSE

163.  Plaintiff's claims based on civil conspiracy are barred, because any damages that Plaintiff may have sustained, which are expressly denied, were not caused by any conduct, act,

15

statement or omission by Tuchman and/or Dunow made in combination with any other co-defendant.

### SIXTH AFFIRMATIVE DEFENSE

164.   Plaintiff cannot maintain an action for fraud where the circumstances constituting the wrong have not been pleaded with sufficient particularity as required pursuant to Federal Rules of Civil Procedure Rule 9(b).

### SEVENTH AFFIRMATIVE DEFENSE

165.   Whatever damages Plaintiff may have sustained, which are expressly denied, were caused by or contributed to as a result of the knowing and assenting conduct of its own executors.   Tuchman and Dunow therefore are not liable to Plaintiff or, alternatively, are only partially liable in relative proportion to the knowing and assenting conduct of Plaintiff's executors.

### PRAYER FOR RELIEF

WHEREFORE, defendants Tuchman and Dunow pray for judgment against Plaintiff as follows:

1.   That Plaintiff take nothing by virtue of its Complaint and be granted neither legal nor equitable relief;

2.   That the Complaint be dismissed in its entirety with prejudice;

3.   That defendants Tuchman and Dunow be awarded their costs in this Action; and

16

4.    That the Court award defendants Tuchman and Dunow such other and further relief as it may deem just and proper.

Dated:  New York, New York
        June 13, 2008

                                        Georges G. Lederman  Attorney at Law


                                        _____S/_____
                                        Georges G. Lederman (GL5051)

                                        *Office and Post Office Address*
                                        52 Duane Street, 7th Floor
                                        New York, NY 10007
                                        Telephone:  (212) 374-9160
                                        Facsimile:  (212) 732-6323
                                        E-mail:  ggl@lederman-law.com

                                        *Attorney for defendants MAURICE*
                                        *TUCHMAN and ESTI DUNOW*

17

# Exhibit C

... 



**M E R C U R Y**
NATIONAL GALLERY OF ART LIBRARY    LIBRARY CATALOG    HEL

SEARCH | TITLES | HISTORY | CHECKOUT | EXIT          | LIBRARY | AUCTION | SLIDES | PHOTOS |

Catalog: National Gallery of Art Library
Search Request: Command = soutine
Search Results: Displaying 9 of 44 entries

◀ PREVIOUS      NEXT ▶

BIBLIOGRAPHIC          MARC FORMAT

### *The impact of Chaim Soutine (1893-1943) : De Kooning, Pollock, Dubuffet,...*

**Call No:** N44.S663 T84 2002
**Author:** Tuchman, Maurice.
**Title:** The impact of Chaim *Soutine* (1893-1943) : De Kooning, Pollock, Dubuffet, Bacon / Maurice Tuchmann, Esti Dunow.
**Publication:** Ostfildern : Hatje Cantz, 2002.
**Description:** 165 p. : chiefly col. ill. ; 31 cm.
**ISBN:** 3775791035 (hd.bd.)
**Note:** "This book was published on the occasion of the exhibition "The impact of Chaim *Soutine*" at Galerie Gmurzynska, November 2 - December 15, 2001"--Colophon.
**Subject(s):** *Soutine*, Chaim, 1893-1943 --Influence --Exhibitions.
*Soutine*, Chaim, 1893-1943 --Exhibitions --2001 --Cologne (Germany)
Expressionism (Art) --Exhibitions.
**Added Entry:** Dunow, Esti.
Galerie Gmurzynska.

---

**Call Number:** N44.S663 T84 2002
**Location:** General Stacks
**Status:** Available

◀ PREVIOUS      NEXT ▶

| Record Options | | |
|---|---|---|
| Select Download Format | Full Record ▾ | Format for Print/Save |
| Enter your email address: | | E-mail |

Search   *Headings*   Titles   History   Exit   Library   Auction   Slides   Photos

*Copyright ©2008 National Gallery of Art, Washington D.C.*

# Exhibit D



## THE COLLECTION

NATIONAL GALLERY OF ART

What's New
Web Newsletter
Calendar
Recent Acquisitions
Videos & Podcasts
About the Gallery
Crosscurrents
Afghanistan

The Collection
Exhibitions
Plan a Visit
Programs & Events
Online Tours
Education
Resources
Gallery Shop
Support the Gallery
NGAKids

Search the Site



Chaim Soutine (painter)
Russian, 1893 - 1943
**_Piece of Beef_**, 1923
oil on canvas
Overall: 81.6 x 60 cm (32 1/8 x 23 5/8 in.) framed: 102.9 x 82.4 x 6.4 cm
(40 1/2 x 32 7/16 x 2 1/2 in.)
Chester Dale Fund
2004.126.1

## Provenance

Maurice Tuchman, New York; purchased 17 November 2004 by NGA.

## Associated Names

- Tuchman, Maurice

artist information
bibliography
exhibition history
inscription

help | search | site map | contact us | privacy | terms of use | press | home

Copyright © 2008 National Gallery of Art, Washington, DC



## THE COLLECTION
NATIONAL GALLERY OF ART

What's New
Web Newsletter
Calendar
Recent Acquisitions
Videos & Podcasts
About the Gallery
Crosscurrents
Afghanistan

The Collection
Exhibitions
Plan a Visit
Programs & Events
Online Tours
Education
Resources
Gallery Shop
Support the Gallery
NGAKids

Search the Site 

# Maurice Tuchman

*Former owner of the following :*

**Soutine, Chaim**
*Piece of Beef*, 1923, oil on canvas, 2004.126.1

**1 objects returned**

help | search | site map | contact us | privacy | terms of use | press | home

Copyright © 2008 National Gallery of Art, Washington, DC

# Exhibit E



# NATIONAL GALLERY OF ART
WASHINGTON

What's New
Web Newsletter
Calendar
Recent Acquisitions
Videos & Podcasts
About the Gallery
Crosscurrents
Afghanistan

The Collection
Exhibitions
Plan a Visit
Programs & Events
Online Tours
Education
Resources
Gallery Shop
Support the Gallery
NGAKids

Search the Site


## Mission Statement

The mission of the National Gallery of Art is to serve the United States of America in a national role by preserving, collecting, exhibiting, and fostering the understanding of works of art, at the highest possible museum and scholarly standards.

Policies and procedures towards these goals are cumulatively set forth in the Gallery's legislation, bylaws, trustee action and staff guidelines. The following general definitions are intended to explicate the goals of the Gallery.

### 1. Preserving
The Gallery's principal duty is to keep its collections intact for future generations and to pass these on in optimum condition. To carry out this responsibility the Gallery strives to maintain effective programs of security, environmental control, buildings maintenance, and conservation.

### 2. Collection
The Gallery limits its active art collecting to paintings, sculpture, and works of art on paper, from the late middle ages to the present, from Europe and the United States. Trustee policy allows the Gallery to accept, in addition, other significant works of art in conjunction with major donations in the primary areas of the Gallery's collections.

### 3. Exhibiting
The Gallery is dedicated to putting its collections on view in Washington and by loan elsewhere, as well as borrowing works of art for exhibition in Washington. As its collecting field is narrow in comparison to the world's art, the Gallery strives to supplement its own works with exhibitions of material from other times and other cultures. At the same time balance is sought with exhibitions that illuminate and reinforce its own collections. The highest standards of scholarship, maintenance, installation, and interaction with the public all contribute to this critical exhibiting role.

### 4. Fostering Understanding
The Gallery's role as an institution dedicated to fostering an understanding of works of art operates on a broad spectrum. From advanced research conducted both at its Center for Advanced Study in the Visual Arts and by its curators, to the dissemination of knowledge to its visitors and to the widest possible student and general public, the Gallery is an educative institution. The Gallery also collects materials for research related to its collections, as well as the history and appreciation of art in general. The Gallery recognizes that not only the dissemination of information but the enhancement of the aesthetic experience are essential to fostering understanding of works of art. Ancillary programs furthering its aesthetic role, such as concerts and changing horticulture displays, have been part of the Gallery's mission virtually since its inception.

help | search | site map | contact us | privacy | terms of use | press | home

Copyright © 2008 National Gallery of Art, Washington, DC

# Exhibit F



**MERCURY**
NATIONAL GALLERY OF ART LIBRARY    LIBRARY CATALOG    HEL

SEARCH | TITLES | HISTORY | CHECKOUT | EXIT    | LIBRARY | AUCTION | SLIDES | PHOTOS |

Catalog: National Gallery of Art Library
Search Request: Command = soutine
Search Results: Displaying 16 of 44 entries

◀ PREVIOUS    NEXT ▶

BIBLIOGRAPHIC    MARC FORMAT

### *Chaim Soutine (1893-1943) : catalogue raisonné = Werkverzeichnis /...*

**Call No:** N44.S663 T83
**Author:** Tuchman, Maurice.
**Title:** Chaim *Soutine* (1893-1943) : catalogue raisonné = Werkverzeichnis / Maurice Tuchman, Esti Dunow, Klaus Perls ; editorial committee, Esti Dunow ... [et al.].
**Publication:** Köln : Benedikt Taschen Verlag, c1993.
**Description:** 2 v. (780 p.) : ill. (chiefly col.), ports. ; 33 cm.
**Note:** Cover title: *Soutine*.
English, French, and German.
Bibliography: p. 83-94.
**Subject(s):** *Soutine*, Chaim, 1893-1943 --Catalogues raisonnés.
**Added Entry:** Dunow, Esti.
Perls, Klaus.
**Added Title:** *Soutine*.

_____

**Call Number:** N44.S663 T83
**Location:** General Stacks
**Holdings:** V.1
V.2
**Status:** v.1 Checked out
v.2 Checked out

◀ PREVIOUS    NEXT ▶

| **Record Options** | | |
| --- | --- | --- |
| Select Download Format | Full Record ▾ | Format for Print/Save |
| Enter your email address: | | E-mail |

Search  *Headings*  Titles  History  Exit  Library  Auction  Slides  Photos

*Copyright ©2008 National Gallery of Art, Washington D.C.*