APPLICANT IS AUTHORIZED TO SERVE JUDICIAL PROCESS UNDER THE UNITED STATES FEDERAL RULES OF CIVIL PROCEDURE AND UNDER THE RULES OF CIVIL PROCEDURE OF THE STATE OF: New York

# REQUEST

## FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

*DEMANDE*
*AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ÉTRANGER D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

**Convention on the Service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.**

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matierè civile ou commerciale, signée à La Haye, le 15 Novembrè 1965.*

| Identity and address of the applicant / *Identité et adresse du requérant* | Address of receiving authority / *Adresse de l'autorité destinataire* |
|---|---|
| **Josh R. Cobb**<br>**APS INTERNATIONAL, LTD**<br>**APS International Plaza**<br>**7800 Glenroy Road**<br>**Minneapolis, Minnesota 55439-3122**<br>**U.S.A.**<br>**Tel. 952.831.7776 Fax: 952.831.8150**<br>**Email: JCobb@CivilActionGroup.com** | **MINISTERE DE LA JUSTICE**<br>**(Bureau de l'Entraide judiciare intl)**<br>**13, place Vendôme**<br>**Paris Cedex 01**<br><br>**75042**<br>**France** |

**The undersigned applicant has the honour to transmit -- in duplicate -- the documents listed below and, in conformity with article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e., (identity and address)**

*Le requérant soussigné a l'honneur de faire parvenir -- en double exemplaire -- a l'autorité destinataire les documents ci-dessous énumérés, en la priant conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, savoir:*

*(identité et adresse)* Galerie Cazeau-Béraudière
16 avenue Matignon, 750 08 Paris, France
Tel: 33 1 45 63 09 00

[ ] **(a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.***
*a) selon les formes légales (article 5, alinéa premier, lettre a).*

[X] **(b) in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5)*:**
*b) selon la forme particuliére suivante (article 5, alinéa premier, lettre b):* En remettant les documents à un huissier, qui se chargera de les signifier à un cadre administratif, un agent gérant ou tout autre agent autorisé à accepter des documents légaux pour le compte du Défendeur. Le Défendeur ne doit pas avoir l'option de refuser la signification. Un chèque d'un montant de 89.00 euro pour couvrir les honoraires de l'huissier est inclus.

[ ] **(c) by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5)*.**
*c) le cas échéant, par remise simple (article 5, alinéa 2).*

**The authority is requested to return or to have returned to the applicant a copy of the documents -- and of the annexes* -- with a certificate as provided on the reverse side.**
*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte -- et de ses annexes -- avec l'attestation figurant au verso.*

**List of documents**
*Enumération des pièces*

See Attached List of Documents
Summary of the Documents to be Served

**Done at** *Fait à* Minneapolis, Minnesota, U.S.A., **the** *le* 7/28/08

**Signature and/or stamp.**
*Signature et/ou cachet.*

APS INTERNATIONAL
APS International Plaza
7800 Glenroy Road
Minneapolis, MN 55439

(Formerly OBD-116 which was formerly LAA-116, both of which may still be used) USM-94 (Est. 11/22/77)

*** Delete if inappropriate.**
*. Rayer les mentions inutiles*

Case Name: The Estate of Lorette Jolles Shefner v. Tucuman
Defendant: Galerie Cazeau-Béraudière
Court Case No.: '08 CIV 4443

**CERTIFICATE**
***ATTESTATION***

**The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,**
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

**1) that the document has been served***
*1. que la demande a été exécutée*

**- the (date)**
*- le (date)* ____________________

**- at (place, street, number)**
*- à (localité, rue numéro)* ____________________

**- in one of the following methods authorised by article 5-**
*- dans une des formes suivantes prévues à l'article 5:*

[ ] **(a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention*.**
*a) selon les formes légales (article 5, alinéa premier, lettre a).*

[ ] **(b) in accordance with the following particular method*:**
*b) selon la forme particulière suivante:* ____________________

[ ] **(c) by delivery to the addressee, who accepted it voluntarily.***
*c) par remise simple*

**The documents referred to in the request have been delivered to:**
*Les documents mentionnés dans la demande ont été remis à:*

**- (identity and description of person)**
*- (identité et qualité de la personne)* ____________________

**- relationship to the addressee (family, business or other):**
*- liens de parenté, de subordination o autres, avec le destinataire de l'acte:* ____________________

**2) that the document has not been served, by reason of the following facts*:**
*2. que la demande n'a pas été exécutée, en raison des faits suivants:*

____________________

**In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.**

*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint.*

**LIST OF DOCUMENTS: Summary of the Document to be Served, See Attached List of Documents**

**Annexes**
*Annexes*
**Documents returned:**
*Piéces renvoyées:*

____________________

**In appropriate cases, documents establishing the service:**
*Le cas échéant, les documents justificatifs de l'exécution:*

____________________

**Done at** ____________________ **, the** ____________________
*Fait à* ____________________ *, le* ____________________

**Signature and/or stamp.**
*Signature et/ou cachet.*

____________________

* **Delete if inappropriate.**
***Rayer les mentions inutiles.***

# SUMMARY OF THE DOCUMENT TO BE SERVED
*ELEMENTS ESSENTIELS DE L'ACTE*

**Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.**

*Convention relative à la signification et à la notification à l'étranger des actes judiciaries et extrajudiciares en matière civile ou commerciale, signée à La Haye, le 15 Novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinéa 4)*

**Name and address of the requesting authority:**
*Nom et adresse de l'autorité requérante:* Josh R. Cobb
APS INTERNATIONAL, LTD
APS International Plaza, 7800 Glenroy Road, Minneapolis, Minnesota 55439-3122, U.S.A.

**Particulars of the parties*:**
*Identité des parties* The Estate of Lorette Jolles Shefner v. Tuchman

**LIST OF DOCUMENTS: Summary of the Document to be Served, See Attached List of Documents**

**JUDICIAL DOCUMENT****
*ACTE JUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:* The purpose of this document is to inform **Galerie Cazeau-Béraudière** that a lawsuit has been started against them and that they have been joined as a defendant.

**Nature and purpose of the proceedings and, where appropriate, the amount in dispute:**
*Nature et objet de l'instance, le cas échéant, le montant du litige:* Plaintiff seeks declaratory judgment and other relief in an amount to be determined as a result of the defendant's fraud, conspiracy and unjust enrichment.

**Date and place for entering appearance**:**
*Date et lieu de la comparution:* Defendant is required to serve on plaintiff's attorneys, ALSTON & BIRD LLP, Karl Geercken, Esq., F. Paul Greene, Esq., 90 Park Avenue, New York, NY 10016, U.S.A., an answer to the attached documents within **20** days after service of the attached documents, exclusive of the day of service. Any answer that defendant serves on the parties to this action must be filed with the Clerk of Court, United States District Court, Southern District of New York, within a reasonable period of time after service.

**Court which has given judgment**:**
*Juridiction qui a rendu la décision:* N/A

**Date of judgment**:**
*Date de la décision:* N/A

**Time limits stated in the document**:**
*Indication des délias figurant dans l'acte:* Defendant is required to serve on plaintiff's attorneys an answer to the attached documents within **20** days after service of the attached documents, exclusive of the day of service. Any answer that defendant serves on the parties to this action must be filed with the Clerk of Court within a reasonable period of time after service.
Failure to do so may result in the plaintiff taking a default judgment against the defendant for the relief demanded in the Complaint.

**EXTRAJUDICIAL DOCUMENT****
*ACTE EXTRAJUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:* N/A

**Time limits stated in the document**:**
*Indication des délias figurant dans l'acte* N/A

* **If appropriate, identity and address of the person interested in the transmission of the document.**
***S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte.***

** **Delete if inappropriate.**
***Rayer les mentions inutiles.***

# LIST OF DOCUMENTS

Summons in a Civil Action
Complaint
Exhibit "A"
Exhibit "B"
Electronic Case Filing Rules & Instructions
Individual Practices of Judge Laura Taylor Swain
Consent to Proceed Before United States Magistrate Judge
Right to Proceed Before a United States Magistrate Judge
Critical Instructions to Attorneys
3rd Amended Instructions for Filing an Electronic Case or Appeal
Guidelines for Electronic Case Filing
Individual Practices of Magistrate Judge Eaton
Appendix A to the Individual Practices of Magistrate Judge Eaton
Notice, Consent, and Order of Reference - Exercise of Jurisdiction by a United States Magistrate Judge
Translations
Summary of the Documents to be Served

AO 440 (Rév. 8/01) Citation à comparaître dans une action civile

**COUR DE DISTRICT DES ETATS-UNIS**
District Sud de l'Etat de New York

LA SUCCESSION DE LORETTE JOLLES SHEFNER, le demandeur

contre

MAURICE TUCHMAN, ESTI DUNOW,
la GALERIE CAZEAU-BÉRAUDIÈRE,
la NATIONAL GALLERY OF ART,
LONTREL TRADING et JOHN DOES 1 À 10,
les défendeurs.

**CITATION A COMPARAITRE DANS UNE ACTION CIVILE**

AFFAIRE N° 08 CIV 4443

JUGE SWAIN

A : (Nom et adresse du défendeur)

Galerie Cazeau-Béraudière
16, Avenue Matignon
75008 Paris
France

**VOUS ETES PAR LES PRESENTES SOMMES DE COMPARAITRE** et vous devez faire signifier à l'AVOCAT DU DEMANDEUR (nom et adresse) :

ALSTON & BIRD LLP
Me Karl Geercken
Me F. Paul Greene
90 Park Avenue
New York, NY 10016

une réponse à la plainte qui vous est signifiée avec cette citation à comparaître dans les 20 jours à compter du lendemain de la signification de cette citation. A défaut de quoi, un jugement par défaut sera rendu contre vous pour le redressement demandé dans la plainte. Toute réponse que vous faites signifier aux parties dans la présente action doit être déposée auprès du greffier du tribunal dans un délai raisonnable après la signification.

J. MICHAEL McMAHON
GREFFIER

12 MAI 2008
DATE

*[Signature]*
(Par le) GREFFIER ADJOINT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT DE NEW YORK

| | | |
|---|---|---|
| LA SUCCESSION DE LORETTE JOLLES SHEFNER, par l'entremise de ses exécuteurs testamentaires M. Barry Shefner, Mme Ariela Braun et M. Leon Miller,<br><br>Demanderesse,<br><br>-contre-<br><br>MAURICE TUCHMAN, ESTI DUNOW, la GALERIE CAZEAU-BÉRAUDIÈRE, la NATIONAL GALLERY OF ART, LONTREL TRADING et JOHN DOES 1-10. | : | Dossier No. 08 CIV 4443<br><br>**DÉCLARATION**<br><br>**PROCÈS DEVANT JURY DEMANDÉ** |

La Succession de Mme Lorette Jolles Shefner (la «Demanderesse» ou la «Succession»), par l'entremise de ses exécuteurs testamentaires, M. Barry Shefner, Mme Ariela Braun et M. Leon Miller, et les avocats soussignés de la Succession, Alston & Bird LLP, pour sa demande contre les Défendeurs susmentionnés, allègue par les présentes ce qui suit :

**Exposé de la demande**

1. La présente action en justice concerne la vente par Mme Lorette Jolles Shefner (la défunte de la partie demanderesse) d'un tableau de l'artiste Chaim Soutine intitulé «*Piece of Beef*» («*Le Bœuf*» selon le *Catalogue Raisonrié*, tel qu'indiqué aux présentes) (le «Tableau») et sa revente presque immédiate pour un profit important. Mme Lorette Jolles Shefner était la propriétaire du Tableau jusqu'en 2004, au moment où les défendeurs Maurice Tuchman («Tuchman») et Esti Dunow («Dunow»), les plus grands experts au monde sur Soutine et son oeuvre, l'ont incitée frauduleusement à vendre le Tableau à un prix grandement inférieur à sa juste valeur marchande. La

Succession n'a pris connaissance des faits essentiels sous-jacents à la fraude et des autres prétentions soutenues aux présentes qu'après le décès de Mme Jolles Shefner.

2. Tuchman et Dunow ont pu inciter Mme Jolles Shefner à vendre à un prix aussi bas, entre autres :

(i) en lui fournissant une liste fausse et trompeuse de «transactions comparables», qui a induit Mme Jolles Shefner à croire raisonnablement que le Tableau valait beaucoup moins qu'il ne valait en réalité et que le marché pour les oeuvres de Soutine était à la baisse;

(ii) en qualifiant l'offre soumise à Mme Jolles Shefner (soi-disant au nom d'un groupe d'investisseurs privés) comme étant «exceptionnellement avantageuse »;

(iii) en comptant sur une relation de plusieurs décennies basée sur la confiance et le respect avec Mme Jolles Shefner en ce qui concerne le Tableau;

(iv) en omettant de divulguer leur conflit d'intérêts important dans la transaction;

(v) en déclarant à Mme Jolles Shefner qu'ils agissaient au nom d'un groupe d'investisseurs privés, alors qu'en réalité, sur la foi de renseignements tenus pour véridiques, ils avaient l'intention de « revendre précipitamment » le Tableau à peu près immédiatement, en touchant un profit considérable en prenant des dispositions pour cette autre vente à une grande institution publique non dévoilée qui attendait en coulisses; et

(vi) en omettant de divulguer, en tant qu'experts sur Soutine, qu'ils avaient une connaissance approfondie et privilégiée de pratiquement toutes les ventes d'oeuvres de Soutine depuis au moins 1993, et qu'ainsi ils savaient parfaitement que le prix auquel ils avaient incité Mme Jolles Shefner à vendre le Tableau était grandement inférieur à sa juste valeur marchande.

3. Tout juste avant ou peu après le moment où Mme Jolles Shefner s'est départie du Tableau, Tuchman et Dunow ont entamé des négociations pour sa revente pour un profit important. Plus précisément, ils ont exposé le Tableau dans un luxueux hôtel de New York (l'Hôtel Plaza Athénée) où, sur la foi de renseignements tenus pour véridiques, ils ont rencontré et reçu au moins un acheteur potentiel. Leurs efforts ont été récompensés dans la mesure où ils ont alors vendu ou pris des dispositions pour vendre le Tableau à un prix qui était au moins deux fois plus élevé que ce qui avait été payé à Mme Jolles Shefner et, en outre, suivant des renseignements tenus pour véridiques, ils (et/ou un ou plusieurs autres défendeurs) ont reçu une rémunération substantielle, sous la forme d'une importante commission, en plus des sommes générées par la revente.

4. L'acheteur final de la Peinture – la National Gallery of Art («NGA») – a fait ses premières tentatives pour l'acquisition du Tableau, avec Tuchman et Dunow, dans les jours ou les semaines avant ou après la vente par Mme Jolles Shefner à Tuchman et Dunow ou par leur entremise. Suivant des renseignements tenus pour véridiques, la Galerie Cazeau-Béraudière, une galerie de Paris qui semblait associée à Tuchman, a aidé Tuchman et Dunow dans leurs tentatives pour vendre le Tableau à la NGA et/ou a agi comme intermédiaire lors d'une telle vente. Suivant d'autres renseignements tenus pour véridiques, la Galerie Cazeau-Béraudière était à tout moment au courant des méthodes frauduleuses par lesquelles Tuchman et Dunow ont incité Mme Jolles Shefner à leur vendre le Tableau ou à le vendre par leur entremise.

5. Sur la foi de renseignements tenus pour véridiques : (i) la NGA était un acheteur potentiel que Tuchman et Dunow ont rencontré à l'Hôtel Plaza Athénée en mai/juin 2004; et (ii) la NGA a fait preuve de peu ou d'aucune diligence raisonnable pour enquêter sur les circonstances par lesquelles Tableau Tuchman et Dunow sont entrés

en possession du Tableau, et cela même si le seul document public de propriété nommait Mme Jolles Shefner comme le dernier propriétaire connu.

6. Sur la foi de renseignements tenus pour véridiques, la NGA : (i) soit avait connaissance du plan de Tuchman et Dunow pour acquérir frauduleusement le Tableau à un bas prix et de le revendre en encaissant un énorme bénéfice; (ii) soit a ignoré imprudemment les méthodes frauduleuses utilisées par Tuchman et Dunow pour ce faire; (iii) ou soit a ignoré imprudemment les circonstances par lesquelles le Tableau – qui était la propriété d'intérêts privés depuis plus de 20 ans – était maintenant en vente sur le marché.

7. Mme Jolles Shefner n'était pas au courant de son vivant qu'elle avait été victime d'une fraude de la part de Tuchman et Dunow, tel qu'il est indiqué aux présentes. Ce n'est qu'en 2007, à son décès, que la Demanderesse a découvert la nature et l'étendue des actes frauduleux de Tuchman et Dunow. Pour ces motifs, la Succession réclame : (i) des dommages intérêts pour la fraude commise par Tuchman, Dunow et autres à l'endroit de Mme Jolles Shefner; (ii) l'annulation de la vente du Tableau à Tuchman, Dunow et autres parties agissant de concert avec eux, ou par leur entremise, y compris la Galerie Cazeau-Béraudière et Lontrel Trading; (iii) un jugement déclaratoire à l'effet qu'aucun des acheteurs n'a jamais été un acheteur de bonne foi du Tableau; et (iv) la remise du Tableau à la Succession.

**Nature de l'action en justice**

8. La présente action en justice est intentée par la Succession de Mme Lorette Jolles Shefner, par l'entremise de ses exécuteurs testamentaires, M. Barry Shefner, Mme Ariela Braun et M. Leon Miller, contre les défendeurs Tuchman, Dunow, la Galerie Cazeau-Béraudière, la National Gallery of Art, Lontrel Trading et John Does 1-

10, pour jugement déclaratoire, restitution et dommages intérêts monétaires en raison de la fraude commise à l'endroit de Mme Lorette Jolles Shefner.

**Compétence et lieu du procès**

9. Ce tribunal est compétent pour les réclamations déposées contre la NGA par l'application des dispositions de 28 U.S.C. § 1346 (*Federal Tort Claims Act*). Ce tribunal est compétent pour les réclamations émises contre les autres défendeurs en vertu des dispositions de 28 U.S.C. § 1367 (juridiction supplémentaire).

10. Le lieu du procès dans ce district est approprié, conformément aux dispositions de 28 U.S.C. § 1391(a), car plusieurs défendeurs ont leur résidence dans ce district judiciaire et qu'une partie importante des événements ou des omissions, donnant lieu aux réclamations de la Demanderesse, se sont produits dans ce district judiciaire. En ce qui concerne la NGA, le lieu du procès est approprié en vertu des dispositions de 28 U.S.C. § 1391 et/ou 1402 car un ou plusieurs défendeurs ont leur résidence dans le district et les actes et les omissions reprochés dans la demande se sont produits dans le district.

**Les parties**

**Mme Jolles Shefner et sa Succession**

11. Messieurs Barry Shefner et Leon Miller sont des personnes résidant à Montréal, au Québec, et ils sont des citoyens du Canada. Mme Ariela Braun est une citoyenne américaine résidant à New York. Ils sont tous des exécuteurs testamentaires habilités de la Succession. La Succession est une entité créée en vertu des lois du Québec et a son situs à Montréal, au Québec.

12. Mme Lorette Jolles Shefner était la mère de Barry Shefner et d'Ariela Braun. Elle résidait à Montréal, au Québec, et elle était une citoyenne canadienne au moment de son décès. Mme Jolles Shefner est décédée le 23 mars 2007. Avant la vente du Tableau à Tuchman et Dunow ou par leur entremise, tel qu'invoqué aux présentes, Mme Jolles Shefner n'avait jamais vendu d'oeuvre d'art et elle était, relativement, une néophyte dans le milieu des arts. Mme Jolles Shefner est devenue veuve lorsque M. Daniel Shefner, son mari depuis 41 ans, est mort le 9 juillet 1986. À partir de ce moment, Mme Jolles Shefner a vécu de façon autonome dans la maison familiale, jusqu'à son décès à l'âge de 90 ans.

13. Les exécuteurs testamentaires ci-dessus ont été nommés aux termes du testament de Mme Jolles Shefner. Ils ont intenté ensemble la présente action en justice au nom de la Succession.

**Tuchman et Dunow**

14. Le défendeur Maurice Tuchman est un marchand, un conseiller et un expert en oeuvres d'art et un auteur en la matière. Il réside, suivant des renseignements tenus pour véridiques, au 200, 69e Rue E., App. 17B, New York, New York 10021. Il est en outre très connu dans le monde des arts et, d'après d'autres informations tenues pour véridiques, il assiste régulièrement à des événements notoires du monde des arts pour faire sa propre promotion et celle de son entreprise. On le cite souvent dans la presse où il se proclame expert du marché de l'art en général et sur les oeuvres de Soutine en particulier. Suivant d'autres renseignements tenus pour véridiques, Tuchman tire des revenus appréciables de son expertise sur l'oeuvre de Soutine.

15. Le défendeur Esti Dunow est également marchande, conseillère et experte en oeuvres d'art ainsi qu'une artiste et un auteur. Elle réside, selon des renseignements tenus pour véridiques, au 209, 86e Rue O., à New York, New York

10024. Elle a écrit – en collaboration avec Tuchman – plusieurs livres sur Soutine et, suivant des renseignements tenus pour véridiques, elle tire des revenus appréciables de son expertise sur l'oeuvre de Soutine.

**Le *Catalogue Raisonné* sur Soutine et autres aspects de l'expertise de Tuchman et de Dunow**

16. Tuchman et Dunow sont les plus grands experts au monde sur Soutine. Ils ont obtenu ce statut lorsqu'ils ont publié, avec l'aide de Klaus Perls, un propriétaire de galerie maintenant décédé, le *Catalogue raisonné* sur Soutine aux alentours de 1993.

17. Un *Catalogue raisonné* est une compilation, au mieux de la connaissance actuelle, de toutes les oeuvres d'un artiste, accompagnée de renseignements sur la provenance (la propriété, le lieu, les transferts du droit de propriété et les expositions) de chacune de ces oeuvres. Le *Catalogue raisonné* est considéré comme la source d'information la plus fiable pour déterminer l'authenticité d'une oeuvre. En général, si une oeuvre est censée provenir d'un certain artiste, mais qu'elle n'est pas répertoriée dans le *Catalogue raisonné* ou que sa provenance ne s'accorde pas avec la provenance indiquée dans celui-ci, alors, sur la foi de renseignements tenus pour véridiques, à moins d'une preuve contraire sur son authenticité, l'oeuvre ne sera pas considérée comme étant authentique.

18. Les auteurs d'un *Catalogue raisonné* ont droit à une reconnaissance particulière dans le milieu des arts. Ils sont souvent considérés comme la plus grande autorité en ce qui concerne les questions d'authenticité et de provenance. Ainsi, les auteurs d'un *Catalogue raisonné* – et dans ce cas particulier, Tuchman et Dunow – sont conscients que les autres se basent couramment sur leurs opinions en ce qui concerne l'artiste sur lequel ils ont acquis des connaissances spécialisées (dans le cas présent,

Soutine). Ces auteurs (y compris Tuchman et Dunow) savent également, compte tenu de leur statut spécial d'expert sur l'artiste (dans le cas présent, Soutine), que cette confiance accordée par les autres, à moins d'informations au contraire, est parfaitement raisonnable.

19. Sur la foi de renseignements tenus pour véridiques, il y a un seul *Catalogue raisonné* sur Soutine qui fait actuellement autorité : le *Catalogue raisonné* Tuchman/Dunow. En conséquence, suivant des renseignements tenus pour véridiques, on peut virtuellement faire un lien, au moins indirect, entre Tuchman et Dunow et toutes les ventes légitimes d'oeuvres de Soutine depuis la parution de leur *Catalogue raisonné* en 1993. À tout le moins, il y a eu consultation auprès d'eux ou consultation de leur *Catalogue raisonné*, lors de ces ventes, pour les questions relatives à l'authenticité.

20. Pour obtenir une certaine forme de garantie concernant l'authenticité d'une oeuvre qu'il pense se procurer, un acheteur (ou ses mandataires) doit normalement consulter une source qui fait autorité sur cette question comme, par exemple, l'auteur d'un *Catalogue raisonné*.

21. Suivant des renseignements tenus pour véridiques, en raison du statut spécial de leur *Catalogue raisonné*, Tuchman et Dunow ont eu connaissance, depuis au moins 1993, de toutes les ventes publiques ou privées d'oeuvres de Soutine et du montant de la vente pour chacune de ces oeuvres. Ils ont également eu connaissance de pratiquement toutes les négociations de vente – parfois plusieurs mois avant que la vente se concrétise – car l'authenticité est l'une des premières questions à régler avant de pouvoir vendre une oeuvre d'art. En général, les renseignements concernant les ventes privées (conclues ou en cours de négociation) ne sont pas rendus publics.

22. En conséquence, Tuchman et Dunow sont considérés comme les experts qui font le plus autorité en ce qui concerne l'oeuvre de Soutine. En outre, Tuchman et

Dunow se présentent eux-mêmes, régulièrement, comme des experts sur Soutine et l'évaluation de ses oeuvres.

23. Suivant des renseignements tenus pour véridiques, Tuchman et Dunow se présentent tous les deux régulièrement comme des experts, en général, en évaluation de tableaux. Toutefois, dans le milieu de l'expertise des oeuvres d'art, il est généralement inadmissible que des experts en authentification (comme Tuchman et Dunow) prennent part à l'évaluation et à l'expertise d'oeuvres qui font partie de leur domaine de spécialisation. Il en est ainsi parce que, dans une certaine mesure, de tels experts pourraient ouvrir le marché pour ces oeuvres, étant donné que : (i) ils sont la référence pour déterminer si une oeuvre est authentique ou non et, par conséquent, si elle a quelque valeur que ce soit; et (ii) ils ont une connaissance approfondie et, en ce qui concerne Tuchman et Dunow en particulier, une connaissance exclusive et toute particulière des ventes privées et publiques d'oeuvres d'art dans leur domaine de spécialisation. Il est également inadmissible, de façon générale, pour des experts en authentification tels que Tuchman et Dunow de négocier ou de prendre des dispositions pour la vente d'oeuvres dans leur domaine de spécialisation, en particulier s'ils ont un intérêt financier ou autre dans la vente.

**Autres défendeurs**

24. La NGA est un organisme fédéral du gouvernement des États-Unis. Elle est passible de poursuite dans la présente action en justice en vertu des dispositions des *Federal Tort Claims and Declaratory Judgment Acts*. Les bureaux de la NGA sont à Washington, D.C. Suivant des renseignements tenus pour véridiques, la NGA a négocié à New York l'achat du Tableau avec Tuchman, Dunow et/ou la Galerie Cazeau-

Béraudière (qui, suivant des renseignements tenus pour véridiques, a utilisé Tuchman et/ou Dunow comme mandataires).

25. Les tentatives de la NGA pour faire l'acquisition du Tableau ont commencé dès les mois de mai et juin 2004, soit seulement quelques jours ou semaines avant ou après que Tuchman et Dunow ne persuadent Mme Jolles Shefner à leur vendre le Tableau ou à le vendre par leur entremise.

26. Le dossier de provenance de la NGA pour le Tableau contient peu ou pas de preuve de diligence raisonnable quant à l'authentification du Tableau ou les circonstances en vertu desquelles le Tableau n'était plus la possession de Mme Jolles Shefner et s'est retrouvé entre les mains de Tuchman, Dunow, la Galerie Cazeau-Béraudière et/ou d'autres personnes agissant de concert avec eux.

27. La Galerie Cazeau-Béraudière est, suivant des renseignements tenus pour véridiques, une entité française basée à Paris, en France. Suivant d'autres renseignements, elle a aidé Tuchman et/ou Dunow dans leurs tentatives pour vendre le Tableau à la NGA, notamment : (i) en mettant à la disposition de Tuchman et Dunow une suite dans un hôtel de luxe pour leur permettre d'exposer le Tableau; et (ii) en prenant des dispositions et en payant pour l'expédition du Tableau à New York par l'intermédiaire d'une société de transport tierce, International Freight Logistics («IFL»). Suivant des renseignements tenus pour véridiques, la Galerie Cazeau-Béraudière fait régulièrement des affaires à New York. En outre, suivant d'autres renseignements tenus pour véridiques, les directeurs de la Galerie Cazeau-Béraudière, Philippe Cazeau (ou son successeur) et Jacques de la Béraudière, se rendaient régulièrement à New York pour s'occuper des affaires de la Galerie Cazeau-Béraudière.

28. Lontrel Trading a été présenté à Mme Jolles Shefner comme étant l'acheteur du Tableau. Suivant des renseignements tenus pour véridiques, Lontrel

Trading a aidé Tuchman et Dunow dans leurs tentatives pour inciter Mme Jolles Shefner à vendre le Tableau et ensuite pour le revendre à la NGA. Suivant d'autres renseignements tenus pour véridiques, Lontrel Trading a apporté son aide à la Galerie Cazeau-Béraudière afin de prendre des dispositions pour le transport du Tableau à New York pour une exposition, à laquelle il est fait référence au paragraphe 27 ci-dessus.

29. Suivant des renseignements tenus pour véridiques, Lontrel Trading fait régulièrement affaires à New York, comme le prouvent les documents relatifs à la vente du Tableau par Mme Jolles Shefner à Tuchman, à Dunow, à la Galerie Cazeau-Béraudière et /ou à Lontrel Trading ou par leur entremise.

30. Les Défendeurs John Does numéros 1-10 sont des personnes ou des entités dont l'identité n'est pas encore connue de la Demanderesse et contre qui elle pourrait avoir un droit d'action en se basant sur les faits allégués aux présentes. La Demanderesse se réserve le droit d'inclure ces personnes ou ces entités comme Défendeurs dans la présente action en justice par une modification à la présente déclaration.

**Allégations de faits communes à tous les chefs de la demande**

**Historique**

31. Le ou vers le 3 juin 1981, Mme Jolles Shefner achète le Tableau de la Galerie Hyraud Bresson à Paris, en France, pour la somme de 68 000 $. Peu après, on procède à l'envoi du Tableau à la demeure des Shefner à Montréal, au Québec, où il est demeuré, suspendu dans la salle de séjour de Mme Jolles Shefner, jusqu'à environ avril 2004.

32. Aux environs de mai 1986, les Shefner ont appris que Tuchman et Dunow effectuaient une compilation d'un *Catalogue raisonné* des oeuvres de Soutine et

que Dunow, en particulier, était à la recherche d'informations sur les propriétaires actuels de toiles de Soutine (dont le Tableau) et sur leur provenance.

33.     Les Shefner ont communiqué peu après avec Dunow pour l'informer qu'ils étaient les propriétaires du Tableau et pour l'inviter à les inclure dans le *Catalogue raisonné* en ce qui concerne la provenance pour le Tableau.

34.     Pour ce faire, les Shefner ont fourni à Dunow une diapositive en couleur du Tableau ainsi que les renseignements de provenance qu'ils avaient obtenus lors de l'achat du Tableau en 1981.

35.     Selon le *Catalogue raisonné* Tuchman/Dunow (le «*Catalogue Raisonné*»), il n'existe que dix peintures «Le Boeuf» par Soutine. En 2003, différents musées à travers le monde avaient déjà fait l'acquisition de la plupart de ces peintures, à l'exception de deux ou trois.

36.     Toujours selon le *Catalogue Raisonné*, la série «Le Boeuf» de Soutine est l'une de ses séries de toiles les plus connues et, par conséquent, elle est en grande demande.

**Les tentatives antérieures de Tuchman et Dunow pour inciter à la vente ou au transfert du Tableau**

37.     Entre 1986 et 2003, Tuchman et Dunow ont communiqué de façon répétée avec les Shefner, et tout particulièrement avec Mme Jolles Shefner, à propos du Tableau. En particulier, l'un d'entre eux ou les deux conjointement ont participé de temps à autre à des entretiens avec Mme Jolles Shefner durant cette période pour discuter de Soutine et du Tableau. Tuchman et Dunow ont même remis une copie dédicacée de la première édition de leur *Catalogue Raisonné* à Mme Jolles Shefner et à sa fille.

38. De façon bien compréhensible, Mme Jolles Shefner était impressionnée et flattée de l'attention que Tuchman et Dunow lui portaient et de l'intérêt qu'ils avaient pour son Tableau. Tuchman et Dunow le savaient très bien et ils ont utilisé cet aspect pour établir une relation privilégiée de confiance avec Mme Jolles Shefner au cours des 20 années suivantes avant de la convaincre de vendre le Tableau.

39. En effet, ce n'était pas la première fois, en 2003, que Tuchman et Dunow tentaient d'inciter Mme Jolles Shefner à vendre ou à effectuer le transfert du Tableau. Vers 1997, Tuchman et Dunow avaient suggéré à M. Norman Kleeblatt (un curateur au Jewish Museum de New York) d'entrer en contact avec Mme Jolles Shefner pour qu'il puisse aller voir le Tableau à la demeure des Shefner à Montréal. M. Kleeblatt a suivi leur suggestion et il a demandé un entretien à Mme Jolles Shefner, précisant que c'était Dunow qui lui avait parlé d'elle.

40. M. Kleeblatt a pris plus tard les dispositions nécessaires pour leur rencontre et il est allé à Montréal expressément pour voir le Tableau et faire la connaissance de Mme Jolles Shefner. Après leur entretien, M. Kleeblatt est entré en contact avec Mme Ariela Braun pour discuter avec elle de la possibilité que Mme Jolles Shefner fasse donation du Tableau au Jewish Museum. Mme Jolles Shefner a rejeté la demande de M. Kleeblatt, en particulier parce qu'elle croyait que le Tableau avait une grande valeur. En fait, elle n'avait jamais envisagé vendre le Tableau et encore moins le donner.

41. Compte tenu de son inexpérience dans la vente d'oeuvres d'art, Mme Jolles Shefner ne savait pas qu'il était en général inapproprié pour un expert en authentification d'évaluer une oeuvre d'un artiste sur lequel il s'est spécialisé ou de prendre des dispositions ou de négocier la vente de telles oeuvres, surtout lorsque cet expert a un intérêt financier ou autre dans la vente.

42.    En outre, Mme Jolles Shefner était âgée de 87 ans lorsque Tuchman et Dunow l'ont incité frauduleusement à leur vendre le Tableau ou de le vendre par leur entremise. Par ailleurs, Mme Jolles Shefner ne connaissait rien en informatique et, par conséquent, elle se fiait entièrement à Tuchman et Dunow pour toute l'information importante concernant la vente du Tableau, tel qu'il est mentionné ci-dessous. Tuchman et Dunow, dans leurs tentatives pour frauder Mme Jolles Shefner, comptaient sur : (i) l'âge avancé de Mme Jolles Shefner; (ii) le fait qu'elle n'était plus active dans le milieu des affaires depuis plusieurs années; et (iii) la confiance qu'elle avait en eux pour toute l'information relative au Tableau.

**Le plan de Tuchman et Dunow pour inciter à la vente du Tableau**

43.    Le ou vers le 23 décembre 2003, Dunow téléphone à Mme Jolles Shefner dans le but de l'inciter à lui vendre le Tableau. Suivant des renseignements tenus pour véridiques, Dunow a effectué cet appel à la connaissance et avec le consentement de Tuchman.

44.    Au moment de l'appel de Dunow, Tuchman et Dunow savaient que Mme Jolles Shefner les tenait en haute estime et qu'ils étaient considérés comme les plus grands experts sur Soutine. Elle basait son jugement qu'elle avait d'eux sur les contacts qu'ils avaient eus antérieurement, sur les déclarations qu'ils lui avaient faites quant à leur expertise et sur la relation de confiance qu'ils avaient entretenue avec Mme Jolles Shefner depuis de nombreuses années.

45.    En effet, Tuchman savait, en raison de ses relations passées avec Mme Jolles Shefner, qu'elle le considérait comme un personnage important du monde des arts et qu'elle était vraiment impressionnée par l'attention qu'il lui portait et qu'il portait au Tableau.

46. Suivant des renseignements tenus pour véridiques, Tuchman a intentionnellement entretenu cette impression chez Mme Jolles Shefner de manière à pouvoir exercer une influence sur elle, tout particulièrement en ce qui concerne les efforts combinés que lui et Dunow exerçaient dans le but de l'inciter à vendre le Tableau.

47. Au moment de l'appel téléphonique du 23 décembre, Mme Jolles Shefner souffrait de pertes d'audition qui nuisaient à sa capacité à mener des discussions d'affaires au téléphone. Mme Jolles Shefner a par conséquent demandé à Dunow d'en parler avec sa fille, Mme Ariela Braun. À chaque occasion, Mme Braun a informé sa mère du contenu des discussions qu'elle avait eues avec Tuchman et/ou Dunow au sujet du Tableau.

48. En ce qui concerne la vente du Tableau, Mme Braun agissait toujours à titre d'intermédiaire pour le compte et sous les directives de sa mère, Mme Jolles Shefner. Tuchman et Dunow étaient au courant de ce fait.

49. Mme Braun ne possède pas et n'a jamais possédé d'expertise en matière de vente ou d'évaluation d'oeuvres d'art. Elle était elle aussi une néophyte dans ce domaine. Elle se contentait d'aider sa mère en communiquant avec Tuchman et Dunow.

50. Mme Braun avait elle-même fait la connaissance de Tuchman et Dunow lors d'une séance de dédicace pour le *Catalogue Raisonné*. C'est à ce moment que Tuchman et Dunow ont signé et dédicacé une copie de leur *Catalogue Raisonné* à Mme Jolles Shefner. Pour cette raison et en raison des autres contacts qu'elle avait eu avec eux, Mme Braun tenait elle aussi Tuchman et Dunow en haute estime, un fait connu de Tuchman et Dunow et sur lequel ils comptaient dans leurs relations avec elle.

51. Suivant des renseignements tenus pour véridiques, Dunow et Tuchman ont ensuite appelé Mme Braun pour tenter d'inciter Mme Jolles Shefner à vendre le

Tableau. Lors de cet appel, ils ont offert 650 000 $ US pour le Tableau. Mme Jolles Shefner a rejeté cette offre.

52.    Lors de la communication de cette offre à Mme Jolles Shefner, Tuchman et Dunow ont faussement déclaré qu'ils rendaient uniquement un service à l'acheteur ou aux acheteurs présumé(s) et qu'ils ne tireraient aucun avantage financier de cette vente.

53.    Le ou vers le 26 mars 2004, Dunow et Tuchman ont fait parvenir une lettre à Mme Braun (la «Lettre du 26-3-04») lui indiquant qu'ils travaillaient pour le compte d'un acheteur potentiel qui était disposé à payer 800 000 $ US pour le Tableau. Une copie certifiée conforme de la Lettre du 26-3-04 est jointe aux présentes à l'Annexe A.

54.    Compte tenu des déclarations antérieures de Tuchman et Dunow, Mme Jolles Shefner croyait toujours qu'ils agissaient comme parties désintéressées dans une vente éventuelle et qu'ils n'en tireraient aucun avantage financier. Tuchman et Dunow n'ont jamais divulgué ou indiqué de quelque façon que ce soit que ce n'était pas le cas. Tout spécialement, ils n'ont en aucun temps révélé à Mme Jolles Shefner, à Mme Braun ou plus tard à M. Barry Shefner qu'ils avaient en fait un intérêt financier dans une éventuelle vente du Tableau ou encore qu'ils planifiaient de le revendre pour en tirer un profit rapide et important.

55.    Sur la foi de renseignements tenus pour véridiques, Tuchman et Dunow n'ont jamais divulgué à Mme Jolles Shefner ou à Mme Braun qu'ils agissaient en fait à titre de mandataires, de conseillers en oeuvres d'art et d'intermédiaires pour le compte de l'acheteur potentiel ou encore qu'ils achetaient eux-mêmes le Tableau par l'entremise d'une ou plusieurs entités telles que Lontrel Trading ou la Galerie Cazeau-Béraudière.

56.    Suivant des renseignements tenus pour véridiques, Tuchman ou Dunow n'ont jamais informé Mme Shefner que, dans le monde des arts, il est généralement

considéré inapproprié que des sommités comme Tuchman et Dunow agissent à titre de mandataires, d'experts ou d'intermédiaires ou qu'ils aient un intérêt financier ou autre lors d'une vente ayant un lien avec Soutine. En fait, tel qu'indiqué ci-dessus, Tuchman et Dunow ont faussement déclaré à Mme Jolles Shefner et à ses enfants qu'ils rendaient seulement un service à un acheteur potentiel, service pour lequel ils ne recevaient aucune forme de rémunération.

57.      En outre, malgré leurs intérêts dans la vente, Tuchman et Dunow ont offert à Mme Jolles Shefner, dans la Lettre du 26-3-04, de la représenter au cours de cette transaction, en déclarant : «[n]ous sommes prêts à vous aider de toutes les manières qu'il nous est possible de le faire».

58.      Cette déclaration visait à gagner la confiance de Mme Jolles Shefner et à l'induire en erreur en lui laissant croire que Tuchman et Dunow protègeraient ses intérêts lors d'une vente éventuelle du Tableau.

59.      Cette déclaration a eu l'effet recherché, en incitant Mme Jolles Shefner à se fier aux opinions émises par Tuchman et Dunow (ainsi qu'a la documentation factuelle incomplète et trompeuse qu'ils lui avaient fournie) concernant la juste valeur marchande du Tableau. La confiance que Mme Jolles Shefner avait en Tuchman et Dunow était raisonnable. Ils étaient les plus grands experts sur Soutine et Mme Jolles Shefner était au courant de ce fait.

60.      À peu près toutes les communications de Tuchman et Dunow avec Mme Jolles Shefner au sujet du Tableau avaient pour but de la convaincre à se fier à eux en ce qui concerne la juste valeur marchande du Tableau et pour toutes les offres dont ils lui faisaient part.

61.    À cette fin, Tuchman et Dunow ont déclaré à Mme Jolles Shefner et à Mme Braun que l'offre dont il est question dans la Lettre du 26-3-04 était « de notre opinion une occasion exceptionnellement avantageuse pour vous».

62.    Pour exécuter leur plan visant à frauder Mme Jolles Shefner, Tuchman et Dunow avaient compilé et inclus dans la Lettre du 26-3-04 une liste de prétendues transactions comparables (la «Liste»), qui visait à démontrer que l'offre dont ils lui avaient fait part était «une occasion exceptionnellement avantageuse».

63.    La Liste toutefois est substantiellement incomplète. En fait, il manque au moins une demi-douzaine de ventes de peintures de Soutine entre 1994 et 2004, toutes à des prix qui excédaient le million de dollars.

64.    En outre, la Liste donnait l'impression fausse et trompeuse que le marché et la valeur des oeuvres de Soutine était à la baisse, malgré le fait que, suivant des renseignements tenus pour véridiques, Tuchman et Dunow savaient pertinemment que c'était le contraire qui était vrai. En effet, la demande et la valeur pour la série de toiles «Le Boeuf » étaient *en hausse*. À cette époque, la grande majorité des peintures «Le Boeuf» étaient la possession de musées importants, ce qui réduisait en conséquence le nombre de ces toiles pouvant se retrouver sur le marché de la vente. Tuchman et Dunow n'ont jamais dévoilé ces faits à Mme Jolles Shefner ou à ses enfants.

65.    La Liste ne comprenait pas, tout particulièrement, des toiles de Soutine de moindre importance et de moindre valeur que celles de la série «Le Boeuf» (par exemple des portraits) mais qui s'étaient tout de même vendues à plus de 1 million de dollars. Par ailleurs, la Liste indiquait que de nombreuses toiles de Soutine mises en vente n'avaient pas été «achetées» et que, par conséquent, le marché des oeuvres de Soutine était à la baisse. Alors que c'était plutôt le contraire qui était vrai.

66. Ainsi, suivant des renseignements tenus pour véridiques, un portrait de Soutine s'est vendu en 2001 pour la somme de 2,092 millions de dollars et un paysage, en 2002, a été vendu pour la somme de 1,575 millions de livres sterling (environ 3 millions de dollars). Tel qu'indiqué ci-dessous, les portraits et les paysages de Soutine ont généralement une valeur moindre que les toiles de la série «Le Boeuf». La Liste que Tuchman et Dunow fait parvenir à Mme Jolles Shefner le ou vers le 26 mars 2004 aurait dû comprendre ces informations.

67. Suivant des renseignements tenus pour véridiques, il existe une certaine hiérarchie de valeur pour les oeuvres de Soutine : (i) les oeuvres emblématiques, comme les peintures «Le Boeuf», ont en général la plus grande valeur; (ii) les portraits, qui ont généralement une valeur moindre que les peintures «Le Boeuf»; (iii) les paysages, qui en général valent moins que les portraits; (iv) les natures mortes, autres que les peintures «Le Boeuf», sont celles généralement qui ont le moins de valeur. Compte tenu de ce qui précède, la juste valeur marchande du Tableau était, au moment où Mme Jolles Shefner l'a vendu à Tuchman et Dunow ou par leur entremise, plus élevée que les peintures indiquées au paragraphe 66 ci-dessus.

68. De plus, la Liste ne fait aucune mention de plusieurs autres toiles de Soutine que l'on se préparait à vendre aux enchères à la même époque. Tuchman et Dunow n'ont jamais divulgué ces ventes aux enchères à ma Mme Jolles Shefner ou à ses enfants. Les toiles en question se sont vendues plus tard pour des sommes pouvant atteindre jusqu'à 6 millions de dollars chacune.

69. En tant qu'experts les plus éminents au monde sur Soutine et son oeuvre, Tuchman et Dunow savaient ou auraient dû savoir, à la date où ils ont envoyé la Liste à Mme Braun, qu'on se préparait à vendre aux enchères les peintures auxquelles il

est fait référence au paragraphe 68 et que le prix de vente pour celles-ci dépasserait de beaucoup 800 000 $.

70.     C'est pourquoi, suivant des renseignements tenus pour véridiques, Tuchman et Dunow ont tenté d'inciter Mme Jolles Shefner à vendre le Tableau avant la vente aux enchères des peintures auxquelles il est fait référence au paragraphe 68, de manière à cacher à Mme Jolles Shefner la juste valeur marchande du Tableau.

71.     En tant qu'éminents experts sur Soutine, Tuchman et Dunow savaient également que l'on aurait dû inclure dans la Liste les peintures auxquelles il est fait référence aux paragraphes 63, 65, 66 et 68 ci-dessus si on voulait que cette Liste donne une indication précise de la juste valeur marchande du Tableau.

72.     Comme on omettait d'inclure dans la Liste les peintures auxquelles il est fait référence aux paragraphes 63, 65, 66 et 68 ci-dessus (ainsi que, sur la foi de renseignements tenus pour véridiques, d'autres informations importantes) (ensemble, les «Omissions importantes»), la Liste était en elle-même une déclaration fausse et trompeuse sur la juste valeur marchande du Tableau lorsque Tuchman et Dunow l'ont constituée.

73.     Tuchman et Dunow savaient que la Liste et les Omissions importantes qu'elle comportait constituaient des déclarations trompeuses. Ces déclarations étaient incomplètes et fausses au moment où elles ont été faites.

74.     Tuchman et Dunow ont en outre déclaré à Mme Jolles Shefner, à Mme Braun et à M. Barry Shefner que les portraits de Soutine étaient ses oeuvres les plus recherchées et que les peintures «Le Boeuf» étaient par conséquent de moins grande valeur.

75. Ces déclarations étaient fausses lorsque Tuchman et Dunow les ont faites en toute connaissance de cause. En effet, les peintures «Le Boeuf» sont parmi les plus reconnues, emblématiques et recherchées des oeuvres de Soutine.

76. La nature emblématique des peintures «Le Boeuf» en général – et du Tableau en particulier – est attestée par la photographie de couverture qui orne le livre de Tuchman et Dunow publié en 2002, *The Impact of Soutine*. Cette photo de couverture (dont copie certifiée conforme est jointe aux présentes à l'annexe B) est celle du Tableau. Suivant des renseignements tenus pour véridiques, la photographie utilisée par Tuchman et Dunow pour la couverture de leur livre est la diapositive en couleur que les Shefner avaient remise à Dunow à la fin des années 80. À aucun moment, avant la publication du livre *The Impact of Soutine*, Tuchman ou Dunow ne s'est adressé à Mme Jolles Shefner pour obtenir l'autorisation d'utiliser la photographie sur la couverture de leur livre. Ils ne lui ont pas dévoilé ce fait non plus après la publication du livre. En outre, Tuchman et Dunow n'ont jamais divulgué, que ce soit avant ou après la vente, le fait qu'ils avaient écrit le livre *The Impact of Soutine* et utilisé une photographie du Tableau pour sa couverture.

77. Ainsi, comme le savaient Tuchman et Dunow, le Tableau, compte tenu de sa nature emblématique et du fait qu'il s'agissait d'une oeuvre recherchée, valait beaucoup plus que les 800 000 $ qu'ils avaient offerts, offre que Tuchman et Dunow avaient faussement et frauduleusement qualifiée comme étant «exceptionnellement avantageuse».

78. Sur la foi de renseignements tenus pour véridiques, le Tableau valait – à la date où Mme Jolles Shefner l'a vendu sur les conseils de Tuchman et Dunow – au moins de 4 à 6 millions de dollars.

79.     Sur la foi de renseignements tenus pour véridiques, Tuchman et Dunow ont communiqué à nouveau avec Mme Jolles Shefner et Mme Braun à la fin de mars et début avril 2004 pour discuter de la vente du Tableau. En aucun temps durant cette période (ou ultérieurement) Tuchman or Dunow n'ont divulgué les Omissions importantes ou corrigé les déclarations trompeuses mentionnées ci-dessus.

80.     En aucun temps durant cette période ou ultérieurement Tuchman et Dunow n'ont divulgué à Mme Jolles Shefner ou à Mme Braun la juste et véritable valeur marchande du Tableau.

81.     D'ailleurs, bien qu'ils se soient proposés d'agir au nom de Mme Jolles Shefner et qu'ils aient incité Mme Jolles Shefner à se fier à eux à titre de plus grands experts au monde sur l'oeuvre de Soutine, Tuchman et Dunow ont délibérément caché la juste et véritable valeur marchande du Tableau à Mme Jolles Shefner et à ses enfants, dans le but d'inciter Mme Jolles Shefner à accepter une offre considérablement inférieure à sa juste valeur marchande.

82.     Le 23 avril 2004, Tuchman et Dunow envoient une nouvelle lettre à Mme Braun (la «Lettre du 23-4-04»). Ils augmentaient leur offre à 1 million de dollars (US).

83.     Suivant des renseignements tenus pour véridiques, Tuchman et Dunow avaient l'intention de vendre le Tableau à la National Gallery of Art (la «NGA»), ou à des personnes ou entités agissant pour le compte de la NGA, plutôt qu'à un consortium d'investisseurs européens.

84.     En aucun temps Tuchman et Dunow n'ont divulgué à Mme Jolles Shefner ou à ses enfants qu'ils agissaient pour le compte ou dans l'intérêt de la NGA.

85.     En aucun temps Tuchman et Dunow n'ont divulgué qu'ils planifiaient une vente du Tableau à eux-mêmes, à Lontrel Trading ou à la Galerie Cazeau-Béraudière, ou par leur entremise, avant de le vendre à la NGA.

86. Sur la foi de renseignements tenus pour véridiques, la NGA, ou les personnes ou entités agissant pour le compte de la NGA à qui Tuchman et Dunow avaient l'intention de vendre le Tableau, avait autorisé Tuchman et Dunow à acheter le Tableau pour le compte de la NGA pour une somme considérablement supérieure à 1 million de dollars.

87. Sur la foi de renseignements tenus pour véridiques, l'objectif de Tuchman et Dunow était d'inciter Mme Jolles Shefner – grâce au lien de confiance et de respect qu'ils avaient créé avec elle – à leur vendre le Tableau (ou à des personnes ou entités avec lesquelles ils avaient un lien, tel que Lontrel Trading ou la Galerie Cazeau-Béraudière) à un prix très bas et ensuite de revendre le Tableau à la NGA, ou à des personnes ou entités agissant pour le compte de la NGA ou d'un autre acheteur, à un prix considérablement plus élevé, de manière à ce Tuchman et Dunow puisse tirer de cette vente un profit considérable et/ou une autre forme de rémunération.

88. En aucun temps Tuchman et Dunow n'ont divulgué l'objectif mentionné ci-dessus ou encore leur intérêt financier dans la transaction à Mme Jolles Shefner, à Mme Braun ou à M. Barry Shefner.

89. Suivant des renseignements tenus pour véridiques, Tuchman et Dunow sont demeurés en contact – après la Lettre du 23-4-04 – avec Mme Jolles Shefner et Mme Braun toujours dans l'intention d'inciter Mme Jolles Shefner – utilisant les tactiques exposées ci-dessus (y compris la Liste) – à accepter leur prétendue offre de 1 million de dollars.

90. En mai 2004, les tactiques de Tuchman et Dunow aboutissent alors que Mme Jolles Shefner accepte de vendre le Tableau pour 1 million de dollars.

**Tuchman et Dunow revendent rapidement le Tableau pour au moins le double du prix d'achat**

91. Le ou vers le 28 avril 2004, Tuchman et Dunow, ou autres parties sous leur contrôle, ont fait en sorte que le Tableau soit envoyé à New York, prétendument pour inspection par l'acheteur potentiel. Suivant des renseignements tenus pour véridiques, cet acheteur était NGA ou autres personnes ou entités agissant de concert pour le compte de la NGA.

92. Ainsi, Tuchman et Dunow (ainsi que la Galerie Cazeau-Béraudière et/ou Lontrel Trading) ont planifié l'envoi du Tableau à l'Hôtel Plaza Athénée à New York. Ils n'ont jamais dévoilé le lieu de destination à Mme Jolles Shefner. Ils ont plutôt déclaré, à elle et à ses enfants, que le Tableau leur serait envoyé à eux ou à leurs mandataires pour inspection et authentification. Suivant des renseignements tenus pour véridiques, Tuchman et Dunow ont planifié l'envoi du Tableau à l'Hôtel Plaza Athénée de manière à le montrer à cet endroit à la NGA et pour négocier une revente rapide qui génèrerait pour eux un profit considérable ou une autre forme de rémunération.

93. Conformément à des documents que la Succession a découverts récemment, il appert que l'envoi du Tableau à l'Hôtel Plaza Athénée a été fait, assuré et reçu par IFL, la société de transport retenue ou engagée par la Galerie Cazeau-Béraudière. Toutefois, Tuchman et Dunow n'avait jamais dévoilé à Mme Jolles Shefner que la Galerie Cazeau-Béraudière participait à la vente du Tableau de quelque façon que ce soit. Ils avaient plutôt déclaré à Mme Jolles Shefner que l'acheteur était Lontrel Trading, qui semble être une société de transport suisse se spécialisant en arts. Suivant des renseignements tenus pour véridiques, Lontrel Trading agissait, en tout temps, sous la direction et pour le compte de Tuchman, Dunow ou de la Galerie Cazeau-Béraudière.

94. Tuchman et Dunow ont ensuite informé Mme Jolles Shefner que le Tableau avait passé l'inspection et, le ou vers le 7 mai 2004, M. Barry Shefner a signé, au nom de Mme Jolles Shefner, un contrat de vente conditionnel (le «Contrat de vente»)

pour le Tableau. Le prix de vente indiqué dans le Contrat de vente était de 1 million de dollars et le nom de l'acheteur indiqué était «Lontrel Trading c/o Alain Disch».

95.    M. Barry Shefner agissait à tout moment, pour la vente du Tableau, à titre d'intermédiaire pour sa mère, Mme Jolles Shefner, et sous sa direction, un fait que connaissaient à la fois Tuchman et Dunow. M. Shefner informait à tout moment Mme Jolles Shefner du contenu des communications qu'il avait avec Tuchman ou Dunow.

96.    Tout comme sa mère et sa soeur, M. Barry Shefner était lui aussi un néophyte dans le monde des arts, un fait qui, suivant des renseignements tenus pour véridiques, était connu de Tuchman et Dunow.

97.    Lors d'une conversation téléphonique à peu près au moment de la signature du Contrat de vente, Tuchman et Dunow ont déclaré à M. Barry Shefner que le présumé acheteur était un groupe d'investisseurs privés de la Suisse, ou un groupe les représentant, et que ce groupe pourrait avoir de la difficulté à payer le prix d'achat en un seul versement. Tuchman et Dunow ont ensuite demandé pour des modalités de paiement, demande que M. Barry Shefner a rejetée au nom de sa mère.

98.    À aucun endroit dans le contrat de vente (que Tuchman et Dunow ont rédigé) Tuchman et Dunow ne divulguent la participation à la vente de la Galerie Cazeau-Béraudière ou de qui que ce soit d'autre.

99.    Conformément au Contrat de vente, un virement électronique d'un montant d'un million de dollars a été effectué le 18 mai 2004 dans le compte bancaire de Mme Jolles Shefner. Le titre de propriété du Tableau passait alors apparemment à Lontrel Trading (du moins selon les informations que Tuchman et Dunow avaient données à Mme Jolles Shefner). En réalité, Tuchman et Dunow (et autres agissant avec

eux, dont Lontrel Trading et la Galerie Cazeau-Béraudière), suivant des renseignements tenus pour véridiques, se sont appropriés le titre du Tableau et ont entrepris le processus de sa revente à la NGA.

100. D'ailleurs, la NGA a admis qu'elle avait entamé les procédures pour faire l'acquisition du Tableau en «mai et juin 2004», soit à peu près au moment où Tuchman et Dunow ont incité Mme Jolles Shefner à leur vendre le Tableau ou à le vendre à d'autres agissant en leur nom.

101. Suivant des renseignements tenus pour véridiques, la NGA décide d'acheter le tableau en «mai ou juin 2004» ou peu après. Le Tableau leur est livré en septembre 2004. Le ou vers le 1er octobre 2004, le conseil d'administration de la NGA approuve l'achat du Tableau de Tuchman, Dunow, Lontrel Trading et/ou de la Galerie Cazeau-Béraudière.

102. Le ou vers le 17 novembre 2004, la NGA effectue un virement électronique à Tuchman, à Dunow et/ou à la Galerie Cazeau-Béraudière et/ou à des personnes ou à des entités sous leur contrôle de manière à acheter d'eux le Tableau.

103. Suivant des renseignements tenus pour véridiques, la NGA, avant d'effectuer le transfert, a fait preuve de peu ou d'aucune diligence raisonnable relativement à la propriété ou l'authenticité du Tableau. D'ailleurs, bien que Mme Jolles Shefner était clairement nommée et inscrite comme la propriétaire du Tableau dans le *Catalogue Raisonné*, la NGA n'a pas exigé de preuve de Tuchman, de Dunow ou de la Galerie Cazeau-Béraudière sur la manière qu'ils avaient obtenu le Tableau.

104. Un tel manque de diligence raisonnable, suivant des renseignements tenus pour véridiques, ne rencontre pas les normes reconnues dans le domaine des arts, surtout lorsqu'une oeuvre d'art a déjà été vendue, comme cela a été le cas pour le Tableau, durant la période nazie. Les liens du Tableau avec la période nazie étaient

clairement mentionnés dans le *Catalogue Raisonné*. Suivant des renseignements tenus pour véridiques, la NGA avait en tout temps dans leur librairie une copie du *Catalogue Raisonné*, mais la NGA a soit négligé de le consulter en rapport avec l'achat du Tableau ou soit l'a consulté mais a rejeté de manière inappropriée l'information qu'il contenait concernant le Tableau.

105. La NGA soutient que le prix d'achat qu'elle a payé pour le Tableau était de 2 millions de dollars. Suivant des renseignements tenus pour véridiques, Tuchman et Dunow ont reçu une rémunération supplémentaire importante de la NGA pour avoir agi comme intermédiaires dans l'achat du Tableau.

106. Suivant des renseignements tenus pour véridiques, le prix d'achat payé par la NGA était bien en deçà de la juste valeur marchande du Tableau. Les ventes de tableaux comparables avant 2004 le démontrent bien (cas comparables qui n'étaient pas inclus dans la Liste).

107. Après l'acquisition du Tableau, le site Web de la NGA indiquait la provenance du Tableau en faisant simplement référence à «Maurice Tuchman». On a agi ainsi malgré la provenance clairement indiquée dans le *Catalogue Raisonné*, qui nommait Mme Jolles Shefner comme la dernière propriétaire reconnue du Tableau.

108. Vers le mois de novembre 2004, une nature morte de Soutine (pas de la série «Le Boeuf») s'est vendue pour plus de 5 millions de dollars. Suivant des renseignements tenus pour véridiques, cette peinture aurait dû faire l'objet d'une divulgation en tant qu'oeuvre comparable au Tableau, accompagnée d'une estimation de sa juste valeur marchande, surtout si l'on tient compte que Tuchman et Dunow devaient savoir à ce moment que cette toile serait mise aux enchères.

109. Également vers le mois de novembre 2004, un portrait de Soutine s'est vendu pour une somme approximative de 6 millions de dollars. Suivant des

renseignements tenus pour véridiques, cette peinture aurait dû faire l'objet d'une divulgation en tant qu'oeuvre comparable au Tableau, accompagnée d'une estimation de sa juste valeur marchande, surtout en tenant compte que Tuchman et Dunow devaient savoir à ce moment que cette toile serait mise aux enchères.

110. Préalablement à la présente demande en justice, la Succession a demandé à la NGA la restitution du Tableau ou, en lieu et place, le paiement d'une somme déterminée pour le motif, notamment, que la NGA n'était pas un acheteur à titre onéreux de bonne foi du Tableau.

111. La NGA a rejeté les demandes de la Succession.

**CHEF I**
**FRAUDE**
**(contre Tuchman et Dunow, la Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1-10)**

112. La Demanderesse réaffirme les paragraphes 1 à 111 ci-dessus comme s'ils étaient inclus en entier aux présentes.

113. Tuchman et Dunow, tel qu'indiqué ci-dessus, ont fait de nombreuses déclarations trompeuses importantes à Mme Jolles Shefner sur des faits actuels ou préexistants en ce qui concerne : (i) la juste valeur marchande du Tableau (sous forme, notamment, de la Liste très incomplète jointe à la Lettre du 26-3-04); et (ii) la qualification de l'offre qu'ils lui ont transmise pour son achat dans la Lettre du 26-3-04 et ailleurs.

114. Tuchman et Dunow ont également négligé de divulguer les faits suivants : (i) la juste valeur marchande du Tableau; (ii) le fait qu'ils allaient tirer un énorme profit ou une autre forme de rémunération importante de la vente du Tableau; (iii) le fait que la Liste jointe à la Lettre du 26-3-04 était très incomplète. Le manquement de Tuchman et

Dunow de divulguer ces renseignements a joué un rôle déterminant dans la décision de Mme Jolles Shefner de leur vendre le Tableau ou de le vendre par leur entremise.

115.    Tuchman et Dunow savaient que les déclarations trompeuses et les omissions mentionnées ci-dessus étaient mensongères au moment où elles ont sont survenues. Tuchman et Dunow ont en outre commis ces fausses déclarations et ces omissions avec l'intention que Mme Jolles Shefner se fie sur elles à son désavantage.

116.    De plus, Tuchman et Dunow comptaient sur l'âge avancé de Mme Jolles Shefner et sur le fait qu'elle n'était plus active dans le milieu des affaires depuis plusieurs années pour réussir à commettre une fraude à son égard.

117.    Mme Jolles Shefner s'est basée sur les fausses déclarations et sur les omissions de Tuchman et Dunow, à son désavantage,  pour vendre le Tableau pour une somme considérablement inférieure à sa juste valeur marchande. La confiance de Mme Jolles Shefner envers Tuchman et Dunow à cet égard était raisonnable, considérant que : (i) Tuchman et Dunow étaient et sont encore les plus grands experts au monde sur l'oeuvre de Soutine; (ii) Mme Jolles Shefner était au courant de ce fait; (iii) Tuchman et Dunow avaient entretenu avec elle durant plusieurs années une relation basée sur la confiance et le respect.

118.    Mme Jolles Shefner a, par conséquent, subi un dommage d'un montant qui sera déterminé en cours de procès.

119.    La conduite de Tuchman et Dunow à cet égard était intentionnelle, malveillante et malicieuse et entreprise en faisant volontairement abstraction des droits et des intérêts de Mme Jolles Shefner. Pour cette raison, il est justifié de rendre une décision exigeant le paiement de dommages intérêts punitifs par Tuchman et Dunow.

120. En conséquence, la Demanderesse est en droit d'obtenir un jugement en sa faveur pour des dommages intérêts compensatoires et punitifs d'un montant qui sera déterminé au procès, mais qui ne sera pas inférieur à un million de dollars.

**COMPLOT AU CIVIL**

121. Suivant des renseignements tenus pour véridiques, la Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1-10 se sont délibérément associés à Tuchman et Dunow et se sont entendus avec eux pour inciter frauduleusement Mme Jolles Shefner à vendre le Tableau à un prix considérablement inférieur à sa juste valeur marchande, tel qu'il est indiqué ci-dessus.

122. Au cours de cette association et de cette entente, la Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1-10 ont partagé un but commun et ont sciemment agi de concert et en association pour inciter frauduleusement Mme Jolles Shefner à vendre le Tableau.

123. Suivant des renseignements tenus pour véridiques, le but de cette association et de cette entente et les moyens par lesquels la Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1-10 ont agi de concert et en association avec Tuchman et Dunow étaient illicites.

124. Dans ce complot, la Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1-10, ainsi que Tuchman et Dunow, ont agi avec malveillance et avec intention de commettre une fraude.

125. Comme conséquence directe et immédiate de ce complot, et de la fraude sous-jacente, Mme Jolles Shefner et la Succession ont subi des dommages et subiront des dommages supplémentaires d'un montant qui sera prouvé au cours du procès.

126. La Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1-10 sont par conséquent conjointement et individuellement responsables des dommages subis par Mme Jolles Shefner et la Succession en raison du complot et de la fraude sous-jacente contre Mme Jolles Shefner, tel qu'il est mentionné ci-dessus.

127. En outre, la conduite de la Galerie Cazeau-Béraudière, de Lontrel Trading, et de John Does 1-10 à cet égard était intentionnelle, malveillante et malicieuse et entreprise en faisant volontairement abstraction des droits et des intérêts de Mme Jolles Shefner. Pour cette raison, il est justifié de rendre contre eux une décision exigeant le paiement de dommages intérêts punitifs.

**CHEF II**
**ENRICHISSEMENT INJUSTIFIÉ**
**(contre les défendeurs)**

128. La Demanderesse réaffirme les paragraphes 1 à 127 ci-dessus comme s'ils étaient inclus en entier aux présentes.

129. Tuchman et Dunow ont incité frauduleusement Mme Jolles Shefner à leur vendre le Tableau ou à le vendre par leur entremise à un prix considérablement inférieur à sa juste valeur marchande. De plus, Tuchman et Dunow comptaient sur l'âge avancé de Mme Jolles Shefner et sur le fait qu'elle n'était plus active dans le milieu des affaires depuis plusieurs années pour commettre une fraude à son égard.

130. Tuchman, Dunow, la Galerie Cazeau-Béraudière, Lontrel Trading et un ou plusieurs des John Does 1-10 ont ensuite revendu le Tableau à la NGA ou à d'autres personnes ou entités pour le compte de la NGA (ou à un autre acheteur) pour une somme considérablement plus élevée, en conservant pour eux la différence. Suivant des renseignements tenus pour véridiques, Tuchman, Dunow, la Galerie Cazeau-

Béraudière et/ou Lontrel Trading ont également reçu une commission importante ou autre forme de rémunération pour cette vente.

131.    Suivant des renseignements tenus pour véridiques, la NGA a acheté le Tableau en négligeant de manière irresponsable les circonstances par lesquelles Tuchman, Dunow, la Galerie Cazeau-Béraudière et/ou Lontrel Trading sont entrés en possession du Tableau.

132.    Il serait inéquitable que quelqu'un de Tuchman, Dunow, la Galerie Cazeau-Béraudière, Lontrel Trading ou John Does 1-10 conserve les profits obtenus en fraudant Mme Jolles Shefner et ensuite en revendant le Tableau à un prix plus élevé et/ou en recevant une commission ou une rémunération pour cette revente.

133.    De plus, il serait inéquitable que la NGA conserve les avantages qu'elle a tirés de l'achat du Tableau, en raison de la négligence irresponsable dont elle a fait preuve relativement aux circonstances frauduleuses par lesquelles l'un ou l'autre des défendeurs est entré en possession du Tableau.

134.    Il y a donc eu par conséquent un enrichissement injustifié des Défendeurs, d'un montant qui sera déterminé lors du procès.

135.    En conséquence de cet enrichissement injustifié direct et immédiat, la Demanderesse a subi des dommages et subira des dommages supplémentaires d'un montant qui sera déterminé au procès. La Demanderesse a subi un préjudice irréparable et continuera subir un tel préjudice jusqu'à ce que l'on ordonne aux Défendeurs de rembourser les fonds et autre(s) avantage(s) que leur a procuré cet enrichissement injustifié.

136.    La Demanderesse n'a aucun recours en justice adéquat.

137. En conséquence, la Demanderesse est en droit d'obtenir un jugement en sa faveur pour des dommages intérêts compensatoires d'un montant qui sera déterminé au procès, mais qui ne sera pas inférieur à un million de dollars.

**CHEF III**
**JUGEMENT DÉCLARATOIRE**
**(contre les Défendeurs)**

138. La Demanderesse réaffirme les paragraphes 1 à 137 ci-dessus comme s'ils étaient inclus en entier aux présentes.

139. La Demanderesse a présenté un résumé des prétentions ci-dessus à Tuchman, à Dunow et à la NGA dans un effort pour tenter de récupérer le Tableau. Les Défendeurs ont tous nié avoir commis une faute relativement aux allégations ci-dessus et la NGA, en particulier, a rejeté la demande de la Demanderesse de remettre le Tableau.

140. En conséquence, il existe vraiment un litige ou un différend entre la Succession, la NGA et les autres Défendeurs, en ce sens que chaque défendeur affirme qu'il (et/ou une entité avec laquelle il était lié) avait ou qu'il pouvait transférer un titre valable et marchand sur le Tableau tandis que la Succession affirme qu'aucun des acheteurs n'est un acquéreur de bonne foi à titre onéreux.

141. De plus, la Succession doit assumer des frais et demeurer dans l'incertitude, en ce sens qu'il est impossible d'administrer et fermer la Succession tant que le litige relatif au titre du Tableau et à la fraude commise à l'endroit de Mme Jolles Shefner ne sera pas réglé.

142. La Succession base ses allégations d'absence de bonne foi de la part de Tuchman, Dunow, la Galerie Cazeau-Béraudière, Lontrel Trading et John Does 1 à 10 sur le fait qu'ils se sont engagés dans un complot frauduleux, tel que mentionné ci-

dessus, dans le but d'inciter Mme Jolles Shefner à vendre le Tableau à un prix inférieur à sa juste valeur marchande. Tuchman et Dunow comptaient en outre sur l'âge avancé de Mme Jolles Shefner et de son retrait du milieu des affaires pour réaliser la fraude à son égard.

143. La Succession base ses allégations d'absence de bonne foi de la part de la NGA sur le fait que celle-ci a fait preuve de peu ou d'aucune diligence raisonnable relativement à l'achat du Tableau et qu'elle a acquis le Tableau en négligeant de manière irresponsable les circonstances par lesquelles il a été mis en vente.

144. Suivant des renseignements tenus pour véridiques, les manquements de la NGA à cet égard sont contraires aux normes de diligence raisonnable généralement acceptées dans le domaine, surtout si l'on tient compte des faits suivants : (i) Mme Jolles Shefner était indiquée comme la dernière propriétaire reconnue du Tableau avant que la NGA ne l'achète; et (ii) le Tableau avait changé de propriétaire pendant la période nazie, changement qui généralement requiert un plus haut niveau de diligence quant à la provenance.

145. Suivant des renseignements tenus pour véridiques, si la NGA avait fait preuve du niveau de diligence approprié, elle aurait découvert la fraude commise par Tuchman, Dunow, la Galerie Cazeau-Béraudière et autres à l'endroit de Mme Jolles Shefner .

146. En conséquence, la Demanderesse est en droit d'obtenir un jugement déclaratoire en sa faveur statuant qu'aucun des Défendeurs n'est et n'a jamais été un acheteur de bonne foi à titre onéreux du Tableau (ou un acheteur dans le cours normal des affaires aux termes de l'UCC) et que le Tableau doit être retourné à la Succession.

**CHEF IV**
**DEMANDE DE RESTITUTION**
**(contre la NGA)**

147.    La Demanderesse réaffirme les paragraphes 1 à 146 ci-dessus comme s'ils étaient inclus en entier aux présentes.

148.    Tel que mentionné ci-dessus,  un ou plusieurs des Défendeurs ont fraudé Mme Jolles Shefner en l'incitant à vendre le Tableau pour un prix très inférieur sa juste valeur marchande.

149.    Tel que mentionné également ci-dessus, en raison de cette fraude et du manque de diligence raisonnable dont a fait preuve la NGA, cette dernière n'était pas un acheteur de bonne foi à titre onéreux du Tableau.

150.    En conséquence, la NGA n'a pas un titre valable et marchand pour le Tableau ni aucun droit à sa possession actuelle.

151.    Au contraire, la Succession possède un titre valable et marchand du Tableau ainsi que le droit d'en avoir la possession immédiate. Le Tableau doit par conséquent être retourné à la Succession.

152.    La Succession a demandé le retour du Tableau. Toutefois, la NGA a rejeté indûment la demande de la Succession et elle est actuellement en possession en contrôle du Tableau.

153.    En conséquence, la Demanderesse est en droit d'obtenir un jugement en sa faveur contre la NGA, ordonnant à cette dernière de rendre le Tableau à la Succession.

**CHEF V**
**ANNULATION DU CONTRAT**
**(contre Lontrel Trading)**

154. La Demanderesse réaffirme les paragraphes 1 à 153 ci-dessus comme s'ils étaient inclus en entier aux présentes.

155. Tel que mentionné ci-dessus au Chef I, Lontrel Trading était un coconspirateur dans la fraude à l'encontre de Mme Jolles Shefner.

156. En conséquence, Lontrel Trading ne peut posséder un titre valable et marchand du Tableau.

157. En outre, comme la vente a été incitée par la fraude perpétrée par Tuchman et Dunow – dans laquelle Lontrel Trading était un coconspirateur – le Contrat de vente n'est pas valide et doit être annulé.

158. En conséquence, la Demanderesse est en droit d'obtenir un jugement en sa faveur ordonnant l'annulation du Contrat de vente entre Mme Jolles Shefner et Lontrel Trading.

POUR CES MOTIFS, la Demanderesse demande jugement comme suit :

(i) sur le premier chef contre Tuchman, Dunow, la Galerie Cazeau-Béraudière, Lontrel Trading et autres ayant agi de concert avec eux, le versement de dommages intérêts compensatoires et punitifs d'un montant qui sera déterminé lors du procès;

(ii) sur le deuxième chef contre tous les défendeurs, le versement de dommages intérêts compensatoires d'un montant qui sera déterminé lors du procès;

(iii) sur le troisième chef, un jugement déclaratoire contre tous les Défendeurs statuant qu'aucun d'entre eux n'a jamais été un acheteur à

37

titre onéreux de bonne foi du Tableau et que le Tableau devrait être retourné à la Succession;

(iv) sur le quatrième chef, un jugement contre la NGA ordonnant la remise du Tableau à la Succession;

(v) sur le cinquième chef, un jugement contre Lontrel Trading annulant le Contrat de vente en raison de la fraude perpétrée contre Mme Jolles Shefner;

(vi) accorder à la Demanderesse les frais raisonnables d'avocats et les dépens pour la présente action en justice, ainsi que les intérêts avant jugement et après jugement sur ceux-ci dans la mesure autorisée par la loi;

(vii) accorder à la Demanderesse toute autre forme de réparation que la cour considère juste et adéquate en les circonstances..

Fait à : New York, New York
Le 12 mai 2008

ALSTON & BIRD LLP

Par : ______________________

Karl Geercken (KG 5897)
F. Paul Greene (FG 1837)
90 Park Avenue
New York, New York 10016
(212) 210-9400

*Avocats pour la Succession de Mme Lorette Jolles Shefner*

30730115

Je certifie par la présente que la traduction ci-dessus a été faite :

☐ du document original

☐ d'une copie du document original

écrit en langue ...anglaise.................

La traduction est fidèle et correspond à tous égards audit document.

N° d'enr. de l'Association 8-TA-0338

Traducteur : SK
HEBERT, Charles

Déclaré solennellement et signé devant moi dans la Ville de Montréal, Province de Québec, en ce ...14e..... jour de ..mai..................... de l'année 2008......

COMMISSAIRE À L'ASSERMENTATION
Paul KELENY 128 438
COMMISSIONER OF OATHS
A.T.I.J. / A.L.C.I.T.
440 EST, RUE ST-ANTOINE
MONTRÉAL H2Y 1A5 CANADA
TÉL.: (514) 845-3111 FAX: (514) 845-3006
Pour tous les districts judiciaires du Québec et pour l'extérieur du Québec.
For all the judicial districts of Quebec and for outside of Quebec.

ASSOCIATION DES TRADUCTEURS ET INTERPRÈTES JUDICIAIRES
ASSOCIATION OF LEGAL COURT TRANSLATORS AND INTERPRETERS

440 est, Saint-Antoine, Montréal, Qc, Canada H2Y 1A5
Tel. : (514) 845-3111 Fax : (514) 845-3006

# PIECE A L'APPUI A

209 West 86 Street
New York, NY 10024
Tel./Fax :212 496.1966

Ariella Braun
941 Park Avenue
New York, NY 10028

Le 26 mars 2004

Chère Madame,

Nous venons de recevoir une offre ferme de 800.000 USD pour votre *Beef*, sous réserve d'un examen normal.

Il s'agit d'une occasion exceptionnellement avantageuse pour vous, à notre avis. Nous espérons que vous la considérerez sérieusement et attentivement.

Nous restons à votre disposition pour vous prêter assistance au mieux de nos capacités.

Veuillez nous appeler ou nous écrire. L'adresse et le numéro d'Esti sont indiqués ci-dessus; Maurice peut être joint au 212 452.9101 (tél.) / 212 452.9102 (télécopie).

Veuillez croire, Chère Madame, à l'expression de nos sincères salutations.

*[Signatures]*

Esti Dunow et Maurice Tuchman

Nature morte aux harengs (Still Life with Herrings) 1917
Christie's, NY – 5 nov. 2003 — 130.700 USD

Les Pintades (Fowl) 1926-27
Christie's, NY – 8 mai 2003 — 113.525 USD

Glaïeuls (Gladiolas) 1919
Christie's, NY – 8 mai 2003 — 89.625 USD

Nature morte aux fruits (Still Life with Fruits) 1922
Christie's, Londres – 25 juin 2002
Estimation : 219 – 292.000 USD — Racheté (PAS VENDU)

La Cruche aux roses (Roses) 1918
Christie's, Londres – 9 avril 2002 — 202.945 USD

Nature morte au chou rouge (Still Life with Red Cabbage) 1918
Phillips, NY – 5 nov. 2002
Estimation : 200 – 300.000 USD — Racheté (PAS VENDU)

Oie Plumée (Plucked Goose) 1926-27
Sotheby's, Londres – 27 juin 2001
Estimation : 48 – 62.000 USD — Racheté (PAS VENDU)

Canard pendu (Hanging Duck)
Christie's, NY – 10 mai 2001
Estimation : 60 – 80.000 USD — Racheté (PAS VENDU)

Le lièvre sur fond bleu (Rabbit/Hare) 1924-25
Canard, Florence – 3 avril 2001
Estimation : 69 – 97.000 USD — Racheté (PAS VENDU)

Le vase de fleurs (Vase of Flower) 1918
Sotheby's, Londres – 6 février 2001
Estimation : 88 – 118.000 USD — Racheté (PAS VENDU)

Nature morte au chou rouge (Still Life with Red Cabbage) 1918
Sotheby's, NY – 11 mai 2000 — 159.750 USD

Nature morte aux deux perdrix rouges (Still Life with Fowl) 1918
Christie's, NY – 9 nov. 1999
Estimation : 140 – 180.000 USD — Racheté (PAS VENDU)

Le lièvre (Rabbit/Hare) 1918
Christie's, NY – 9 nov. 1999
Estimation : 100 – 150.000 USD — Racheté (PAS VENDU)

| | |
|---|---|
| L'étal de boucherie (Butcher Stall with Beef) 1919<br>Christie's, NY – 9 nov. 1999<br>Estimation : 180 – 220.000 USD | Racheté (PAS VENDU) |
| Nature morte à la coupe de fruits (Still Life with Fruit) 1916<br>Christie's, NY – 9 nov. 1999 | 140.000 USD |
| Les glaïeuls (Gladiolas) 1919<br>Sotheby's, Tel Aviv – 8 oct. 1998 | 244.500 USD |
| Oie Plumée (Plucked Goose) 1926-27<br>Christie's, Londres – 2 juillet 1998 | 72.190 USD |
| Les Pintades (Fowl) 1926-27<br>Loudmer, Paris - 19 juin 1997 | 157.628 USD |
| Le faisan (Pheasant) 1926<br>Christie's, NY – 15 mai 1997 | 36.800 USD |
| Nature morte aux fruits (Still Life with Fruits) 1922<br>Sotheby's, Londres – 4 déc. 1996 | 110.722 USD |
| Les glaïeuls (Gladiolas) 1919<br>Christie's, NY – 14 nov. 1996 | 74.000 USD |
| Bouquet de fleurs (Bouquet of Flowers) 1919<br>Christie's, Tel Aviv – 30 sept. 1996 | 96.000 USD |
| Nature morte aux poivrons et carottes (Still Life with Peppers and Carrots) 1918<br>Christie's, Tel Aviv – 14 avril 1996 | 90.500 USD |
| Nature morte à la soupière (Still Life with Soup Tureen) 1916<br>Christie's, Tel Aviv – 12 oct. 1995 | 145.500 USD |
| Nature morte au canard (Still Life with Duck) 1923<br>Christie's, Londres – 27 juin 1995 | 107.227 USD |
| ✓ Pièce de bœuf (Beef) 1922-23<br>Christie's, NY – 10 mai 1995 | <u>508.500 USD</u> |
| Les glaïeuls (Gladiolas) 1919<br>Christie's, NY – 10 mai 1995 | 354.500 USD |
| Les glaïeuls au pot bleu (Gladiolas)<br>Sotheby's, NY – 8 mai 1995 | 112.500 USD |

| | |
|---|---|
| Nature morte au faisan (Pheasant) 1918<br>Christie's, NY – 11 mai 1984 | 222.500 USD |
| Le canard, 1933-34<br>Christie's, Londres – 23 juin 1993 | 66.489 USD |

# PIÈCE À L'APPUI B

L'impact de

# Chaim Soutine

De Kooning, Pollock, Dubuffet, Bacon

J. MICHAEL McMAHON
GREFFIER DU TRIBUNAL

**COUR DE DISTRICT DES ETATS-UNIS**
DISTRICT SUD DE L'ETAT DE NEW YORK
500 PEARL STREET, NEW YORK, NY 10007
300 QUARROPAS STREET, WHITE PLAINS, NY 10601

WWW.NYSD.USCOURTS.GOV

# Règles et instructions pour le dépôt électronique de dossiers

Edition du 28 mai 2008

## INFORMATIONS IMPORTANTES POUR LES NOUVELLES AFFAIRES

Une partie déposant une nouvelle affaire au civil affectée au système de dépôt électronique de dossiers (*Electronic Case Filing* ou ECF) doit effectuer les formalités suivantes après avoir obtenu un numéro d'affaire civile :

1) envoyer par courriel une copie sous format PDF des documents introductifs d'instance au greffe du tribunal dans les 24 h suivant la remise des documents papier au tribunal et

2) faire signifier les documents introductifs d'instance à chacune des parties à l'action, ainsi qu'une copie des documents suivants :

   a) Règles et instructions pour le dépôt électronique de dossiers dans le district sud de l'Etat de New York (ci-jointes) et

   b) Les Pratiques habituelles du juge désigné pour l'instance.

Pour plus d'informations et pour connaître les adresses électroniques, voir la section 14 – Ouverture d'une action civile.